IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MELISSA FOOTLICK; ROBIN SIMKINS;
ERIN CLARK; TOBY ADAMSON; JAY
RUDMAN; AND GRIFFIN CAPRIO,

                Plaintiffs,

    v.                               Case No.

TOPSTEP LLC; PATAK HOLDINGS, INC.;
and MICHAEL PATAK, *in his individual
capacity*,

                Defendants.

## COMPLAINT

Plaintiffs Melissa Footlick, Robin Simkins, Erin Clark, Toby Adamson, Jay Rudman, and

Griffin Caprio (collectively "Plaintiffs"), by and through their attorneys Ian H. Fisher, Gillian G.

Lindsay and Michael A. Mayerck, and for their Complaint against Defendants Topstep LLC, Patak

Holdings, Inc., and Michael Patak (collectively "Defendants"), hereby state as follows:

## NATURE OF ACTION

1.      This action is filed by former employees of Defendant Topstep LLC ("Topstep").

2.      At all relevant times, Defendant Patak Holdings, Inc. ("Patak Holdings"), was the

sole Manager of Topstep.

3.      Patak Holdings is owned by Defendant Michael Patak ("Patak"). Patak was and is

the President of Patak Holdings and the sole Class A Member of Topstep.

4.      Throughout the course of Plaintiffs' employment with and/or service to Topstep,

Plaintiffs were offered Class B shares in the company to reward them for their excellent work and

accomplishments on behalf of Topstep ("Incentive Shares").

5.     Defendants continually touted the growth, health and profitability of Topstep, and the value of the Incentive Shares.

6.     Defendants' issuance of Incentive Shares was the first step in a scheme to defraud Plaintiffs.

7.     After Topstep issued the Incentive Shares, Defendants continually misrepresented the value of Topstep and the mechanics of the Incentive Shares.

8.     In January 2020, Defendants intended to restructure the business and enter into a new Operating Agreement, which required Plaintiffs' consent via execution of the new Operating Agreement.

9.     In an effort to further strip away rights, benefits, and value from the Incentive Shares, Defendants amended the Operating Agreement to include a provision whereby Plaintiffs' vested shares could be redeemed for $1, should the employee withdraw from the company or be terminated.

10.     In addition, Defendants stripped away all fiduciary duties within the Operating Agreement and eliminated Plaintiffs' rights to an independent appraisal of their units.

11.     Defendants negligently and fraudulently misrepresented the changes implemented in the Operating Agreement, by circulating the Amended and Restated Limited Liability Company Agreement as an attachment to an email explaining that other than tax reporting, "you will see nothing change and it will be 'business as usual.'"

12.     At various times after execution of the 2020 Operating Agreement, Plaintiffs withdrew, or were forced out, of Topstep.

13.     Thereafter, Defendants attempted to redeem Plaintiffs' vested Incentive Shares at valuations much lower than the fair market value of those shares.

14.　　Defendants also discriminated against the women Plaintiffs herein, providing valuations much lower than their male counterparts. Indeed, with respect to Ms. Adamson, Defendants claimed her Incentive Shares were worthless and offered a $1 redemption.

15.　　Plaintiffs have also uncovered that Patak and/or Patak Holdings have taken more than five-million dollars in special distributions from the company in the last two years.

16.　　Upon information and belief, Patak and/or Patak Holdings have transferred and used Topstep funds to fund new businesses and demonstrate higher balances in personal accounts in securing personal financing.

17.　　Plaintiffs bring this action to recover compensation they are rightfully entitled to, but due to Defendants fraudulent conduct, never received.

## JURISDICTION AND VENUE

18.　　This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Counts I and II arise under the laws of the United States, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et. seq.*; and the Equal Pay Act, 29 U.S.C. § 621, *et. seq.*

19.　　This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367 on the grounds that the state law claims are so related to the federal claims that they form a part of the same case or controversy.

20.　　This Court has personal jurisdiction over Defendants because they reside in, transact business in, otherwise have significant contacts with this District, and a substantial part of the events giving rise to these claims occurred in this District.

21.　　Venue is proper in this District as Defendants reside in, transact business in, otherwise have significant contacts with this District, and a substantial part of the events giving

rise to these claims occurred in this District.

22.     Footlick, Simkins, Clark, and Adamson timely filed charges of sex discrimination with the Equal Employment Opportunity Commission ("EEOC"), within 180 days after their termination or withdrawal from Topstep.

23.     Copies of Footlick, Simkins, and Clark's Notices of Right to Sue from the EEOC are attached hereto as Ex. A.

## THE PARTIES

### a. Topstep LLC

24.     Topstep is a Delaware Limited Liability Company.

25.     Topstep is the successor in interest to Patak Trading Partners, LLC ("Patak Trading Partners") and TopstepTrader, LLC ("TopstepTrader").

26.     Topstep's principal place of business is 141 W. Jackson Blvd., Suite 4240, Chicago, IL 60604.

27.     Topstep is comprised of two members, Topstep Holdings, LLC and Patak Holdings.

28.     Topstep is a financial technology firm that provides resources and "coaching" for aspiring futures traders.

### b. Patak Holdings, Inc.

29.     Patak Holdings is an Illinois corporation with its principal place of business located at 130 S. Jefferson, Suite 200, Chicago, IL 60661.

30.     At all relevant times, Patak Holdings was the sole Manager of TopstepTrader and Topstep, following the company's restructuring.

31.     At all relevant times, Michael Patak was the owner, Manager, and President of Patak Holdings, Inc.

### c. Michael Patak

32. Patak is the sole owner, Manager, and President of Patak Holdings, Inc.

33. At all relevant times, Patak served as TopstepTrader and Topstep's Chief Visionary Officer.

34. Following Jay Rudman's departure, Patak served as Chief Executive Officer of Topstep.

35. Upon information and belief, Patak resides in Pitkin County, Colorado.

### d. Melissa Footlick

36. From September 20, 2010 to approximately September 3, 2021, Melissa Footlick ("Footlick") was employed by Patak Trading Partners, TopstepTrader, and Topstep.

37. During her employment, Footlick was awarded Incentive Shares.

38. Footlick is a woman and resides in Johnson County, Kansas.

### e. Robin Simkins

39. Plaintiff Robin Simkins ("Simkins") was employed by TopstepTrader and Topstep from April 1, 2018 through August 2021.

40. During her employment, Simkins was awarded Incentive Shares.

41. Simkins is a woman and resides in Cook County, IL.

### f. Erin Clark

42. Plaintiff Erin Clark ("Clark") was employed by TopstepTrader and Topstep from approximately November 2012 through July 2, 2021.

43. During her employment, Clark was awarded Incentive Shares.

44. Clark is a woman and resides in Cook County, Illinois.

**g. Toby Adamson**

45.     From September 24, 2019 to May 25, 2022, Plaintiff Toby Adamson ("Adamson") was employed by TopstepTrader and Topstep.

46.     During her employment, Adamson was awarded Incentive Shares.

47.     Adamson is a woman and resides in Cook County, Illinois.

**h. Jay Rudman**

48.     Plaintiff Jay Rudman ("Rudman") was employed by TopstepTrader and Topstep from approximately 2016 through January 31, 2022.

49.     During his employment, Rudman was awarded Incentive Shares.

50.     Rudman resides in Cook County, Illinois.

**i. Griffin Caprio**

51.     Plaintiff Griffin Caprio ("Caprio") was an advisor of TopstepTrader and Topstep from December 2015 through February 2022.

52.     During that time, Caprio was awarded Incentive Shares.

53.     Caprio resides in Cook County, Illinois.

## FACTUAL BACKGROUND

*General Background*

54.     Topstep, originally named Patak Trading Partners, was founded in or around December 2009 by Patak.

55.     Topstep is a financial technology firm based in Chicago, Illinois.

56.     Topstep provides training and resources to customers desiring to become familiar with day-trading futures and foreign exchange contracts.

57.     Customers who pass Topstep's initial evaluation, known as the Trading Combine,

earn a funded trading account.

58.     These Topstep customers trade futures contracts in the financial markets using Topstep's capital.

59.     Plaintiffs herein were employed by or retained as advisors to Topstep at various times, none of Plaintiffs are current employees or advisors.

60.     Patak Trading Partners was later organized under the name TopstepTrader and subsequently Topstep.

61.     In exchange for their service to Topstep, Plaintiffs were all offered, at various times, Incentive Shares via Incentive Unit Award Agreements.

62.     Shares in Topstep were organized in two "Classes," Classes A and B. All of the Plaintiffs herein were awarded Class B units by Topstep's Manager, Patak Holdings.

63.     At all relevant times, Patak was the sole Class A member of Topstep.

64.     Within its onboarding materials, Topstep described the Incentive Shares as follows:

[I]n layman's terms, your incentive units are "profit interests" which means once vested, you have certain rights to Topstep's profits. These incentive units are not options. However, similar to an option's strike price, there is a "hurdle" (currently $16M). As of July 2019, Topstep's expected revenues for the year - confidentially - should approximate $15M. Assuming a multiple of 4x revenues, that hypothetically implies a buyer might pay $60M for Topstep. Thus, in this hypothetical example, each 1% interest in Topstep equates to $600,000 of value (not accounting for the profit hurdle). Amortized over a 4-year vesting period, that contributes $150,000 annually to your perceived total compensation. Furthermore, a change in control accelerates the vesting of incentive units, therefore potentially reducing the denominator when calculating per year compensation. Again, the example outlined above is hypothetical, but it is Topstep's current belief that its revenues, and therefore its value, will only continue to grow over time.

65.     Over time, Topstep's revenue and value grew vastly. Per example, the profit hurdle for Class B incentive shares increased as follows:

    a.  2017: $100,000;

b. 2018: $250,000;

c. 2019: $16,000,000;

d. 2020: $28,000,000.

***The 2016 Operating Agreement***

66.     On October 1, 2016, TopstepTrader entered into an Amended and Restated Operating Agreement ("2016 Operating Agreement").

67.     Section 6.07 of the 2016 Operating Agreement provides that "Each Manager shall discharge the Manager's duties to the Company and other Members in good faith and with that degree of care that an ordinarily prudent person in a similar position would use under similar circumstances."

68.     Section 8.07 of the 2016 Operating Agreement provides:

If any Person who was issued Class B Units ceases to be employed by the Company for any reason at any time, the Company shall have the right, but not the obligation, to purchase all of the Vested Class B Units that were issued to such Person (regardless of whether such Units are still held by the Person or have been Transferred in accordance with this Agreement) on the following terms: (1) for the Fair Market Value of such Class B Units at the time of such termination of employment unless an employee is terminated for cause or quits and goes to work for a direct competitor, or (2) for 0% of the Fair Market Value of such Class B Units at the time of such termination of employment if an employee is terminated for cause or if an employee quits and goes to work for a direct competitor.

69.     The definition section of the 2016 Operating Agreement defines "Fair Market Value," as "with respect to any property on a given date as determined in good faith by the Manager, the amount a willing buyer would pay a willing seller for such property, where neither the buyer nor the seller is under any compulsion to buy or sell and both are aware of all the material facts with respect to the property."

70.     Section 8.04 of the 2016 Operating Agreement provides that a member selling their incentive units may obtain up to three independent appraisals to determine the shares' fair market

value.

***The 2020 Restructuring and Amended Operating Agreement***

71.     Effective January 1, 2020, TopstepTrader and its related entities were restructured into Topstep and various subsidiaries.

72.     On March 30, 2020, Topstep emailed all members to describe the restructuring changes and obtain member consent. The correspondence from Melissa Elaguizy, Topstep's former Accounting Manager and Director of Finance, cc'ing CEO Jay Rudman and Michael Patak, provides that:

> [b]y restructuring, we are moving to a more organized business structure which provides all members benefits from all entities . . . [p]reviously, our Funded Trader entities (TopstepFX and TopstepFunded (FKA Patak Trading Partners) were solely owned by Michael Patak. However, this restructure moves these entities under the umbrella of Topstep LLC. This gives interest holders the benefits of having an interest in the company in its entirety, not piecemeal.

73.     In the same email, Topstep advised its members "As a profit interest holder, you may wonder what this means for you. Essentially, it just means you have ownership over TopstepTrader, and ALL its entities. Other than tax reporting . . . you will see nothing change and it will be 'business as usual.'"

74.     Topstep's March 30, 2020 email fraudulently misrepresented changes to the valuation and repurchase process of Class B Units.

75.     Specifically, the following changes were adopted in Topstep's January 1, 2020 Amended and Restated Limited Liability Company Agreement ("2020 Operating Agreement"):

> a.     The fair market value of the Class B units is determined solely by the discretion of Patak Holdings, and Class B Members' right to independent appraisal of units was eliminated;
>
> b.     All fiduciary duties were removed from Patak Holdings;

      c.      If the company terminates the employment of a Class B unit holder, or if a Class B unit holder withdraws from the company without "good cause," Topstep has an option to purchase the Class B unit holder's vested units at an aggregate price equal to $1.

76.      All of the Plaintiffs herein withdrew from Topstep following entry of the 2020 Operating Agreement and received Notices of Forfeiture of Unvested Units and Repurchase of Vested Units from Topstep.

77.      In each of the Notices of Forfeiture of Unvested Units and Repurchase of Vested Units, Patak Holdings fraudulently misstated the fair market value of the Class B Units.

78.      The valuation of Plaintiffs' vested Class B units in the Notices of Forfeiture of Unvested Units and Repurchase of Vested Units ran contrary to the distribution method used in each of Plaintiffs' Incentive Unit Award Agreements.

***Patak's Disregard of the Corporate Form***

79.      Patak disregarded the corporate form in his operation of Patak Holdings and Topstep.

80.      Patak used Patak Holdings and Topstep as if they were one company.

81.      Patak failed to adequately capitalize Topstep.

82.      Patak comingled resources between Patak Holdings and Topstep, resulting in inaccurate accounting for both companies.

83.      Patak knowingly misrepresented the fair market value of the companies and the Plaintiffs' incentive shares.

84.      Patak diverted Topstep resources and membership distributions to fund a separate company he founded and managed, Bluechxp, LLC, without members' knowledge or consent.

85.      Upon information and belief, Patak informally took $5 Million in personal distributions without notice to Topstep officers or stakeholders.

86.     Upon information and belief, Patak transferred distributions to into his personal accounts to reflect more liquidity in seeking approval for personal loans.

87.     Upon information and belief, Patak used inappropriate Topstep distributions to purchase a home in Aspen, CO.

88.     Upon information and belief, Patak misappropriated Topstep funds for his own use.

89.     Upon information and belief, Patak added non-employee family members to Topstep's payroll, allowing them to receive improper payments and benefits.

*Award of Plaintiffs' Incentive Shares, Vesting, and Redemption*

**a. Melissa Footlick**

90.      Footlick initially served as Recruitment Manager of Patak Trading Partners from approximately 2010-2012.

91.     Footlick served as Director of Operations of TopstepTrader from approximately 2012 through 2017.

92.     From 2017 through 2021, Footlick served as Chief Operating Officer of TopstepTrader and Topstep.

93.     In 2012, Footlick worked with Patak to create TopstepTrader. As a member of the founding leadership team, she helped build the company from the ground up and was responsible for defining and executing company strategy and vision.

94.     In 2013, as compensation for her outstanding performance, and to incentivize her to stay, Patak offered her 2,193,170 Class B units in TopstepTrader.

95.     On November 1, 2014, Footlick entered into an Incentive Unit Award Agreement with TopstepTrader, whereby she was granted 2,193,170 Class B units.

96.     As of November 1, 2014, Footlick's 2,193,170 units were fully vested.

97.     On November 26, 2019, Footlick entered into another Incentive Unit Award Agreement, which granted her a 0.25% profits interest for hitting certain EBITDA and revenue goals in 2019 and 2020, for a total of 1% profits interests, *i.e.,* 5,95,149 Incentive Units.

98.     Footlick achieved the milestones and the incentive units vested.

99.     On September 3, 2021, Footlick executed a Separation Agreement and General Release, but expressly reserved all rights and claims she may have against "Topstep LLC as a member of Company arising under: that certain Amended and Restated Limited Liability Company Agreement dated as of January 1, 2020; TopstepTrader LLC Amended and Restated Equity Incentive Plan dated October 1, 2016; TopstepTrader LLC Incentive Unit Award Agreement, dated November 26, 2019; Acknowledgement, dated January 1, 2020; and TopstepTrader, LLC Incentive Unit Award Agreement, dated November 1, 2014."

100.    On November 12, 2021, Topstep sent Footlick a Notice of Forfeiture of Unvested Class B Units and Repurchase of Vested Class B Units.

101.    In the Notice and Repurchase documents, Topstep's Manager, Patak Holdings determined the fair market value of the company at less than one-third of revenue for a partial year, January 1, 2021 through October 31, 2021.

102.    Footlick, through counsel, objected to the redemption and requested to review Topstep's books and records to understand the valuation, but Topstep refused to provide relevant information.

103.    Footlick did not execute the Notice of Forfeiture of Unvested Class B Units and Repurchase of Vested Class B Units.

**b. Robin Simkins**

104.    Simkins was employed as the Vice President of Marketing of TopstepTrader and

Topstep from April 1, 2018 through August 2021.

105.    During her tenure as Vice President of Marketing, Simkins led a high-functioning marketing department with low attrition. She transitioned the TopstepTrader brand from TopstepTrader to Topstep, establishing a new brand purpose and corresponding visual identity.

106.    On April 1, 2018, Simkins entered into an Incentive Agreement with Topstep whereby she was awarded 575,503 Class B shares.

107.    On November 12, 2021, Topstep sent Simkins a Notice of Forfeiture of Unvested Class B Units, Repurchase of Vested Class B Units, and a Subordinated Promissory Note.

108.    Topstep purportedly elected to purchase her 575,503 vested units.

109.    Topstep's Manager, Patak Holdings, determined the fair market value of the remaining vested shares at $36,820.00.

110.    Simkins, through counsel, objected to the redemption and requested to review Topstep's books and records to understand the valuation, but Topstep refused to provide relevant information.

111.    Simkins did not execute the Notice of Forfeiture of Unvested Class B Units and Repurchase of Vested Class B Units.

**c.  Erin Clark**

112.    From approximately November 2012 through 2015, Clark served as an Executive Assistant at TopstepTrader.

113.    From approximately 2015 to September 2018, Clark served as Customer Support Manager of TopstepTrader.

114.    From September 2018 through July 2, 2021, Clark served as the People and Culture Manager with TopstepTrader and Topstep, following the company's restructuring.

115.    As Executive Assistant, Clark's responsibilities included, customer support, IT, HR, and office management, *e.g.*, she oversaw and directed two office moves.

116.    As Customer Support Manager, Clark recruited, interviewed, hired, and trained talent. She created and implemented policies and strategic operational tools and protocols. For example, she implemented credit card processing, the payment gateway, a new phone system, and customer support ticketing software.

117.    As People and Culture Manager, Clark retained her responsibilities for recruiting, interviewing, hiring, onboarding, and training. She also took charge of the diversity and inclusion initiative as well as philanthropy and volunteering opportunities.

118.    On May 15, 2017, Clark entered into an Incentive Agreement with Topstep whereby she was awarded 281,222 Class B shares.

119.    On November 12, 2021, Topstep sent Clark a Notice of Forfeiture of Unvested Class B Units, Repurchase of Vested Class B Units, and a Subordinated Promissory Note.  Topstep purportedly elected to purchase her 281,222 vested units.

120.    Topstep's Manager, Patak Holdings, determined the fair market value of the remaining vested shares at $26,115.00, and elected to purchase them at that price.

121.    Clark, through counsel, objected to the redemption and requested to review Topstep's book and records to understand the valuation, but Topstep refused to provide relevant information.

122.    Clark did not execute the Forfeiture of Unvested Class B Units and Repurchase of Class B Units.

   **d.  Toby Adamson**

123.    Adamson was employed as Topstep's Vice President of Product from September

24, 2019 to May 25, 2022.

124.    As the Vice President of Product, Adamson spearheaded efforts to create and manage product strategy, provide a roadmap of Topstep's portfolio of products, created strategies to develop growth into other markets, and managed the team that defined the requirements for produce enhancements.

125.    In November 2021, Adamson also lead Topstep's technical team, assisting in product engineering.

126.    On November 2, 2020, Adamson entered into an Incentive Agreement with Topstep whereby she was awarded 300,630 Class B shares.

127.    On July 7, 2022, Topstep sent Adamson a Notice of Forfeiture of Unvested Class B Units and Repurchase of Vested Units. Therein, Topstep purportedly elected to purchase her 150,315 vested units and alleged that the remainder of her 150,315 unvested units were forfeited.

128.    Topstep's Manager, Patak Holdings determined the fair market value of the remaining vested shares to be $0. Topstep indicated it was willing to buy the vested shares at a price of $1.

129.    Adamson objected to the redemption and requested to review Topstep's books and records to understand the valuation, but Topstep refused to provide relevant information.

130.    Adamson did not execute the Notice of Forfeiture of Unvested Class B Units and Repurchase of Vested Class B Units.

**e. Jay Rudman**

131.    Rudman joined TopstepTrader in 2016 as a pro bono mentor.

132.    Rudman then served as TopstepTrader and Topstep's Chief Growth Officer and ultimately Chief Executive Officer ("CEO") from approximately 2017 through January 31, 2022.

133. As CEO, Rudman grew Topstep's revenue 5-6 times in five years and maintained double-digit EBITDA, without taking in any investment dollars.

134. On March 1, 2017, Rudman entered into an Incentive Unit Award Agreement with TopstepTrader, whereby he was awarded 1,105,312 Class B units.

135. On March 16, 2018, Rudman entered into a second Incentive Unit Award Agreement with TopstepTrader, whereby he was awarded 1,151,007 Class B units.

136. On August 22, 2019, Rudman entered into a third Incentive Unit Award Agreement with TopstepTrader, whereby he was awarded 1,190,297 Class B units.

137. On January 8, 2021, Rudman entered into a fourth Incentive Unit Award Agreement with Topstep, whereby he was awarded 1,237,122 Class B units.

138. In 2021, Rudman was a finalist for 1871's "Outstanding Tech CEO Award."

139. On July 14, 2022, Topstep sent Rudman a Notice of Repurchase of Vested Class B Units.

140. The Notice of Repurchase of Class B Units provided that 1,237,122 Class B units awarded under the fourth Incentive Unit Award Agreement were unvested and forfeited without payment.

141. Topstep provided that its Manager, Patak Holdings, valued the 2,256,319 vested units awarded under the first and second Incentive Unit Award Agreements at $146,895.00.

142. Topstep provided that its Manager, Patak Holdings valued the 1,190,297 vested units under the third Incentive Unit Award Agreement at $0, but would purchase the same for $1.

143. Rudman objected to the redemption and requested to review Topstep's books and records to understand the valuations, but Topstep refused to provide relevant information.

144. Rudman did not execute the Notice of Repurchase of Class B Units.

### f. Griffin Caprio

145. Caprio served as an Advisory Board Member to TopstepTrader and Topstep from approximately December 2015 through February 2022.

146. Caprio used his experience in technology, product and marketing to advise and scale Topstep.

147. On May 28, 2017, Caprio entered into an Incentive Unit Award Agreement with TopstepTrader, whereby he was awarded 133,231 Class B units.

148. On October 1, 2017, Caprio entered into a second Incentive Unit Award Agreement with TopstepTrader, whereby he was awarded 139,559 Class B units.

149. On July 14, 2022 Topstep sent Caprio a Notice of Repurchase of Vested Class B Units.

150. The Notice of Repurchase of Class B units provided that Topstep's Manager, Patak Holdings, valued Caprio's 272,790 vested units at $18,788.00 and chose to purchase the units at that price.

151. Caprio objected to the redemption and requested to review Topstep's books and records to understand the valuations, but Topstep refused to provide relevant information.

152. Caprio did not execute the Notice of Repurchase of Vested Class B Units.

### COUNT I – TITLE VII
### (Footlick, Simkins, & Clark v. Topstep)

153. Footlick, Simkins, and Clark ("Title VII Plaintiffs") hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

154. Topstep is an employer as defined under Title VII.

155. The Title VII Plaintiffs were employees of Topstep.

156. Topstep intentionally discriminated against the Title VII Plaintiffs by, including but

not limited to, treating them less favorably than male employees by redeeming their Class B shares at values less than those paid to male employees, in violation of Title VII, 42 U.S.C. § 2000e-2(a).

157.    Topstep acted with malice and/or reckless indifference to Title VII Plaintiffs' federally protected rights to be free from such discrimination.

158.    As a direct and proximate result of Topstep's unlawful conduct, Title VII Plaintiffs have been injured and are entitled to judgment and compensation pursuant to Title VII.

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Topstep and compensatory damages, punitive damages, attorney's fees and costs, and pre- and post-judgment interest in an amount to be proven at trial, plus injunctive and other relief.

## COUNT II – EQUAL PAY ACT
### (Footlick, Simkins, Clark, & Adamson v. Topstep)

159.    Plaintiffs Footlick, Simkins, Clark, and Adamson ("EPA Plaintiffs") hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

160.    Topstep is an employer as defined under the Equal Pay Act.

161.    The EPA Plaintiffs were employees of Topstep.

162.    The conditions of ownership and valuation of Class B units were substantially the same, if not identical to EPA Plaintiffs' similarly situated male colleagues.

163.    Topstep compensated EPA Plaintiffs at a substantially lower amount than their male counterparts, by redeeming their Class B units at values less than those paid to similarly situated male employees, in violation of 29 U.S.C. § 206(d).

164.    EPA Plaintiffs received the lower valuations despite the same valuation procedure purportedly applying to all employees.

165.    Topstep acted with malice and/or reckless indifference to EPA Plaintiffs' federally protected right to be free from such discrimination.

166.    As a result of Topstep's discriminatory conduct, EPA Plaintiffs have been damaged and are entitled to compensation.

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Defendants and lost compensation and liquidated damages, attorney's fees and costs, and pre-and post-judgment interest in an amount to be proven at trial.

### COUNT III – ILLINOIS EQUAL PAY ACT
**(Footlick, Simkins, Clark, & Adamson v. Topstep)**

167.    Plaintiffs Footlick, Simkins, Clark, and Adamson ("IEPA Plaintiffs") hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

168.    Topstep is an employer as defined under the Illinois Equal Pay Act.

169.    IEPA Plaintiffs were employees of Topstep.

170.    The conditions of ownership and valuations of Class B units were substantially the same, if not identical to IEPA Plaintiffs' similarly situated male colleagues.

171.    The IEPA Plaintiffs entered into Equity Incentive Agreements and the 2020 Operating Agreement with Topstep.

172.    Under the Equity Incentive Agreements and 2020 Operating Agreement, Topstep redeemed IEPA Plaintiffs' Class B shares at a valuation substantially lower than their similarly situated male counterparts.

173.    Topstep acted with malice and/or reckless indifference to IEPA Plaintiffs' protected right to be free from such discrimination, in violation of 820 ILCS § 112, *et. seq.*

174.    As a result of Topstep's discriminatory conduct, IEPA Plaintiffs have been damaged and are entitled to compensation pursuant to 820 ILCS § 112/30.

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Defendants and actual damages, compensatory damages, punitive damages, civil penalties,

attorney's fees and costs, and pre-and post-judgment interest in an amount to be proven at trial, plus injunctive relief.

## COUNT IV – ILLINOIS HUMAN RIGHTS ACT
### (Footlick, Simkins, Clark, & Adamson v. Topstep)

175.    Footlick, Simkins, Clark, and Adamson ("IHRA Plaintiffs") hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

176.    Topstep is an employer under the IHRA.

177.    The IHRA Plaintiffs were employees under the IHRA.

178.    As women, IHRA Plaintiffs are members of a protected class under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101, *et. seq.*

179.    While employed with Topstep, IHRA Plaintiffs excelled in their duties, helping increase the growth and profitability of the company.

180.    Defendants intentionally discriminated against the IHRA Plaintiffs by, including but not limited to, treating them less favorably than male employees by redeeming their Class B shares at values less than those paid to male employees, in violation of the IHRA.

181.    As a direct and proximate result of Defendants' unlawful conduct, IHRA Plaintiffs have been injured and are entitled to judgment and compensation pursuant to the IHRA.

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Defendants and actual damages, punitive damages, preliminary and permanent injunction, attorney's fees and costs, pre and post-judgment interest, and civil penalties, in an amount to be proven at trial.

## COUNT V  – BREACH OF CONTRACT
### (Plaintiffs v. Defendants)
### *2020 Operating Agreement*

182.    Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 152 as though fully

set forth herein.

183.    Plaintiffs each entered into the 2020 Operating Agreement with Defendants.

184.    Plaintiffs performed their obligations under the 2020 Operating Agreement.

185.    Pursuant to the 2020 Operating Agreement, Defendants breached the Agreement in several ways, including but not limited to:

      a.    Redeeming Plaintiffs' Class B shares for values not equal to their fair market value;

      b.    Providing more than Five-Million Dollars in distributions to Patak, while undervaluing Topstep and the Plaintiffs' Class B shares;

      c.    Failing to secure proper authority for distributions to Patak;

      d.    Following Plaintiffs' proper demand, failing to allow Plaintiffs to inspect Topstep's books and records

      e.    Failure to provide Plaintiffs a cap table in their various records requests;

      f.    Providing an unreasonable one week closing for Class B units;

      g.    Failing to issue appropriate tax documentation and distributions.

186.    As a direct and proximate result of Defendants' breaches, Plaintiffs have sustained monetary damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Defendants and an award of damages and interest in an amount to be proven at trial.

### <u>COUNT VI – BREACH OF CONTRACT</u>
**(Plaintiffs v. Defendants)**
*Incentive Unit Award Agreements*

187.    Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

188.    Plaintiffs each entered into Incentive Unit Award Agreements with Defendants.

189.    Plaintiffs performed their obligations under the Incentive Award Agreements.

190. Defendants breached the incentive unit award agreements in several ways, including but not limited to, redeeming Plaintiffs' Incentive Shares for value not equal to their fair market value.

191. As a direct and proximate result of Defendants' breaches, Plaintiffs have sustained monetary damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Defendants and award damages in an amount to be proven at trial, attorney's fees, and costs.

## COUNT VII – BREACH OF FIDUCIARY DUTY
### (Plaintiffs v. Patak Holdings and Patak)

192. Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

193. Under the 2016 Operating Agreement, Patak, as an officer of Topstep and its sole Class A member, owed Plaintiffs a duty of loyalty, good faith, and candor.

194. Under the 2016 Operating Agreement, Patak Holdings, as the Manager of Topstep, owed Plaintiffs a duties of loyalty, good faith, and candor.

195. Patak and Patak Holdings breached their fiduciary duties in multiple ways, including but not limited to:

a. Negligently misrepresenting the changes implemented in the 2020 Operating Agreement;

b. Stripping fiduciary duties from the 2020 Operating Agreement;

c. Eliminating the right to independent appraisal of Class B units;

d. Implementing a provision in the 2020 Operating Agreement that terminated employees and employees withdrawing from Topstep without "good reason" may have their vested Class B shares redeemed by Topstep at a price of $1;

e.  Taking more than Two-Million Dollars in undisclosed distributions;

f.  Inaccurately claiming the profits interest hurdle applies to redemptions;

g.  Without members' knowledge or consent, diverting membership distributions to fund Patak's company, Bluechxp, LLC;

h.  In placing all ownership of Incentive Shares in the holding entity, Patak and Patak Holdings shifted liabilities to the holders, which lowered the value of their shares;

i.  Upon information and belief, adding Patak's non-employee family members to Topstep's payroll so they may receive improper payments and insurance benefits.

196.  As a direct and proximate result of Patak and Patak Holdings' breaches, Plaintiffs have sustained damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Defendants in an amount to be proven at trial.

## COUNT VIII – ALTER EGO - PIERCING THE CORPORATE VEIL
### (Plaintiffs v. Patak and Patak Holdings)

197.  Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

198.  Topstep and Patak Holdings were merely an alter ego, instrumentality, conduit, or adjunct of Patak.

199.  Patak ignored the corporate form in several ways, including but not limited to:

a.  Signing Plaintiffs' redemption notices in his personal capacity;

b.  Commingling the assets and affairs of Topstep and Patak Holdings;

c.  Misappropriating Topstep funds for his own personal use/gain;

d.  Without members' knowledge or consent, diverting membership distributions to fund Patak's company, Bluechxp, LLC;

e.  As the sole Class A shareholder of Topstep, knowingly making misrepresentations regarding the effect of the 2020 Operating Agreement on the valuation of the Class

B shares;

f. Upon information and belief, adding his non-employee family members to Topstep payroll so they may receive improper payments and insurance benefits.

200.     Patak's disregard of the corporate form warrants piercing of the corporate veil of Topstep and Patak Holdings.

201.     Patak is accordingly personally liable for the amounts owed to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Defendants in an amount to be proven at trial.

## COUNT IX – NEGLIGENT MISREPRESENTATION
### (Plaintiffs v. Defendants)

202.     Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

203.     At all relevant times, Defendants owed fiduciary duties to Plaintiffs, including the duty of good faith and fair dealing.

204.     Topstep's March 30, 2020, email regarding company restructuring, providing that no changes would be implemented adverse to Class B members' interest, *i.e.,* "business as usual," constituted false statements of material fact.

205.     Defendants acted carelessly, negligently, and with disregard for the truth in making their false statements in the March 30, 2020 email to Plaintiffs.

206.     By making their false statements in their March 30, 2020 email to Plaintiffs, Defendants intended to fraudulently induce Plaintiffs to sign the 2020 Operating Agreement.

207.     In reliance on Defendants' false and fraudulent statements, Plaintiffs did execute the 2020 Operating Agreement, to their detriment.

208.     As a result of Plaintiffs' reliance on Defendants' false and fraudulent statements,

Plaintiffs suffered monetary damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Defendants and an award of actual damages, punitive damages, attorney's fees and costs, and interest in an amount to be proven at trial.

## COUNT X – COMMON LAW FRAUD
### (Plaintiffs v. Defendants)

209.    Plaintiffs hereby incorporate by reference Paragraphs 1 through 152 as though fully set forth herein.

210.    Defendants' March 30, 2020, email regarding company restructuring, providing that no changes would be implemented adverse to Class B members' interest was a false statement of material fact.

211.    Defendants knew that the false and fraudulent statements did not accurately reflect the changes implemented in the 2020 Operating Agreement effecting the Class B members' rights under the agreement.

212.    By making their false statements in their March 30, 2020 email to Plaintiffs, Defendants intended to fraudulently induce Plaintiffs to sign the 2020 Operating Agreement.

213.    In reliance on Defendants' false and fraudulent statements, Plaintiffs did execute the 2020 Operating Agreement, to their detriment.

214.    As a result of Plaintiffs' reliance on Defendants' false and fraudulent statements, Plaintiffs suffered monetary damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Defendants and an award of actual damages, punitive damages, attorney's fees and costs, and interest in an amount to be proven at trial.

**COUNT XI – ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505, *et. seq.*)**
**(Plaintiffs v. Defendants)**

215.    Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

216.    Defendants engaged in deceptive actions in various ways, including but not limited to inducing Plaintiffs to sign the 2020 Operating Agreement by virtue of their false and misleading March 30, 2020 email, and fraudulently undervaluing the Class B shares to redeem the units for the lowest price possible.

217.    Defendants' deceptive actions were made in the course of trade or commerce, with the intention of making profit.

218.    Defendants intended to induce Plaintiffs to rely upon their deceptive actions and Plaintiffs did so rely upon the same in signing the 2020 Operating Agreement.

219.    Defendants' deceptive actions proximately caused injury and monetary damages to Plaintiffs in in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Defendants and an award of actual damages, punitive damages, attorney's fees and costs, and interest in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court Order the following relief from Defendants jointly and/or severally:

a.    Entry of judgment in their favor for compensatory, incidental, consequential, and punitive damages, lost profits, interest, attorneys' fees, and costs.

b.      Pursuant to the Declaratory Judgment Act, an Order declaring the forced redemptions invalid and ineffective as they were not signed by the Manager, Patak Holdings, Inc.  28 U.S.C. § 2201(a).

c.      Entry of an Order compelling Patak Holdings to allow Plaintiffs to inspect Topstep's financial books and records dating from its inception through present.

d.      Pre and post-judgment interest.

e.      For such other relief as the Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as to all claims so triable.


Respectfully Submitted,



By:*/s/ Gillian G. Lindsay*
                    Attorney for Plaintiffs

Ian H. Fisher (ARDC #6224920)
Gillian G. Lindsay (ARDC #6298511)
Michael A. Mayerck (ARDC #6333038)
IFisher@taftlaw.com
GLindsay@taftlaw.com
MMayerck@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Dr., Suite 2600
Chicago, IL  60601
Telephone:     (312) 527-4000
Facsimile:     (312) 527-4011

Dated:  November 7, 2022