# EXHIBIT C

TOPSTEP LLC

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

Effective as of January 1, 2020

THE INTERESTS REPRESENTED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE FEDERAL OR STATE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFER SET FORTH HEREIN.

{00140793 4}

**TABLE OF CONTENTS**

**Page No.**

ARTICLE 1 DEFINITIONS ........................................................................... 1
ARTICLE 2 ORGANIZATIONAL MATTERS ............................................. 9
  2.1.   Formation of the Company. .......................................................... 9
  2.2.   Name. ............................................................................................ 9
  2.3.   Purpose. ........................................................................................ 9
  2.4.   Location of Principal Place of Business. ...................................... 9
  2.5.   Registered Office and Registered Agent. ..................................... 9
  2.6.   Interest Holders. ........................................................................ 10
  2.7.   Term. .......................................................................................... 10
  2.8.   No State Law Partnership. ......................................................... 10
ARTICLE 3 INTERESTS AND CAPITAL CONTRIBUTIONS ................. 10
  3.1.   Interests. ..................................................................................... 10
  3.2.   Initial Capital Contributions. ..................................................... 11
  3.3.   Additional Capital Contributions. .............................................. 11
  3.4.   Capital Call Default. .................................................................. 11
  3.5.   Return of Capital Contributions. ................................................ 12
  3.6.   Capital Accounts. ....................................................................... 12
  3.7.   Loans. ......................................................................................... 12
  3.8.   Representations, Warranties and Covenants of Interest Holders. .. 13
ARTICLE 4 DISTRIBUTIONS ................................................................... 14
  4.1.   Distributions to Interest Holders. ............................................... 14
  4.2.   Class B Interest Holders. ............................................................ 14
  4.3.   Tax Distributions. ...................................................................... 14
  4.4.   Limitation on Distributions. ....................................................... 14
  4.5.   Withholding. ............................................................................... 15
ARTICLE 5 PROFITS AND LOSSES ......................................................... 15
  5.1.   Allocation of Profits and Losses. ............................................... 15
  5.2.   Loss Limitation. ......................................................................... 15
  5.3.   Minimum Gain Chargeback. ...................................................... 15
  5.4.   Member Nonrecourse Debt Minimum Gain Chargeback. ........... 16
  5.5.   Qualified Income Offset. ........................................................... 16
  5.6.   Nonrecourse Deductions. ........................................................... 16
  5.7.   Member Nonrecourse Deductions. ............................................. 16
  5.8.   Curative Allocations. ................................................................. 16
  5.9.   Allocations for Income Tax Purposes. ....................................... 16
ARTICLE 6 POWERS, RIGHTS AND DUTIES OF THE MANAGER AND MEMBERS ... 17
  6.1.   Management of the Company. .................................................... 17
  6.2.   Compensation; Reimbursement of Expenses. ............................ 19
  6.3.   Duties and Time Devoted to Business of the Manager and the Members; Other Activities; Transactions with Affiliates; No Employment Rights. ... 19
  6.4.   Rights of the Members. .............................................................. 20
  6.5.   Liability and Indemnification. .................................................... 20
  6.6.   Restrictive Covenants. ............................................................... 21
  6.7.   Liability and Indemnification. .................................................... 21
ARTICLE 7 TRANSFER OF MEMBERSHIP RIGHTS AND INTERESTS; WITHDRAWAL OF MEMBERS ... 23
  7.1.   Transfers. ................................................................................... 23
  7.2.   Permitted Transfers. ................................................................... 24

Plaintiffs0809

| | | |
|---|---|---|
| 7.3. | Voluntary Withdrawal of Members. | 24 |
| 7.4. | Transfers by Operation of Law, Involuntary Withdrawal, Breach of Agreement. | 24 |
| 7.5. | Consequences of Withdrawal. | 26 |
| 7.6. | Drag-Along. | 27 |
| 7.7. | Transferees Bound by Agreement. | 27 |
| 7.8. | Call Option for Class B Units. | 27 |

**ARTICLE 8 DISSOLUTION, LIQUIDATION AND TERMINATION OF THE COMPANY** ........ **29**

| | | |
|---|---|---|
| 8.1. | Dissolution. | 29 |
| 8.2. | Procedure for Winding Up. | 29 |
| 8.3. | Distributions at Liquidation. | 29 |
| 8.4. | Negative Capital Account. | 30 |
| 8.5. | Termination. | 30 |

**ARTICLE 9 BOOKS, RECORDS, ACCOUNTING AND TAX ELECTIONS** .................................. **30**

| | | |
|---|---|---|
| 9.1. | Bank Accounts. | 30 |
| 9.2. | Books and Records. | 30 |
| 9.3. | Annual Accounting Period and Taxable Year. | 30 |
| 9.4. | Reports. | 30 |
| 9.5. | Tax Matters Partner. | 31 |
| 9.6. | Tax Elections. | 32 |
| 9.7. | Title to Company Property. | 32 |

**ARTICLE 10 AMENDMENTS AND WAIVERS** .................................................................................. **32**

| | | |
|---|---|---|
| 10.1. | Amendments and Waivers. | 32 |
| 10.2. | Amendments Without Consent of the Members. | 32 |

**ARTICLE 11 GENERAL PROVISIONS** ............................................................................................... **33**

| | | |
|---|---|---|
| 11.1. | Uniform Commercial Code. | 33 |
| 11.2. | Further Assurances. | 33 |
| 11.3. | Notifications. | 33 |
| 11.4. | Specific Performance. | 33 |
| 11.5. | Complete Agreement. | 33 |
| 11.6. | Applicable Law; Venue; Attorney's Fees. | 34 |
| 11.7. | Section Titles. | 34 |
| 11.8. | Binding Provisions. | 34 |
| 11.9. | No Third Party Beneficiaries. | 34 |
| 11.10. | Terms. | 34 |
| 11.11. | Severability of Provisions. | 34 |
| 11.12. | Counterparts, Facsimile; Reproductions. | 34 |
| 11.13. | Legal Counsel. | 35 |

Plaintiffs0810

DocuSign Envelope ID: C461C1CD-9DAE-476E-9433-69B17726E05E

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF
## TOPSTEP LLC

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT of TOPSTEP LLC (the "Company") is effective as of January 1, 2020, by and among the Members (as defined below), the Manager (as defined below) and those other Interest Holders (as defined below) executing this Agreement from time to time in accordance with the terms hereof. The parties hereto agree as follows:

## EXPLANATORY STATEMENTS

A.     The Company was formed pursuant to those certain Articles of Incorporation (the "Certificate") filed with the Secretary of State of the State of Delaware on November 1, 2019.

B.     The Company is currently governed by that certain Limited Liability Company Operating Agreement dated as of November 1, 2019 (the "Original LLC Agreement").

C.     The parties with to amend and restated the Original LLC Agreement and agreed that the terms of this Agreement shall supersede and replace the Original LLC Agreement in its entirety and govern, regulate and manage the affairs of the Company.

## ARTICLE 1
## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in this Article 1, unless otherwise defined elsewhere herein:

"Act" means the Delaware Limited Liability Company Act, as amended from time to time.

"Additional Capital Contribution" shall have the meaning ascribed to such term in Section 3.3.

"Additional Capital Contribution Balance" means, for each Interest Holder, the total Additional Capital Contributions of such Interest Holder, less the cumulative distributions to such Interest Holder, if any, in payment thereof pursuant to Article 4.

"Affiliate", with respect to any Person, means: (i) any other Person owning 50% or more of the voting or beneficial interests of the subject Person; (ii) any other Person directly or indirectly controlling, controlled by or under common control with the subject Person; (iii) any manager, officer, director, trustee or general partner of the subject Person; (iv) any individual who is a Family Member of the subject Person; (v) any trust for the benefit of the Subject Person; (vi) any trust for the benefit of any Family Member of the subject Person; or (v) any Person in which more than 50% of the voting or beneficial interests are owned by a Person who has a relationship with the subject Person described in clause (i), (ii), (iii) or (iv) above.

"Agreement" means this Amended and Restated Limited Liability Company Agreement, as amended from time to time in accordance with its terms.

"Applicable Law" means the provisions of all applicable statutes and laws of the United States of America, the states thereof (including the Act), and all other countries in which the Company or its Affiliates are doing business.

Plaintiffs0811

"Approved Sale" shall have the meaning ascribed to such term in <u>Section 7.6(a)</u>.

"Assumed Income Tax Rate" means the highest effective marginal combined federal, state and local income tax rate for a fiscal year prescribed for an individual resident in Illinois (taking into account (a) the deductibility of state and local income taxes for Federal income tax purposes and (b) the character (e.g., long-term or short-term capital gain or ordinary or exempt) of the applicable income).

"Attorney-in-Fact" shall have the meaning ascribed to such term in <u>Section 6.7</u>.

"Bankruptcy" means, with respect to an Interest Holder, the happening of any of the following: (i) the filing of an application by such Interest Holder for, or a consent to, the appointment of a trustee of all or a portion of such Interest Holder's assets for the benefit of creditors generally, (ii) the filing by such Interest Holder of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Interest Holder's inability to pay such Interest Holder's debts generally as they come due, (iii) the making by such Interest Holder of a general assignment for the benefit of creditors or (iv) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Interest Holder as bankrupt or appointing a trustee of all or a portion of such Interest Holder's assets for the benefit of creditors generally, and such order, judgment or decree continuing unstayed and in effect for a period of 90 days.

"Business" means (i) an online platform for educating, developing, and evaluating traders, (ii) providing products or services that are designed for use by an online platform provider for educating, training and evaluating traders, and (iii) providing capital and participating in trading various asset classes through funding traders.

"Business Day" means any day other than Saturday, Sunday and a day on which commercial banks are authorized or required to close in Chicago, Illinois.

"Capital Account" means, with respect to each Interest Holder, the account established and maintained for such Interest Holder on the books of the Company in compliance with Regulation § 1.704-1(b)(2)(iv). For this purpose, the Manager may, in its sole discretion, upon the occurrence of any of the events specified in Regulation §1.704-1(b)(2)(iv)(g), increase or decrease the Capital Accounts in accordance with rules of such regulation and Regulation §1.704-1(b)(2)(iv)(g) to reflect a revaluation of Company property. Without limiting the generality of the foregoing, each Interest Holder's Capital Account shall be (i) increased by (x) the amount of money contributed by such Interest Holder to the Company, (y) the fair market value of property contributed by such Interest Holder to the Company (net of liabilities that the Company is considered to assume or take subject to pursuant to Section 752 of the Code), and (z) allocations to such Interest Holder of Profits and other items of income and gain, including income and gain exempt from tax, but excluding (for federal income tax purposes) items of income and gain as described in Section 1.704-1(b)(4)(i) of the Regulations; and (ii) decreased by (x) the amount of money distributed to such Interest Holder, (y) the fair market value of any property distributed to such Interest Holder (net of any liabilities that such Interest Holder is considered to assume or take subject to pursuant to Section 752 of the Code), and (z) such Interest Holder's share of Losses and other items of loss and deduction, but excluding (for federal income tax purposes) items of loss or deduction as described in Section 1.704-1(b)(4)(i) of the Regulations.

"Capital Call Contribution Notice" shall have the meaning ascribed to such term in <u>Section 3.3</u>.

"Capital Contribution" means the total amount of cash and the Gross Asset Value of any other assets contributed to the Company by an Interest Holder, net of liabilities assumed or to which the assets are subject.

Plaintiffs0812

DocuSign Envelope ID: C461C1CB-9DAE-476E-9433-69B17726E05E

"Capital Transaction" means (i) a Sale Transaction, (ii) a sale, exchange, transfer, assignment or other disposition of any asset of the Company outside the ordinary course of business which does not constitute a Sale Transaction, as determined by the Manager in its sole discretion, or (iii) any financing or refinancing of any indebtedness of the Company or any financing or refinancing in respect of any asset of the Company.

"Certificate" shall have the meaning ascribed to such term in the Explanatory Statements.

"Class A Member" means a Member who holds Class A Units.

"Class B Member" means a Member who holds Class B Units.

"Class A Units" shall have the meaning ascribed to such term in Section 3.1(a).

"Class B Units" shall have the meaning ascribed to such term in Section 3.1(a).

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning ascribed to such term in the Explanatory Statements.

"Company Asset" means any property or asset of the Company; and "Company Assets" means the aggregate of all the property and assets of the Company.

"Company Minimum Gain" has the same meaning as "partnership minimum gain" set forth in Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"Confidential Information" shall have the meaning ascribed to such term in Section 6.6.

"Contribution Date" shall have the meaning ascribed to such term in Section 3.3.

"Control" or "control" means (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Default Amount" shall have the meaning ascribed to such term in Section 3.4(a).

"Default Capital Contribution" shall have the meaning ascribed to such term in Section 3.4(a).

"Default Capital Contribution Balance" means, for each Interest Holder, the total Default Capital Contributions of such Interest Holder, less the cumulative distributions to such Interest Holder, if any, in payment thereof pursuant to Article 4 hereof.

"Defaulting Interest Holder" shall have the meaning ascribed to such term in Section 3.4(a).

"Disability" or "Disabled" means, as to a Member who is an employee of the Company holding Class B Units, the inability to perform such Member's essential Company duties and responsibilities, with or without reasonable accommodation, by reason of a physical or mental infirmity, for a period of 180 consecutive days. Such period of 180 consecutive days shall be deemed continuous unless such Member returns to the Company and performs such duties and responsibilities for at least 15 consecutive Business Days during such period and performs during such period at the level and competence that existed prior to the beginning of such 180 consecutive day period. The determination of Disability or Disabled shall be

Plaintiffs0813

DocuSign Envelope ID: C461C1CB-9DAE-476E-9433-69B17726E05E

made by a physician mutually satisfactory to such Member and the Company. The date of such Disability or becoming Disabled shall be the date of the first day of such 180 consecutive day period.

"<u>Family Member</u>" means, with respect to any individual, such individual's spouse, children and grandchildren.

"<u>Fiscal Year</u>" means each 12-month period (or portion thereof) beginning on January 1 and ending on December 31 of each year.

"<u>Good Cause</u>" shall be deemed to exist, as it relates to a Member who is an employee or consultant of the Company holding Class B Units, if such Member shall:

(a)     fail, refuse or neglect to perform such Member's duties as an employee or consultant of the Company;

(b)     engage in acts of intentional dishonesty, wrongdoing or malfeasance in connection with such Member's employment or consulting relationship with the Company; or

(c)     commit an act of willful misconduct or gross negligence in the conduct of such Member's employment or consulting duties; or

(d)     be convicted of any felony.

"<u>Good Reason</u>" shall be deemed to exist, as it relates to a Member who is an employee or consultant of the Company holding Class B Units, if, and only if, such Member terminates such Member's employment or consulting relationship because, without such Member's written consent, the Company fails to pay such Member any undisputed compensation due.

"<u>Gross Asset Value</u>" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by an Interest Holder to the Company shall be the fair market value of such asset, as determined by the Manager in its reasonable discretion;

(b)     The Gross Asset Values of all Company Assets shall be adjusted by the Manager to equal their respective fair market values (unless otherwise determined by the Manager in its reasonable discretion) as of the following:

(i)     The acquisition of additional Units by any new or existing Interest Holder in exchange for more than a *de minimis* Capital Contribution if the Manager reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Interest Holders in the Company;

(ii)     The grant of Units in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a Member capacity, or by a new Member acting in a Member capacity or in anticipation of becoming a Member;

(iii)     The distribution by the Company to an Interest Holder of more than a *de minimis* amount of Company property as consideration for Units if the Manager reasonably

Plaintiffs0814

DocuSign Envelope ID: C461C1CB-9DAE-476E-9433-69B17726E05E

determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Interest Holders in the Company; and

(iv)     The liquidation of the Company within the meaning of Regulation § 1.704-1(b)(2)(ii)(g).

(c)     The Gross Asset Value of any Company Assets distributed to any Interest Holder shall be the gross fair market value of such asset, as determined by the Manager in its reasonable discretion, on the date of such distribution; and

(d)     The Gross Asset Values of Company Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining capital accounts pursuant to Regulation § 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subsection (d) to the extent that the Manager determines that an adjustment pursuant to subsection (b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (d).

"Incapacity" means, with respect to each Member, the appointment of a guardian or general conservator for such Member by a court of competent jurisdiction or adjudication by a court of competent jurisdiction that such Member is incompetent to manage such Member's person or property or perform such Member's duties hereunder.

"Incentive Agreement" means, as to any Class B Member, the Incentive Agreement between the Company and such Class B Member pursuant to which such Class B Member has been issued Class B Units.

"Indemnified Parties" shall have the meaning ascribed to such term in Section 6.5(c).

"Initial Capital Contribution" shall have the meaning ascribed to such term in Section 3.2.

"Initial Capital Contribution Balance" means, for any Interest Holder, the total Initial Capital Contributions of such Interest Holder, less the cumulative distributions to such Interest Holder, if any, in payment thereof pursuant to Article 4.

"Interest" shall mean a direct ownership interest in the Company, including a direct ownership interest in Units, entitling the holder thereof to receive a share of distributions and Profits and Losses of the Company in accordance with the terms of this Agreement.

"Interest Holder" means any Person holding an Interest (including a Class A Member and a Class B Member), whether as a Member or an assignee of a Member who has not been admitted as a Member.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

(i)     the Bankruptcy of such Member;

(ii)     if such Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

Plaintiffs0815

(iii)     if such Member is a partnership or a limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(iv)     if such Member is a corporation, the dissolution of the corporation or the revocation of its charter; provided, however, the revocation of the charter of a Member shall not be deemed an Involuntary Withdrawal if such charter is revived within 90 days thereafter;

(v)     if such Member is an individual, such Member's death, Disability or Incapacity;

(vi)     if such Member is an estate, the distribution by the fiduciary of the estate's entire Interest in the Company; or

(vii)     any other event causing the resignation of such Member under the Act other than a Voluntary Withdrawal.

"Liquidating Agent" shall have the meaning ascribed to such term Section 8.2.

"Majority-in-Interest of the Members" means the Class A Members whose aggregate Percentage Interests exceed 50% of the Percentage Interests of all Class A Members.

"Manager" means Patak Holdings, Inc., an Illinois corporation, or such Person elected or appointed to be a Manager in accordance with Article 6. References to the Manager in the singular or as him, her, it, itself or other like references shall also, where the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

"Member" means each Person listed as a Member in the books and records of the Company (including each Class A Member and Class B Member) and any Person who subsequently is admitted as a Member of the Company in accordance with the terms of this Agreement, each of which shall be added to such list of Members.

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" set forth in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

"Membership Rights" means all the rights of a Member in the Company subject to the terms and conditions of this Agreement, including a Member's: (i) Units; and (ii) solely as to Class A Members, the right to vote on matters coming before the Members, subject to the terms and conditions of Article 6.

"Negative Capital Account" means a Capital Account with a balance of less than zero.

"Net Cash Flow" means, with respect to any period, all revenues, funds and proceeds received by the Company from any source (but excluding Capital Contributions), less the sum of (i) all expenses of the Company or any Affiliate paid or incurred during such period, (ii) all payments of principal or interest with respect to indebtedness of the Company or any Affiliate owing to any Person, (iii) all capital expenditures of the Company or any Affiliate paid during such period and (iv) all Reserves established during such period. Net Cash Flow shall be determined by the Manager in its sole discretion.

Plaintiffs0816

DocuSign Envelope ID: C461C4CD-9DA5-476E-9432-69B17726E05E

"Non-Defaulting Interest Holder" shall have the meaning ascribed to such term in Section 3.4(a).

"Nonrecourse Deductions" shall have the meaning set forth in Regulation Sections 1.704-2(b)(1).

"Nonrecourse Liability" shall have the meaning set forth in Regulations Section 1.704-2(b)(3).

"Notice" shall have the meaning ascribed to such term in Section 11.3.

"Operation of Law Transfer" means a Transfer of Interests effected by operation of law which does not constitute an Involuntary Withdrawal.

"Percentage Interest" means, with respect to any Interest Holder as of any determination date, the percentage determined by dividing the total Units held by such Interest Holder by the then total outstanding Units held by all Interest Holders; it being understood that for purposes of determining the Percentage Interest, the total Units held and the total outstanding Units held, only Class B Units which are vested shall be included in such calculation.

"Person" means any individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

"Presumed Tax Liability" means, with respect to any Interest Holder for any period, an amount equal to the product of (a) the excess, if any, of the cumulative amount of income and gain items of the Company which are reported or reportable on the Schedule K-1 (IRS Form 1065) with respect to such Interest Holder for such period, over the sum of the deduction and loss items of the Company reported or reportable on such Schedule K-1 for such period, and (b) the Assumed Income Tax Rate.

"Profits" and "Losses" for any period means all items of Company income and gain (in the case of Profits) and all items of Company loss, deduction and expense (in the case of Losses) for such period; provided that, for purposes of computing the amount of any item of income, gain, loss, deduction or expense to be reflected in Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes except that:

       (i)     The computation of all items of income, gain, loss and deduction shall include those items described in Sections 705(a)(l)(B) or 705(a)(2)(B) of the Code and Regulation Section 1.704-1(b)(2)(iv)(i), without regard to the fact that such items are not includable in gross income or are not deductible for federal income tax purposes.

       (ii)     If the Gross Asset Value of any property is adjusted pursuant to Regulation Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property.

       (iii)     Items of income, gain, loss or deduction attributable to the disposition of property having a Gross Asset Value that differs from its adjusted basis for tax purposes shall be computed by reference to the Gross Asset Value of such property.

       (iv)     Items of depreciation, amortization and other cost recovery deductions with respect to property having a Gross Asset Value that differs from its adjusted basis for tax purposes shall be computed by reference to the property's Gross Asset Value in accordance with Regulation Section 1.704-1(b)(2)(iv)(g).

Plaintiffs0817

DocuSign Envelope ID: C461C4CD-9DA5-476F-9432-69B17726E05E

(v)     To the extent an adjustment to the adjusted tax basis of any asset pursuant to Sections 732(d), 734(b) or 743(b) of the Code is required, pursuant to Regulation Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

(vi)     To the extent that the Company distributes any asset in kind, the Company shall be deemed to have realized Profit or Loss thereon in the same manner as if the Company had sold such asset for an amount equal to the fair market value of such asset or, if greater and otherwise required by the Code, the amount of debts to which such asset is subject.

(vii)     All items specially allocated pursuant to Sections 5.2-5.8 shall not be taken into account in determining Profits and Losses.

"Regulations" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"Reserves" means an amount of funds deemed sufficient by the Manager in its sole discretion, as of the date of determination, for working capital, capital required by Applicable Law, capital expenditures, capital to be used to pay debt service, capital required for tax distributions, capital required by third-party covenants, capital to pay other costs and expenses incident to the operation of the Company or any Affiliate, capital to be used for Company acquisitions and capital for all other uses determined by the Manager. The Manager shall determine in its sole discretion the amount of the Reserves at any time and from time to time.

"Restriction Period" shall have the meaning ascribed to such term in Section 6.6(f).

"Restrictive Covenants" shall have the meaning ascribed to such term in Section 6.6(d).

"RMP" shall have the meaning ascribed to such term in Section 11.13.

"Sale Agreement" shall have the meaning ascribed to such term in Section 7.6(b).

"Sale Transaction" means any transaction pursuant to which the Company sells its property or business by (i) a sale or conveyance of all or substantially all the Company's properties or assets to any Person, (ii) a sale or conveyance of a majority of the Units (or other equity interest in the Company) to any Person or (iii) a merger or consolidation of the Company with any Person pursuant to which the Members (and their Affiliates) immediately prior to such merger or consolidation shall own, immediately after giving effect thereto, less than a majority of the equity interest of the surviving entity (or its parent) or the purchasing entity (or its parent), as the case may be.

"Seller" shall have the meaning ascribed to such term in Section 7.4(b).

"Seller Interests" shall have the meaning ascribed to such term in Section 7.4(b).

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Tax Matters Partner" shall have the meaning ascribed to such term in Section 9.5.

Plaintiffs0818

"Tax Representative" shall have the meaning ascribed to such term in Section 9.5.

"Territory" shall have the meaning ascribed to such term in Section 6.6(d).

"Third Party Claim" shall have the meaning ascribed to such term in Section 6.5(c).

"Transfer" means, when used as a noun, any sale, exchange, encumbrance, disposition, hypothecation, pledge, assignment, distribution, attachment, mortgage or other transfer or grant of rights or interests, whether voluntarily or involuntarily, by operation of law or otherwise, and, when used as a verb, means, to sell, exchange, encumber, dispose, hypothecate, pledge, assign, distribute, mortgage or otherwise transfer or grant rights or interests, whether voluntarily or involuntarily, by operation of law or otherwise.

"Transferred Interests" shall have the meaning ascribed to such term Section 7.2(e).

"TSH" means Topstep Holdings LLC, a Delaware limited liability company.

"Units" shall have the meaning ascribed to such term in Section 3.1(a).

"Voluntary Withdrawal" means a Member's voluntary withdrawal from the Company or a Member's resignation from the Company by such Member's express will or other voluntary act.

## ARTICLE 2
## ORGANIZATIONAL MATTERS

2.1.    Formation of the Company. The Company was formed upon the filing of the Certificate with the Secretary of State of the State of Delaware. The Manager shall accomplish all filings, recordings, publishings and other acts necessary or appropriate for compliance with all the requirements for the formation and continued existence of the Company as a limited liability company under the Act and under all other laws of the State of Delaware or such other jurisdictions in which the Manager determines that the Company may conduct business. This Agreement is the Company's operating agreement, as that term is used in the Act. The rights and duties of the Manager, Members and other Interest Holders shall be as provided in this Agreement and, to the extent not inconsistent with the terms of this Agreement, in the Act.

2.2.    Name. The name of the Company is "Topstep LLC", as such name may be modified from time to time by the Manager.

2.3.    Purpose. The purpose of the Company shall be to engage in any lawful business, purpose, investment or activity for which limited liability companies may be organized under the Act.

2.4.    Location of Principal Place of Business. The location of the principal place of business of the Company is 130 S. Jefferson St., Ste. 200, Chicago, IL 60661, or such other location as may be determined by the Manager. The Manager may change the location of the principal place of business of the Company. In addition, the Company may maintain such other offices as the Manager may deem advisable at any other place or places within or without the United States.

2.5.    Registered Office and Registered Agent. The Company's registered agent shall be the Person designated by the Manager from time to time to act in that capacity.

Plaintiffs0819

2.6.    Interest Holders. The name, Units, Initial Capital Contribution, and Percentage Interests as of the date hereof of each Interest Holder are set forth on Schedule A, as such Schedule A may be amended from time to time by the Manager.

2.7.    Term.The term of the Company commenced at the time the Certificate was marked "Filed" by the Secretary of State of the State of Delaware, and shall continue in existence in perpetuity unless its existence is sooner terminated pursuant to Article 8.

2.8.    No State Law Partnership. The Members intend that the Company shall not be a partnership and that no Member shall be a partner of any other Member, for any purposes other than federal, state and local tax purposes, and the provisions of this Agreement shall not be construed otherwise.

**ARTICLE 3**
**INTERESTS AND CAPITAL CONTRIBUTIONS**

3.1.    Interests.

(a)    Interests of the Company shall be represented by "Units", all of which shall initially be "Class A Units" and "Class B Units" owned by the Interest Holders as set forth on Schedule A, as amended from time to time by the Manager. The number of authorized Class A Units and Class B Units shall be determined by the Manager from time to time.

(b)    Class A Members shall (i) have all voting rights with respect to any matter herein on which Members are entitled to vote, (ii) be counted for purposes of determining a quorum on Members approving any action of the Company, and (iii) be entitled to all notices, voting and other rights as set forth herein with respect to the voting of Members. Class B Members shall not (i) have any voting rights with respect to any matter herein on which Members are entitled to vote, (ii) be counted for purposes of determining a quorum on Members approving any action of the Company, and (iii) be entitled to any notices, voting or other rights as set forth herein with respect to the voting of Members. The Class A Units are intended to represent "capital interests" and the Class B Units are intended to represent "profits interests", in each case, in accordance with the Code and the related Regulations.

(c)    Class B Members shall receive Class B Units without consideration, as determined by the Manager. The Class B Units shall be restricted and subject to vesting and forfeiture pursuant to the Incentive Agreement between the Class B Member and the Company executed in connection with the issuance of such Class B Units. Notwithstanding anything contained in this Agreement, Class B Units will entitle each Class B Member to share only in the portion of the future Profits and Losses of the Company accruing after the date such Class B Units are issued. Accordingly, the Capital Account balances of all of the Interest Holders at the time of issuance of Class B Units will be revalued as of the date of such issuance pursuant to Regulation §1.704-1(b)(2)(iv)(f), as determined by the Manager in its sole discretion, and no amount shall be attributed to the Capital Account of such Class B Member with respect to the issuance of such Class B Units. Notwithstanding anything herein to the contrary, treatment of Class B Units and the rights and privileges associated therewith may be changed by the Manager as necessary in order to comply with the provisions of the Code and the Regulations.

(d)    The Manager may issue additional Units from time to time in its sole discretion, which additional Units may be issued in one or more new classes or series, the rights, powers,

{00140793 4}                                     -10-

Plaintiffs0820

preferences, obligations, qualifications, limitations and restrictions of which shall be established by the Manager. Such additional Units may (i) rank senior to, junior to, or *pari passu* with, outstanding Units as to the payment or the distribution of assets on liquidation, (ii) bear a stated distribution or allocation and/or rank senior to, junior to, or *pari passu* with, outstanding Units as to distributions of Net Cash Flow and/or allocations of Profits and Losses, (iii) be redeemable by the holder thereof, (iv) have voting or other rights with respect to the management of the Company which rank senior to, junior to, or *pari passu* with, outstanding Units, and/or (v) otherwise have rights, powers or preferences which are senior (or otherwise superior) to, junior to, or *pari passu* with, any outstanding Units. In addition, the Manager may from time to time issue options and/or warrants to purchase Units, with such terms as the Manager may determine in its sole discretion. The Manager shall have the right to amend this Agreement, and the books and records of the Company, without consent of any Interest Holder, to reflect the adjusted Percentage Interests of, and the number of Units held by, the Interest Holders and the relative rights, powers, preferences, obligations, qualifications, limitations and restrictions of the Units in connection with the issuance of additional Interests and/or options or warrants to purchase Units. The establishment or existence of a class or series of Interest with preferential terms or the granting of preferential terms to one or more Members or class of Members will not entitle any other Member or class of Members to similar terms, and neither the Company nor the Manager will be required to obtain the consent or approval of, or give notice to, any Member or class of Members in connection therewith; provided, however, that an Interest Holder's Percentage Interest may not be reduced, other than on a pro rata basis, without such Interest Holder's consent except as otherwise specifically provided in this Agreement.

3.2.     Initial Capital Contributions. As their respective initial Capital Contributions, the Members have contributed to the Company cash in such amount set forth in the books and records of the Company (the "Initial Capital Contribution").

3.3.     Additional Capital Contributions. In the event the Manager, in the exercise of its reasonable discretion, determines that an additional Capital Contribution to the Company ("Additional Capital Contribution") is necessary for any reason, the Manager shall notify each Interest Holder in writing ("Capital Call Contribution Notice") of the need for such Additional Capital Contribution and such Interest Holder's pro rata share of such Additional Capital Contribution (based upon the respective Percentage Interests of each Interest Holder in relation to all Interest Holders) and the date (the "Contribution Date") by which the Additional Capital Contribution must be contributed by such Interest Holder (which date shall be no earlier than 10 Business Days after the date of the Capital Call Contribution Notice). Each Interest Holder shall make its Additional Capital Contribution by the Contribution Date.

3.4.     Capital Call Default.

(a)     In the event an Interest Holder (a "Defaulting Interest Holder") fails for any reason to make any Additional Capital Contribution when due pursuant to Section 3.3 (the amount of such defaulted Additional Capital Contribution, the "Default Amount",) the Interest Holders who have not defaulted in making their Additional Capital Contribution (the "Non-Defaulting Interest Holder") shall have the right to fund all or part of the Default Amount by providing written notice of its election to do so to the Defaulting Interest Holders and the amount to be funded within 15 Business Days of the date the Additional Capital Contribution was due. Any amount funded by the Non-Defaulting Interest Holders shall be referred to as a "Default Capital Contribution".

Plaintiffs0821

(b)     If a Non-Defaulting Interest Holder funds all or any portion of such Default Amount, the Percentage Interests of the Defaulting Interest Holder shall be decreased, and the Percentage Interests of the Non-Defaulting Interest Holder shall be increased, in accordance with this Section 3.4(b). In such case, the Percentage Interests of each Interest Holder would be adjusted to be the resulting Percentage Interests calculated as follows: (x) the sum of (1) the total Initial Capital Contributions made by such Interest Holder as of such date plus (2) the total Additional Capital Contributions made by such Interest Holder as of such date plus (3) the total Default Capital Contributions made by such Interest Holder as of such date divided by (y) the sum of (1) the total Initial Capital Contributions made by the Interest Holders as of such date plus (2) the total Additional Capital Contributions made by the Interest Holders as of such date plus (3) the total Default Capital Contributions made by the Interest Holders as of such date. A numerical example is as follows:

Assume:

(A)     Interest Holder A has made a $2,000,000 Initial Capital Contribution and has a 20% Percentage Interests; and Interest Holder B has made a $8,000,000 Initial Capital Contribution and has a 80% Percentage Interests; and

(B)     An Additional Capital Contribution in the amount of $1,000,000 is required; and

(C)     Interest Holder B funds its pro rata share of such Additional Capital Contribution ($800,000); and Interest Holder A fails to fund its pro rata share of such Additional Capital Contribution, resulting in a Default Amount of $200,000; and

(D)     No other Additional Capital Contributions have been made to date; and
(D)     Interest Holder B delivers notice of its election to fund the Default Amount and funds such Default Capital Contribution in the total amount of $200,000.

Interest Holder B Result:     Percentage Interests equals (x) the sum of (1) $8,000,000 plus (2) $800,000 plus (3) $200,000 divided by (y) the sum of (i) $10,000,000 plus (ii) 800,000 plus (iii) $200,000; or 81.8%

Interest Holder A Result:     Percentage Interest equals 19.2%

The rights, powers and remedies available to the Company and the Non-Defaulting Interest Holder pursuant to Section 3.4(b) shall be the exclusive remedies of the Company and the Non-Defaulting Interest Holder as to the Defaulting Interest Holder. No course of dealing between the Company and any Defaulting Interest Holder, and no delay in exercising any right, power or remedy, shall operate as a waiver or otherwise prejudice the exercise of such right, power or remedy.

3.5.     Return of Capital Contributions. No Interest Holder shall be entitled to receive any interest on its Capital Contributions. The Interest Holders shall not have the right to demand return of their Capital Contributions, nor shall the Interest Holders have a right to demand and receive property other than cash in return for their Capital Contributions.

3.6.     Capital Accounts. A separate Capital Account shall be maintained for each Interest Holder on the books of the Company.

3.7.     Loans. The Manager shall have the right to have the Company obtain funds through loans from any Person, including Interest Holders and their Affiliates, having such terms and conditions as the Manager may determine in its sole discretion.

Plaintiffs0822

DocuSign Envelope ID: C461C4CD-9DA5-476F-9432-69B17726E05E

3.8.　　Representations, Warranties and Covenants of Interest Holders. Each Interest Holder represents, warrants and covenants to the Company and acknowledges that: (i) such Interest Holder has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (ii) such Interest Holder has reviewed and evaluated all information necessary to assess the merits and risks of its investment in the Company; (iii) such Interest Holder recognizes that the Company is a highly speculative venture involving a high degree of financial risk, and such Interest Holder is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (iv) such Interest Holder is acquiring its Interests for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (v) the Interests have not been registered under the Securities Act or the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified, or an exemption from such registration and qualification requirements is available, under the Securities Act and other applicable securities laws and with which the provisions of this Agreement have been complied; (vi) the Interests were not offered by any means of general solicitation or general advertising, and no representation, warranty or written communication with respect to the Interests were made to such Interest Holder, and in entering into this transaction, such Interest Holder is not relying upon any information other than that contained in this Agreement and the results of its own independent investigation; (vii) the execution, delivery and performance of this Agreement have been duly authorized by such Interest Holder and do not require such Interest Holder to obtain any consent or approval that has not been obtained, and do not contravene or result in a default under any provision of any constitution, statute, rule, law or regulation, or any injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court applicable to such Interest Holder or the charter, bylaws or other governing documents of such Interest Holder or any agreement, contract, lease, license or instrument to which such Interest Holder is a party or by which such Interest Holder or its assets are bound; (viii) the determination of such Interest Holder to acquire Interests has been made by such Interest Holder independent of any other Interest Holder and independent of any statements or opinions as to the advisability of such acquisition or as to the properties, business, prospects or condition (financial or otherwise) of the Company which may have been made or given by any other Interest Holder or by any agent or employee of any other Interest Holder; (ix) there are substantial restrictions on the transferability of the Interests; (x) Interest Holders have no rights to require the Interests to be registered under the Securities Act or the securities laws of any state; (xi) there currently is no, and it is anticipated that there will never be any, public market for the Interests; (xii) it may not be possible for such Interest Holder to liquidate such Interest Holder's investment in the Company and, accordingly, such Interest Holder may have to hold the Interests and bear the economic risk of this investment indefinitely; (xiii) such Interest Holder has been advised to consult with such Interest Holder's own attorney regarding legal matters concerning the Company and to consult with such Interest Holder's tax advisor regarding the tax consequences of investing in the Company; (xiv) this Agreement constitutes the valid and legally binding obligation of such Interest Holder, enforceable against such Interest Holder in accordance with its terms; (xv) such Interest Holder has the full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and perform its obligations hereunder; (xvi) such Interest Holder is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation (or other formation); and (xvii) such Interest Holder need not give any notice to, make any filing with, or obtain any consent, authorization or approval of any government or governmental agency in order to enter into or consummate the transactions contemplated by this Agreement. The representations and warranties set forth in this Section 3.8 shall be deemed to be continuing with respect to each Interest Holder during the period in which such Interest Holder remains an Interest Holder. Each Interest Holder acknowledges and agrees that any breach of the representations and warranties set forth in this Section 3.8 shall be deemed to be a material breach of this Agreement. Each Interest Holder agrees that such Interest Holder will immediately notify the Manager (x) if it is the subject of any action, suit, claim, complaint, investigation,

Plaintiffs0823

DocuSign Envelope ID: C461C4CD-9DA5-476E-9432-69B17726E05E

inquiry or proceeding related to any representation or warranty set forth in this <u>Section 3.8</u>, or (y) if, to the knowledge of any such Interest Holder, any of such Interest Holder's representations and warranties contained herein become inaccurate or untrue in any material respect.

**ARTICLE 4**
**DISTRIBUTIONS**

4.1.     <u>Distributions to Interest Holders</u>. Subject to <u>Section 4.2</u>, <u>Section 4.3</u> and <u>Section 4.4</u>, the Manager has the right, in the Manager's sole discretion, to make distributions of Net Cash Flow, at such time and from time to time as the Manager shall determine. In such case, such distributions shall be made to the Interest Holders in the following priority:

(a)     First, to the Interest Holders (pro rata based upon their respective Default Capital Contribution Balances) in payment of their respective Default Capital Contribution Balances until their respective Default Capital Contribution Balances have been reduced to zero;

(b)     next, to the Interest Holders (pro rata based upon their respective Additional Capital Contribution Balances) in payment of their respective Additional Capital Contribution Balances until their respective Additional Capital Contribution Balances have been reduced to zero;

(c)     next, to the Interest Holders (pro rata based upon their respective Initial Capital Contribution Balances) in payment of their respective Initial Capital Contribution Balances until their respective Initial Capital Contribution Balances have been reduced to zero;

(d)     Thereafter, to the Interest Holders in accordance with their respective Percentage Interests in the Company (taking into account any applicable vesting of Class B Units).

4.2.     <u>Class B Interest Holders</u>. Without limiting the foregoing, (i) distributions to an Interest Holder holding Class B Units shall be no greater than the sum of Profits and Losses allocated to such Interest Holder after the date such Class B Units were issued as provided herein and (ii) the Manager shall have the right, in its reasonable discretion, to make such distributions in a manner consistent with the Class B Members being entitled to share only in the portion of such future Profits and Losses of the Company accruing after the date the applicable Class B Units are issued (it being understood that this <u>Section 4.2</u> shall be interpreted and applied consistent with the Class B Units being "profits interests" under the Code and subject to applicable vesting under the Incentive Agreements).

4.3.     <u>Tax Distributions</u>. Notwithstanding <u>Section 4.1</u>, the Company, at the sole option of the Manager, may make quarterly distributions to the Interest Holders as soon as is practicable following the end of each calendar quarter in amounts equal to the Presumed Tax Liability with respect to each Interest Holder relating to such quarter (as estimated by the Manager based on the results of such quarter). Any amounts distributed to an Interest Holder pursuant to this <u>Section 4.3</u> shall be treated as a dollar-for-dollar advance against the first amounts otherwise distributable to such Interest Holder pursuant to <u>Section 4.1</u>.

4.4.     <u>Limitation on Distributions</u>. Notwithstanding anything to the contrary contained herein, no distribution of Net Cash Flow shall be declared or made which shall impair the capital of the Company, nor shall any distribution of Net Cash Flow be made to any Interest Holder, unless (i) the aggregate value of the assets of the Company remaining after such distribution is at least equal to the aggregate of its debts and liabilities, including capital, (ii) payment thereof would not be prohibited by Applicable Law and (iii) payment thereof would not violate any restrictions contained in credit facilities to which the Company or any Affiliate may then be a party or otherwise bound. The Manager's

Plaintiffs0824

DocuSign Envelope ID: C461C4CD-9DA5-476E-9432-69B17726E05E

determination of the restrictions and limitations set forth in the preceding sentence shall be final and conclusive as to all Interest Holders.

4.5.    Withholding. Notwithstanding anything to the contrary contained in the Agreement or herein, in the event that any state, local or other income tax imposed on the Company as an entity is reduced by reason of the holding of Units by any Interest Holder, no part of the expense of the Company for such tax shall be allocated to such Interest Holder. In addition, if the Company is obligated under Applicable Law to pay any amount to a governmental agency because of an Interest Holder's status as an Interest Holder of the Company for federal or state withholding taxes, such amount shall be treated as an advance against and reduce the distributions which would otherwise be made to such Interest Holder pursuant to this Article 4. An amount described in the immediately preceding sentence shall be considered withheld by the Company if remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the Manager as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs. Each Interest Holder shall indemnify the Company and the other Interest Holders for any liability they may incur for under-withholding of taxes in respect of such Interest Holder. Each Interest Holder agrees that none of the Company, the Manager or any other Interest Holder shall be liable for any excess taxes withheld and that, in the event of over-withholding, an Interest Holder's sole recourse shall be to apply for a refund from the appropriate governmental authority.

## ARTICLE 5
## PROFITS AND LOSSES

5.1.    Allocation of Profits and Losses. Except as hereinafter provided in this Article 5 and subject to Section 3.1(c), after adjusting each Member's Capital Account for all Capital Contributions, distributions and all special allocations with respect to each accounting period, Profits and Losses for such accounting period shall be allocated among the Members in such manner that, as of the end of such accounting period, the Capital Account of each Member shall be equal to (a) the respective net amount, positive or negative, which would be distributed to such Member (if positive) or for which such Member would be liable to the Company (if negative) under this Agreement, determined as if the Company were to sell all of the assets of the Company for an amount equal to their Gross Asset Value and liquidate in accordance with Section 8.3 minus (b) the sum of such Member's share of Company Minimum Gain (as determined according to Regulation Sections 1.704-2(d) and (g)(3)) and Member Nonrecourse Debt Minimum Gain (as determined according to Regulation Section 1.704-2(i)), each as computed immediately prior to the hypothetical sale described in this Section 5.1. It is the intent of the Members that the foregoing allocations will meet the requirements for "substantial economic effect" of Section 704 of the Code, and the Treasury Regulations promulgated thereunder. The allocations set forth in this Article 5 shall be interpreted consistently with the foregoing intent and the allocations shall be amended, if necessary, in order to accomplish this purpose. All such calculations shall be in accordance with generally accepted accounting principles, consistently applied.

5.2.    Loss Limitation. Notwithstanding any provision of Section 5.1 to the contrary, no allocation of Losses shall be made to an Interest Holder if it would cause such Interest Holder to have an Adjusted Capital Account Deficit. Allocations of Losses (and items thereof) that would be made to an Interest Holder but for this Section 5.2 shall instead be made to other Interest Holders pursuant to Section 5.1 to the extent not inconsistent with this Section 5.2.

5.3.    Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain in any year, each Interest Holder will be allocated items of income and gain for the year equal to such Interest

Plaintiffs0825

Holder's share of the net decrease in "partnership minimum gain" within the meaning of Regulation Section 1.704-2(g)(2). The Company's minimum gain shall be determined as provided in Regulation Section 1.704-2(d), and an Interest Holder's share of Company Minimum Gain shall be determined as provided in Regulation Section 1.704-2(g). This provision is intended to comply with the minimum gain chargeback provisions of Regulation Section 1.704-2(f) and shall be interpreted and applied consistently therewith.

5.4.    Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Member Nonrecourse Debt Minimum Gain in any year, each Interest Holder will be allocated items of income and gain for the year equal to such Interest Holder's share of the net decrease in Member Nonrecourse Debt Minimum Gain within the meaning of Regulation Section 1.704-2(i)(4). The items to be so allocated shall be determined in accordance with Regulation Section 1.704-2(i)(4) and 1.704-2(j)(2)(ii). This provision is intended to comply with the minimum gain chargeback provisions of Regulation Section 1.704-2(i)(4) and shall be interpreted and applied consistently therewith.

5.5.    Qualified Income Offset. If any Interest Holder unexpectedly receives any adjustment, allocation or distribution described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for the year) shall be specially allocated to such Interest Holder in an amount and manner sufficient to eliminate, to the extent required by Regulations, any Adjusted Capital Account Deficit of an Interest Holder as quickly as possible; provided that an allocation pursuant to this Section 5.5 shall be made if and only to the extent that such Interest Holder would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 5 have been tentatively made as if this Section 5.5 were not in this Agreement. This provision is intended to constitute a "qualified income offset" under Regulation 1.704-1(b)(2)(ii)(d).

5.6.    Nonrecourse Deductions. Nonrecourse Deductions derived from a property held by the Company shall be allocated to the Interest Holders in accordance with their respective Percentage Interests with respect to the Company.

5.7.    Member Nonrecourse Deductions. The Company shall allocate Member Nonrecourse Deductions (within the meaning of Regulation Section 1.704-2(i)(2)) solely to the Interest Holder who has the economic risk of loss with respect to the Member Nonrecourse Debt related thereto under Regulation Section 1.704-2(i)(1).

5.8.    Curative Allocations. It is the intent of the Members that, to the extent possible, the allocations set forth in the foregoing Sections 5.2 through 5.7 shall be offset with special allocations of other items of Company income, gain, loss and deduction pursuant to this Section 5.8. Therefore, notwithstanding any other provision of this Article 5, the Company shall make such offsetting special allocations of Company income, gain, loss or deduction so that, after such offsetting allocations are made, each Member's Capital Account is, to the extent possible, equal to the Capital Account balance such Member would have had if the allocations set forth in Sections 5.2 through 5.7 were not part of this Agreement. In applying this Section 5.8, the Company shall take into account future allocations under Section 5.3 and Section 5.4 that, although not yet made, are likely to offset other allocations previously made under Section 5.6 and Section 5.7.

5.9.    Safe Harbor Election. The Company and each Interest Holder authorizes and directs the Company to elect to have the "safe harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "Proposed Revenue Procedure") apply to any Interest in the Company transferred to a service provider by the Company on or after the effective date of the

Plaintiffs0826

DocuSign Envelope ID: C461C4CD-9DA5-476E-9432-69B17726E05E

Proposed Revenue Procedure as compensation for services provided to the Company. The "tax matters partner" or "tax representative" of the Company hereby agrees to execute a statement electing such safe harbor election on behalf of the Company in accordance with Section 3.03(1) of the Proposed Revenue Procedure and shall attach such safe harbor election to the next applicable income tax return of the Company. The Company and each Interest Holder hereby agrees to comply with all requirements of the safe harbor described in the Proposed Revenue Procedure, including the requirement that each Interest Holder shall prepare and file all federal income tax returns reporting the income tax effects of the safe harbor Interests issued by the Company in a manner consistent with the requirements of the Proposed Revenue Procedure.

5.10.    Allocations for Income Tax Purposes. The income, gains, losses, deductions and credits of the Company for Federal, state and local income tax purposes shall be allocated in the same manner and in the same proportions as the corresponding items entering into the computation of Profits and Losses (and items thereof) were allocated pursuant to Sections 5.1 and 5.2; provided that solely for Federal, state and local income and franchise tax purposes and not for book or Capital Account purposes, income, gain, loss and deduction with respect to property properly carried on the Company's books at a Gross Asset Value other than its tax basis shall be allocated (i) in the case of property contributed in kind, in accordance with the requirements of Section 704(c) of the Code and such Regulations as may be promulgated thereunder from time to time, and (ii) in the case of other property, in accordance with the principles of Section 704(c) of the Code and the Regulations thereunder as incorporated among the requirements of the relevant provisions of the Regulations under Section 704(b) of the Code. The Company shall apply the "remedial method" described in Regulation Section 1.704-3(d) for purposes of applying Section 704(c) principles with respect to all assets contributed to the Company directly or indirectly by the Members.

## ARTICLE 6
## POWERS, RIGHTS AND DUTIES OF THE MANAGER AND MEMBERS

6.1.    Management of the Company.

(a)    Manager.

(i)    The business and affairs of the Company shall be managed under the direction of the Manager. Except as otherwise specifically provided herein or by Applicable Law, the Manager shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as the Manager deems necessary or appropriate to accomplish the purposes of the Company as set forth herein.

(ii)    Except as otherwise provided herein or expressly authorized by the Manager, no Member of the Company, and no other Person, shall have the authority or power, directly or indirectly, to act as agent of the Company for any purpose, engage in any transaction, make any commitment, enter into any contract or incur any obligation (whether as principal, surety or agent) in the name of the Company or in any other way bind the Company or hold itself out as acting for or on behalf of the Company. Any attempted action in contravention of this Section shall be null, void and not binding upon the Company, unless ratified or authorized in writing by the Manager.

(b)    Number; Election; Tenure.

Plaintiffs0827

DocuSign Envelope ID: C461C4CD-9DA5-476E-9432-69B17726E05E

(i)      The Company shall have one Manager, which Manager shall be appointed or removed from time to time by a Majority-in-Interest of the Members. The Company may, upon the approval of a Majority-in-Interest of the Members, increase or decrease such number of Managers from time to time. Without limiting the foregoing, the Members agree that Patak Holdings, Inc., an Illinois corporation, shall be the sole Manager of the Company.

(ii)      The Manager shall hold office until its, his or her successor is appointed, or until its, his or her earlier death, dissolution, termination, resignation or removal.

(c)      <u>Removal and Resignation of Manager</u>.

(i)      The Manager may resign at any time by giving written notice to the Class A Members. Such resignation shall take effect upon receipt thereof by the Class A Members, unless otherwise specified therein. The acceptance of a resignation shall not be necessary to make it effective.

(ii)      Any Manager may be removed from such position with or without cause, at any time, by a Majority-in-Interest of the Members.

(d)      <u>Vacancies.</u> Any vacancy occurring for any reason with respect to any Manager shall be filled by a Majority-in-Interest of the Members.

(e)      <u>Meetings and Consents of the Manager.</u> All actions and decisions of the Manager shall be binding on the Company and all Interest Holders. Any action required or permitted to be taken at any meeting of the Manager may be taken without a meeting, without prior notice and without a vote, (i) if a consent in writing, setting forth the action so taken, shall be signed by the Manager (such written consent may be transmitted by means of electronic delivery), or (ii), to the extent permissible by law, if the Manager consents thereto by providing an affirmative vote by e-mail; provided however, that the e-mail consent must include the action or actions for which consent is provided either as an attachment or in the body of such e-mail and such e-mail consent must originate from an e-mail address of the Manager maintained in the books and records of the Company as belonging to such Manager. Consent so provided shall be deemed to be approved by the Manager providing consent by e-mail and shall be treated in all manner and respects and for all purposes as an original agreement and shall be considered to have the same binding legal effect as if it were an original signed version of such consent delivered in person. Any action taken by e-mail vote shall be ratified by the Manager as soon as reasonably practical by written consent signed by the Manager and the Manager providing consent by e-mail shall promptly provide a signed written consent of such action upon the request of the Company. The Company shall maintain copies of all consents, including consents by e-mail in its minute book (whether such minute book is maintained in "hard-copy" or in an electronic format).

(f)      The Manager may from time to time authorize, elect or appoint individuals to act as officers or agents of the Company on a general basis or for a specific purpose, which individuals shall have full power and authority to act for and bind the Company as authorized by the Manager. Each officer or agent of the Company appointed by the Manager shall hold office until his, her or its successor is elected or appointed or until his, her or its earlier death, dissolution, termination, resignation, or removal. Any officer or agent of the Company may resign by written notice to the Company and may be removed for cause or without cause by the Manager in its sole discretion. Any number of offices may be held by the same Person.

Plaintiffs0828

DocuSign Envelope ID: C461C4CD-9DA5-476F-9432-69B17726E05E

6.2.   <u>Compensation; Reimbursement of Expenses</u>. No Manager or Member shall be entitled to be compensated for any services provided to the Company except as authorized in writing by the Manager. The Company shall reimburse the Manager for reasonable business expenses incurred by any such Manager on behalf of the Company.

6.3.   <u>Duties and Time Devoted to Business of the Manager and the Members; Other Activities; Transactions with Affiliates; No Employment Rights</u>.

(a)   The Manager shall devote a reasonable amount of time to the business and affairs of the Company, but not less than the amount of time that is necessary to perform its duties and carry out its responsibilities as the Manager in a diligent and professional manner.

(b)   The Interest Holders acknowledge and agree that (i) the Manager shall have no duties (including fiduciary duties) to the Company or the Interest Holders other than those duties expressly described herein and the Manager's implied contractual covenant of good faith and fair dealing and (ii) so long as the Manager acts in a manner consistent with the implied contractual covenant of good faith and fair dealing and with the express provisions of this Agreement, the Manager shall not be in breach of any duties (including fiduciary duties) with respect of the Company and/or any Interest Holder otherwise applicable at law or in equity. The provisions of this Agreement, to the extent that they expand, restrict or eliminate the duties and liabilities of the Manager otherwise existing at law or in equity, are agreed by the Interest Holders to replace fully and completely such other duties and liabilities of the Manager. Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement the Manager is permitted or required to make a decision or take an action (i) in its "sole discretion" or "discretion" (or in the "sole discretion" or "discretion" of the Manager) or under a similar grant of authority or latitude, in making such decisions or taking such actions, the Manager shall be entitled to take into account the interests of the Interest Holders as a whole or (ii) in "good faith" or under another expressed standard, the Manager shall act under such express standard and shall not be subject to any other or different standard.

(c)   Each Member hereby acknowledges that in the course of its business activities, such Member may become aware or learn of business opportunities that are within the scope of the business of the Company or any Affiliate of the Company or, if learned of by such Member, would constitute a business opportunity belonging to the Company or any Affiliate of the Company (collectively, "Corporate Opportunities"). Each Member acknowledges and agrees that no Member shall have any duty to make the Company or the other Member aware of or to offer to the Company or the other Member any such Corporate Opportunities and the Members shall be entitled to exploit such Corporate Opportunities for their own benefit or for the benefit of any of their respective Affiliates without thereby breaching this Agreement or any duty that the Members may otherwise have to the Company. The Company shall have no right, title and interest in or to, and it shall have no claim to and against, any revenues or profits arising out of the exploitation of such Corporate Opportunities, whether by any Member or any of such Member's Affiliates.

(d)   No provision of this Agreement shall be deemed to give any Person any right to be employed or engaged by, or continue in the employ or engagement of, the Company or any of its Affiliates, create any inference as to the length of employment or engagement, affect the right of the Company or its Affiliates to terminate the employment of any at-will employee, consultant or advisor, or give any Person any right to participate in any employee welfare or benefit plan or other program of the Company or any of its Affiliates.

Plaintiffs0829

DocuSign Envelope ID: C461C4CD-9DA5-476E-9432-69B17726E05E

6.4.    <u>Rights of the Members</u>. Notwithstanding anything to the contrary contained herein, except as required by Applicable Law and except as explicitly set forth herein or as authorized in writing by the Manager, the Members shall not participate in the management or control of the Company's business nor shall they transact any business for the Company, nor shall they have the power to act for or bind the Company, such powers being vested solely and exclusively in the Manager.

6.5.    <u>Liability and Indemnification</u>.

(a)    Except as otherwise required by non-waivable provisions of Applicable Law or as expressly set forth in this Agreement, no Interest Holder shall have any personal liability whatsoever in such Interest Holder's capacity as an Interest Holder in excess of its Capital Contribution, whether to the Company, to any of the other Interest Holders, to the creditors of the Company or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company, other than arising out of actions by such Interest Holder prohibited by this Agreement or any actions or liability described in <u>Section 6.5(d)</u>.

(b)    None of the Members, the Manager or officers shall be personally liable for the return of any portion of the Capital Contributions (or any return thereon) of the Members and the return, if any, of such Capital Contributions (or any return thereon) shall be made solely from assets of the Company. Except as may be otherwise provided herein, none of the Members shall be required to pay to the Company or any Member any deficit in any Member's Capital Account upon dissolution of the Company or otherwise. None of the Members, the Manager or officers shall be liable, responsible or accountable, in damages or otherwise, to any Member or to the Company for any act performed or omitted to be performed by such Person within the scope of the authority conferred on such Person by this Agreement or by the Manager pursuant to this Agreement, except for such Person's gross negligence, reckless conduct, fraud, bad faith, material breach of this Agreement or violation of Applicable Law.

(c)    Subject to <u>Section 6.5(d)</u>, the Company shall, to the fullest extent permitted by the Act, indemnify and hold harmless the Interest Holders, the Manager and officers and their respective partners, shareholders, members, officers, trustees, advisory board, directors, employees, attorneys and agents and other Affiliates (collectively, the "<u>Indemnified Parties</u>") from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of their activities on behalf of the Company or in furtherance of the interests of the Company, including any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the investigation and defense of any actual or threatened action, proceeding or claim, unless the acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claim is based were constituted gross negligence, reckless conduct, fraud, bad faith, a material breach of this Agreement, or a violation of Applicable Law by such Indemnified Party. If any claim for indemnification is based on a claim by a third party (a "<u>Third Party Claim</u>"), the Indemnified Party in question shall give prompt written notice thereof to the Company and shall permit the Company to defend and/or settle such Third Party Claim, so long as it does so diligently and in good faith; <u>provided</u>, <u>however</u>, that no compromise or settlement of any claim may be effected by the Company without the Indemnified Party's consent (which will not be unreasonably withheld, conditioned or delayed) unless the sole relief provided is monetary damages that are paid in full by the Company. Any such indemnification shall only be from the assets or insurance of the Company and no Interest Holder shall be required to contribute capital to the Company to satisfy any such indemnification. Any such indemnification shall be paid by the Company in advance of the final disposition of any such action, proceeding or claim upon receipt of an undertaking by or on behalf of the Indemnified Party seeking advancement to repay the amount advanced should it ultimately be determined that the Indemnified Party was not entitled to be indemnified hereunder or under the Act.

Plaintiffs0830

(d)     Each Interest Holder shall indemnify and hold harmless the Company and the other Interest Holders and its and their respective Affiliates, managers, members, officers, directors, employees, agents and representatives from and against any claim, loss, liability, damage, fine, charge, assessment or expense resulting from or arising out of such Interest Holder's (or its Affiliates') gross negligence, reckless conduct, fraud, bad faith, or material breach of this Agreement, violation of Applicable Law or as provided in any other written agreement between the Company and such Interest Holder (or its Affiliates').

6.6.     <u>Restrictive Covenants</u>.

(a)     Each Interest Holder recognizes and acknowledges that such Interest Holder will be entrusted with or have access to confidential and proprietary information which is the property of the Company and/or third parties to which the Company or its Affiliates owe a duty of confidentiality (whether pursuant to Applicable Law, by contract or otherwise). Each Interest Holder therefore agrees that, at all times during and after such Interest Holder is an Interest Holder, such Interest Holder shall (i) not, without the prior written consent of the Manager, directly or indirectly, use, copy or duplicate, or disclose or otherwise make available to any third party, any Confidential Information other than in the performance of such Interest Holder's duties with respect to the Company, (ii) take such protective measures as may be reasonably necessary to preserve the secrecy and interest of the Company (or, if applicable, of a third party to which the Company or its Affiliates owe a duty of confidentiality) in the Confidential Information and (iii) not, without the prior written consent of the Manager, utilize or convert Confidential Information for such Interest Holder's own benefit or gain, of whatever nature other than in performance of such Interest Holder's duties with respect to the Company. As used herein, the term "Confidential Information" shall mean trade secrets and other non-public information, whether tangible or intangible, in any form or medium, relating to the business or affairs of the Company or its Affiliates that is proprietary to the Company or its Affiliates (or relating to the business or affairs of a third party to which the Company or its Affiliates owe a duty of confidentiality) and which the Company or its Affiliates make reasonable efforts to keep confidential.

(b)     Each Member acknowledges that (i) to the extent permitted by Applicable Law, all Work (as defined below) shall be deemed a "work made for hire" within the meaning of that term under United States Copyright Act, 17 U.S.C. §§ 101 et seq., as amended or superseded, and (ii) the Company shall be deemed the exclusive author of such Work and the exclusive owner of all rights, title and interest in and to such Work in any and all media, languages, territories and jurisdictions throughout the world, now known or hereafter devised. For purposes of this Agreement, "<u>Work</u>" means all intellectual property which any Member alone or jointly creates, conceives, develops, reduces to practice on or after the date hereof, or causes another to create, conceive, develop or reduce to practice, on or after the date hereof. Notwithstanding anything in this Agreement to the contrary, the definition of "Work" does not include, and this Agreement does not apply to, any invention developed by any such Member (i) entirely on his, her or its own time and (ii) without the use of any equipment, supplies, facilities or trade secret information of the Company, unless such invention (x) relates to business of the Company or its actual or demonstrably anticipated research or development or (y) results from any work or services performed by any such Member for or on behalf of the Company.

(c)     Unless consented to in writing by the Manager, during the period commencing on the date of this Agreement and ending on the one year period following the date that an Interest Holder is no longer a Member of the Company (the "<u>Restriction Period</u>"), such Interest Holder shall not, directly or indirectly, as agent, employee, consultant, distributor, representative, equity holder, manager, partner or in any other capacity, own (other than through the passive ownership of less than 5% of the publicly traded shares of any Person), operate, manage, control, engage in, invest in (other than through the passive

Plaintiffs0831

DocuSign Envelope ID: C461C4CD-9DA5-476F-9432-69B17726E05E

ownership of less than 5% of the publicly traded shares of any Person) or participate in any manner in, act as a consultant or advisor to, render services for (alone or in association with any person), or otherwise assist any person that directly engages in or owns, invests in, operates, manages or controls any venture or enterprise that engages in the Business any place within 10 miles of any location where the Company or its Affiliates engages in the Business (it being understood that the Company engages or plans to engage in such territory (the "Territory").

(d)      During the Restriction Period, each Interest Holder shall not, directly or indirectly, as agent, employee, consultant, distributor, representative, equity holder, manager, partner or in any other capacity, employ or engage, or recruit or solicit for employment or engagement, any Person (i) who is employed or engaged by the Company or any of its Affiliates (both before and after the date hereof), (ii) who was employed or engaged by the Company or any of its Affiliates within six months of such contact or (iii) who was engaged in the Business during the six months prior to the date hereof, or otherwise seek to influence or alter any such Person's relationship with the Company.

(e)      While the restrictions aforesaid are considered by the Interest Holders to be reasonable in all circumstances, it is agreed that if any court of competent jurisdiction shall deem such restrictions to go beyond that which is reasonable in all circumstances for the protection of the legitimate interests of the Company or the Interest Holders, the court shall modify the restrictions at issue to the point of greatest restriction permissible by Applicable Law.

(f)      Each Interest Holder acknowledges and agrees that the covenants set forth in this Section 6.6 (collectively, the "Restrictive Covenants") are reasonable and necessary for the protection of the Company's business interests, that the other Interest Holders would not have purchased Interests or entered into this Agreement without such Restrictive Covenants, that irreparable injury will result to the Company if any Interest Holder breaches any of the terms of the Restrictive Covenants, and that, in the event of any Interest Holder's actual or threatened breach of any of the Restrictive Covenants, the Company will have no adequate remedy at law. Each Interest Holder accordingly agrees that in the event of any actual or threatened breach by such Interest Holder of any of the Restrictive Covenants, the Company shall be entitled to immediate temporary injunctive and other equitable relief, without the necessity of showing actual monetary damages or of posting any bond or other security. Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of any damages.

6.7.    Liability and Indemnification.

(a)      Each Interest Holder hereby irrevocably constitutes and appoints the Manager (and any Liquidating Agent) as such Interest Holder's true and lawful Attorney-in-Fact ("Attorney-in-Fact"), and in the Interest Holder's name, place and stead, subject in each case to the prior approval by the Manager, to make, execute, sign, acknowledge (including swearing to), record and file, on behalf of such Interest Holder and on behalf of the Company, the following:

(i)      all documents (including amendments to the Certificate) that accurately reflect any duly adopted amendment of this Agreement;

(ii)      any and all other certificates or other instruments required to be filed by the Company under the laws of the State of Delaware or of any other state or jurisdiction, which in each case is consistent with the terms of this Agreement, including any certificate or other instruments necessary in order for the Company to continue to qualify as a limited liability company under the laws of the State of Delaware;

Plaintiffs0832

(iii)     one or more applications to use an assumed name; and

(iv)     all documents that may be required to dissolve and terminate the Company and cancel its Certificate, provided that such dissolution and termination of the Company were authorized in accordance with this Agreement.

(b)     The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by Applicable Law, shall survive the death, Bankruptcy or Incapacity of an Interest Holder, as well as the Transfer of an Interest. Each Interest Holder shall be bound by any representations made by the Attorney-in-Fact acting in good faith and in accordance with the terms of this Agreement pursuant to this power of attorney, and each Interest Holder hereby waives any and all defenses that may be available to contest, negate or disaffirm the action of the Attorney-in-Fact taken in good faith and in accordance with the terms of this Agreement under this power of attorney. The powers conferred on the Manager pursuant to this Section 6.7 may be exercised by the Mangers on behalf of each Interest Holder by an electronic signature or by listing all of the Interest Holders executing any instrument with a single signature as attorney-in-fact for all of them and shall be exercised only to the extent that such action is otherwise authorized hereunder and would be required to be taken by the Interest Holder, as an Interest Holder of the Company, under Applicable Law.

(c)     Each Interest Holder agrees that the Attorney-in-Fact shall not be liable, responsible or accountable in damages or otherwise to any Interest Holder for any acts performed or failed to be performed by the Attorney-in-Fact in good faith and in accordance with the terms of this Agreement, exercising reasonable judgment and within the scope of this power of attorney.

(d)     The Company hereby agrees to indemnify, defend and hold the Attorney-in-Fact free and harmless from and against any and all losses, damages, attorneys' fees, expenses or liabilities of any nature which the Attorney-in-Fact may sustain as a result of any action taken or omitted to be taken hereunder by the Attorney-in-Fact in good faith and in accordance with the terms of this Agreement, exercising reasonable judgment and within the scope of this power of attorney.

## ARTICLE 7
## TRANSFER OF MEMBERSHIP RIGHTS AND INTERESTS;
## WITHDRAWAL OF MEMBERS

7.1.     Transfers.

(a)     Notwithstanding anything to the contrary contained herein and subject to Section 7.2, (i) no Interest Holder may Transfer any Interests, including any Units, except if such Transfer (x) is required by Section 7.4 or Section 7.6 or (y) is made with the prior written consent of the Manager, which consent may be given or withheld in its sole discretion, and (ii) no Member may Transfer any Membership Rights (including any Interests) without the prior written consent of the Manager, which consent may be given or withheld in its sole discretion. Subject to the restrictions set forth in the preceding sentence, any transferee of Interests, including any Units, shall be deemed to be an unadmitted assignee of the transferring Member and shall only be admitted as a Member (and granted Membership Rights) upon the written approval of the Manager, which approval may be given or withheld in its sole discretion.

(b)     Each Interest Holder agrees that such Interest Holder shall, upon the request of the Manager, execute such transfer instruments reasonably required by the Manager to Transfer Interests permitted to be Transferred hereunder together with such other documentation as the Manager may require, including certificates or other documents to preserve the limited liability of the Interest Holders

Plaintiffs0833

DocuSign Envelope ID: C461C1CD-9DA5-476E-9432-69B17726E05E

under the laws of the jurisdictions in which the Company is doing business. Each Interest Holder further agrees that such Person will pay all reasonable expenses, including reasonable attorneys' fees and the cost of the preparation, filing and publishing of any amendment to the Certificate or this Agreement, incurred by the Company in connection with such Transfer.

(c)     Each Interest Holder hereby acknowledges the reasonableness of the prohibitions contained in this Article 7 in view of the purposes of the Company and the relationship of the Members. Any attempted Transfer in violation of this Article 7 shall be void ab initio and of no force or effect.

(d)     The Transfer of Membership Rights and the admission of a substituted Member shall not be cause for dissolution of the Company.

(e)     Upon the Transfer of any Interests, including Units, or Membership Rights in accordance with the provisions of this Article 7, the books and records of the Company shall be appropriately amended by the Manager to reflect the name, present mailing address, Units, Initial Capital Contribution, Percentage Interest and other relevant information of the transferor (if the transferor retained any of its Percentage Interest) and the transferee in such Transfer and the Percentage Interest of the other Members.

7.2.     Permitted Transfers. Any Transfer of Interests approved by the Manager pursuant to Section 7.1(a)(i)(y) shall be void and of no further effect unless the following conditions are satisfied:

(a)     The Transfer will not require registration of Interests under the Securities Act or any applicable state securities laws and, if requested by the Manager, the transferor delivers to the Company an opinion (reasonably acceptable in form and substance to the Manager) of legal counsel reasonably acceptable to the Manager to such effect;

(b)     The transferee delivers to the Company a written instrument agreeing to be bound by all the terms of this Agreement and assuming obligations of the transferring Interest Holders hereunder, reasonably acceptable in form and substance to the Manager;

(c)     The transferee is able to make representations and warranties set forth in Section 3.7, in each case as determined by the Manager in its reasonable discretion;

(d)     The Transfer will not result in the Company being treated as an association taxable as a corporation for Federal income tax purposes unless otherwise approved by the Manager;

(e)     The transferor or the transferee delivers to the Company the transferee's taxpayer identification number and the transferee's initial tax basis in the Interests Transferred (the "Transferred Interests"); and

(f)     The Transfer is not prohibited by Applicable Law.

7.3.     Voluntary Withdrawal of Members. Without the prior written consent of the Manager, no Member shall have the right or power to Voluntarily Withdraw from the Company. Any attempted Voluntary Withdrawal without the written consent of the Manager shall be void ab initio and of no force or effect. No Member who shall Voluntarily Withdraw shall be entitled to receive, in liquidation of its Interests, pursuant to the Act or otherwise, the fair value of the Member's Interests as of the date of any Voluntary Withdrawal.

7.4.     Transfers by Operation of Law, Involuntary Withdrawal, Breach of Agreement.

Plaintiffs0834

(a)     Immediately upon the occurrence of (i) an Involuntary Withdrawal (other than due to death, Disability or Incapacity which, in the case of Class B Members, shall be governed by the Incentive Agreement of such Class B Member) (or, with respect to an Interest Holder that is not a Member, any event that would cause such an Involuntary Withdrawal of such Interest Holder if such Interest Holder was a Member), (ii) a Transfer of Interests effected by operation of law which does not constitute an Involuntary Withdrawal (an "Operation of Law Transfer") or (iii) a material breach of this Agreement by an Interest Holder (including any attempted Voluntary Withdrawal by a Member without the prior written consent of the Manager)(except as otherwise agreed to in writing by an Interest Holder and the Company), the successor of the withdrawn Member or Interest Holder, if any, the transferee of the Operation of Law Transfer and the breaching Interest Holder, as applicable, shall thereupon, subject to Section 7.4(b), solely have all the rights and be subject to all of the obligations of an Interest Holder but shall not be a Member or have any Membership Rights. Without limiting the foregoing, none of the predecessor or the successor Interest Holder, the transferor or transferee of the Operation of Law Transfer or the breaching Interest Holder shall be entitled to receive in liquidation of its Interests the fair value of the withdrawn, transferor or breaching Interest Holder's Interests as of the date such Member Involuntarily Withdrew from the Company, the date the Operation of Law Transfer is effected or the date such Interest Holder materially breached this Agreement, as applicable, except as otherwise provided in Article 7.

(b)     In the event of the occurrence of an Involuntary Withdrawal (other than due to death, Disability or Incapacity which in the case of Class B Member shall be governed by the Incentive Agreement of such Class B Member) (or, with respect to an Interest Holder that is not a Member, any event that would cause an Involuntary Withdrawal of such Interest Holder if such Interest Holder was a Member), an Operation of Law Transfer or a material breach of this Agreement by an Interest Holder (except as otherwise agreed to in writing by an Interest Holder and the Company), the Company shall have the right, but not the obligation, to purchase from such successor of the withdrawn Member or Interest Holder, transferee of the Operation of Law Transfer and breaching Interest Holder, as applicable (each such Person is referred to herein as a "Seller"), any or all Interests (x) held by the withdrawing Member or Interest Holder, (y) Transferred pursuant to the Operation of Law Transfer or (z) held by the breaching Interest Holder (such Interests referred to herein as "Seller Interests") upon the following terms and conditions:

(i)     The foregoing option shall be exercisable by written notice to the Seller provided within six months of the later of (x) the date such Seller Involuntarily Withdrew from the Company, the date of the Operation of Law Transfer or the date such Seller materially breached this Agreement, as applicable, and (y) the date upon which the Manager acquires actual notice of such Withdrawal, Operation of Law Transfer or material breach, as applicable.

(ii)     The purchase price for the Seller Interests shall be equal to the lesser of (x) the fair market value of the Seller Interests as determined by the Manager in its reasonable discretion (which determination shall be final and binding on the parties) and (y) the balance of the Capital Account of the Seller (determined without regard to any increase (but not decrease) in the Capital Account of such Seller resulting from any revaluation of Company property (as provided in the definition of "Capital Account")) attributable to the Seller Interests to be purchased by the Company as of the last day of the month preceding the month in which the Seller Involuntarily Withdrew from the Company, the date the Operation of Law Transfer is effected or the date the Seller materially breached this Agreement, as applicable.

Plaintiffs0835

   (iii)  The aggregate purchase price for the Seller Interests to be purchased pursuant to this <u>Section 7.4(b)</u> may be paid in cash at the closing of such purchase or may be paid by delivery of an unsecured promissory note subordinated and junior in right of payment to all other indebtedness of the Company, with customary terms and conditions, payable in four annual payments on the first, second, third and fourth anniversaries of the closing. Interest shall accrue from the date of the closing on the balance of the purchase price remaining unpaid from time to time at the "Applicable Federal Rate" (as defined in the Code) in effect from time to time, and accrued interest shall be payable together with the payment of the purchase price. All or part of the purchase price may be prepaid at any time without penalty or premium. As a condition to the issuance of the subordinated promissory note described above, the payee thereunder agrees to promptly execute, verify, deliver and file any (i) subordination, intercreditor or similar agreement requested by any holder of other indebtedness of the Company and (ii) any other agreement, document or instrument thereafter requested by any holder of other indebtedness of the Company from time to time in connection with such subordination.

   (iv)  Seller Interests to be purchased pursuant to this <u>Section 7.4(b)</u> shall be purchased and sold at such place and time as the Manager designates. The Manager shall give the Seller at least five Business Days' prior written notice of the time, date and place of closing. At the closing, the Seller shall deliver to the Manager appropriate duly endorsed transfer instruments reasonably required by the Manager to transfer all of the Seller Interests as to which the Manager has delivered a notice of its intent to purchase pursuant to this <u>Section 7.4(b)</u>, free and clear of all claims, liens and encumbrances from any third parties, together with such other documentation as the Manager may reasonably require, including an agreement containing representations and warranties with respect to due authority, enforceability, no conflicts or violations, no required consents or approvals and valid title to the Transferred Units, free and clear of all claims, liens or encumbrances of third parties.

   (v)  If the Seller fails, for any reason, to tender the documents required for the purchase and sale of the Seller Interests to be purchased by the Company from the Seller at the time and place specified by the Manager pursuant to <u>Section 7.4(b)(iv)</u>, the Seller shall be deemed to have assigned all its right, title and interest in and to such Seller Interests to the Company, and the Seller shall cease to have any rights with respect to such Seller Interests except only to receive the purchase price as computed pursuant to this <u>Section 7.4(b)</u> upon delivery of such instruments and such Seller Interests shall be cancelled on the Company's books and shall no longer be outstanding.

Notwithstanding anything in this <u>Section 7.4(b)</u> to the contrary, to the extent that the Incentive Agreement of such Class B Member includes the Company's right to repurchase the Class B Units of such Class B Member if such Class B Member ceases to be employed by the Company or any of its Affiliates for any reason (regardless of circumstances), then the applicable provisions of the Incentive Agreement shall govern such event.

  7.5. <u>Consequences of Withdrawal</u>. The Voluntary Withdrawal or Involuntary Withdrawal of a Member shall not cause a dissolution of the Company, but the rights of such Member to share in the Profits and Losses of the Company, to receive distributions of Company funds and to assign its Interests pursuant to this <u>Article 7</u> shall, on the happening of such an event, devolve on such Member's estate, trustee, receiver or other successor, subject to the terms and conditions of this Agreement and the Company shall continue as a limited liability company. The estate, trustee, receiver or other successor, as

Plaintiffs0836

DocuSign Envelope ID: C461C4CD-9DA5-476E-9432-69B17726E05E

the case may be, shall be liable for all the obligations of the withdrawn Member. However, such estate, trustee, receiver or other successor shall be deemed to be an unadmitted assignee of the withdrawn Member, and shall not become a Member, unless such Member is admitted as a Member of the Company in accordance with this <u>Article 7</u>.

7.6. <u>Drag-Along</u>.If a Sale Transaction is approved by the Manager and the Manager requires the Interest Holders to participate therein (an "<u>Approved Sale</u>"), each Interest Holder shall (i) consent to (if, and only if, such Interest Holder's consent is required with respect thereto pursuant to Applicable Law) and raise no objection to the Approved Sale or the process pursuant to which the Approved Sale was arranged, (ii) waive any dissenter's rights, appraisal rights and other similar rights and (iii) (x) if the Approved Sale is structured as a sale of Interests (or other equity interests of the Company), shall agree to sell all Interests (or other equity interests of the Company) held by such Interest Holder on the terms and conditions approved by the Manager, (y) if the Approved Sale is structured as a merger or consolidation, each Interest Holder shall vote in favor thereof (if, and only if, such Interest Holder has the right to vote with respect thereto pursuant to Applicable Law), and (z) if the Approved Sale is structured as a sale of all or substantially all of the assets of the Company and a subsequent dissolution and liquidation of the Company, each Interest Holder shall vote in favor thereof and will vote in favor of the subsequent dissolution and liquidation of the Company (in each case, if, and only if, such Interest Holder has the right to vote with respect to such matters pursuant to Applicable Law).

(b) In addition to the actions described in <u>Section 7.6(a)</u>, each Interest Holder agrees to cooperate in consummating an Approved Sale, including by (i) becoming a party to, executing and delivering the sale agreement (the "<u>Sale Agreement</u>") and all other appropriate related agreements, (ii) delivering at the consummation of such Approved Sale, instruments of transfer for the Interests (or other equity interests of the Company) held by such Interest Holder reasonably required by the Company, duly endorsed for transfer, free and clear of all claims, liens and encumbrances, and (iii) taking any other necessary or appropriate action in furtherance thereof, including the execution and delivery of any other appropriate agreements, certificates, instruments and other documents. In furtherance of the foregoing and by way of illustration, each Interest Holder agrees to make any representation or warranty and agrees to be bound by any covenant, obligation or other agreement in the Sale Agreement that the Class A Members have agreed to make or be bound by, including representations and warranties with respect to such Interest Holder, its ownership of and good title to Interests (or other equity interests of the Company), restrictive covenants, indemnification covenants, agreements with respect to amounts paid into escrow, amounts subject to holdbacks or amounts subject to post-closing purchase price adjustments, and agreements to appoint representatives and grant powers of attorney with respect to such Interest Holder.

(c) All Interest Holders shall bear their own expenses related to the Approved Sale to the extent such expenses are not otherwise paid by the Company.

7.7. <u>Transferees Bound by Agreement</u>. Any successor or transferee of an Interest Holder hereunder shall be subject to and bound by all of the provisions of this Agreement as if such successor or transferee was originally a party to this Agreement.

7.8. <u>Call Option for Class B Units</u>.Unless otherwise specified in a Class B Member's Incentive Agreement, if the Company terminates the employment or other type of relationship of a Class B Member for Good Cause or a Class B Member terminates its employment or other type of relationship with the Company without Good Reason, in each case, within a period of five years from the date of this Agreement, the Company shall have the option to purchase, and such Class B Member shall have the obligation to sell, all the Interests owned by such Class B Member at an aggregate price equal to $1.

Plaintiffs0837

DocuSign Envelope ID: C461C4CD-9DA5-476F-9432-69B17726E05E

(b)     Unless otherwise specified in a Class B Member's Incentive Agreement, if (i) the Company terminates the employment or other type of relationship of a Class B Member without Good Cause, or (ii) a Class B Member terminates its employment or other type of relationship without Good Reason, the Company shall have the option to purchase, and such Class B Member shall have the obligation to sell, all the Interests owned by such Class B Member at an aggregate price equal to the fair market value of such Class B Units as determined by the Manager in its reasonable discretion (which determination shall be final and binding on the parties).

(c)     The foregoing options shall be exercisable by written notice to the selling Class B Member provided within six months of the date of such Class B Member's termination of employment with the Company.

(d)     The aggregate purchase price for the Class B Units to be purchased pursuant to Section 7.8(a) shall be paid in cash at the closing of such purchase. The aggregate purchase price for the Class B Units to be purchased pursuant to this Section 7.8(b) may be paid in cash at the closing of such purchase or may be paid by delivery of an unsecured promissory note subordinated and junior in right of payment to all other indebtedness of the Company, with customary terms and conditions, payable in four annual payments on the first, second, third and fourth anniversaries of the closing. Interest shall accrue from the date of the closing on the balance of the purchase price remaining unpaid from time to time at the "Applicable Federal Rate" (as defined in the Code) in effect from time to time, and accrued interest shall be payable together with the payment of the purchase price. All or part of the purchase price may be prepaid at any time without penalty or premium. As a condition to the issuance of the subordinated promissory note described above, the payee thereunder agrees to promptly execute, verify, deliver and file any (i) subordination, intercreditor or similar agreement requested by any holder of other indebtedness of the Company and (ii) any other agreement, document or instrument thereafter requested by any holder of other indebtedness of the Company from time to time in connection with such subordination.

(e)     Class B Units to be purchased pursuant to this Section 7.8 shall be purchased and sold at such place and time as the Manager designates. The Manager shall give the selling Class B Member at least five Business Days' prior written notice of the time, date and place of closing. At the closing, the selling Class B Member shall deliver to the Manager appropriate duly endorsed transfer instruments reasonably required by the Manager to transfer all of the Class B Units as to which the Manager has delivered a notice of its intent to purchase pursuant to this Section 7.8, free and clear of all claims, liens and encumbrances from any third parties, together with such other documentation as the Manager may reasonably require, including an agreement containing representations and warranties with respect to due authority, enforceability, no conflicts or violations, no required consents or approvals and valid title to such Class B Units, free and clear of all claims, liens or encumbrances of third parties.

(f)     If the selling Class B Member fails, for any reason, to tender the documents required for the purchase and sale of such Class B Units to be purchased by the Company from the selling Class B Member at the time and place specified by the Manager pursuant to Section 7.8(e), the selling Class B Member shall be deemed to have assigned all its right, title and interest in and to such Class B Units to the Company, and the selling Class B Member shall cease to have any rights with respect to such Class B Units except only to receive the purchase price therefor as computed pursuant to Section 7.8(a) or 7.8(b), as applicable, upon delivery of such instruments and such Class B Units shall be cancelled on the Company's books and shall no longer be outstanding.

(g)     Each Class B Member acknowledges that his or her employment, if any, by the Company is and will continue to be on an at-will basis, and that this Agreement does not constitute or

Plaintiffs0838

DocuSign Envelope ID: C461C4CD-9DA5-476E-9432-69B17726E05E

imply an employment contract nor guaranty or give such Class B Member any right to continued employment by the Company.

**ARTICLE 8**
**DISSOLUTION, LIQUIDATION**
**AND TERMINATION OF THE COMPANY**

8.1.     <u>Dissolution</u>. The Company shall be dissolved upon the first to occur of the following:

(a)     The approval of the Manager.

(b)     The approval of a Majority-in-Interests of the Members.

8.2.     <u>Procedure for Winding Up</u>.

(a)     In the event of the dissolution of the Company, the Manager or a liquidating agent appointed by the Manager (the Manager or liquidating agent hereinafter referred to as the "<u>Liquidating Agent</u>"), shall commence to wind up the affairs of the Company and to liquidate the Company's assets. The Interest Holders shall continue to share all Profits, Losses, and distributions during the period of liquidation in accordance with <u>Articles 4</u> and <u>5</u>. The Liquidating Agent shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company property pursuant to such liquidation, giving due regard to the activity and condition of the relevant market and general financial and economic conditions. If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets may receive that interest as a tenant-in common with all other Interest Holders so entitled. The fair market value of the assets shall be determined by the Liquidating Agent in its reasonable discretion.

(b)     The Liquidating Agent shall have all of the rights and powers with respect to the assets and liabilities of the Company in connection with the liquidation and termination of the Company that the Members and the Manager would have with respect to the assets and liabilities of the Company during the term of the Company, and the Liquidating Agent is hereby expressly authorized and empowered to execute any and all documents necessary or desirable to effectuate the liquidation and termination of the Company and the transfer of any assets.

(c)     Notwithstanding the foregoing, (i) a Liquidating Agent which is not an Interest Holder shall not be deemed an Interest Holder and shall not have any of the economic interests in the Company of an Interest Holder; and such Liquidating Agent shall be compensated for its services to the Company at normal and customary rates for its services to the Company as reasonably determined by the Manager, and (ii) a Liquidating Agent shall not enter into or carry out, or cause the Company to enter into or carry out, any transaction, contract, lease, license or other agreement with any Affiliate of the Liquidating Agent, any Affiliate of any Manager, and/or any Affiliate of any Interest Holder, unless the same has been approved by all Interest Holders. The Liquidating Agent, if a Manager or Member, shall not be entitled to any compensation for acting as the Liquidating Agent, but shall be entitled to be reimbursed for its expenses as provided in <u>Section 6.2</u>. A Liquidating Agent that is neither a Manager nor a Member shall be entitled to reasonable compensation for its services, as determined by the Manager in its reasonable discretion.

8.3.     <u>Distributions at Liquidation</u>. The Liquidating Agent shall, as soon as practicable, wind up the affairs of the Company and sell and/or distribute the assets of the Company. The assets of the Company shall be applied in the following order of priority:

Plaintiffs0839

(a) first, to pay the costs and expenses of the winding up, liquidation and termination of the Company;

(b) second, to creditors of the Company (including Interest Holders and their respective Affiliates) in the order of priority provided by law;

(c) third, to establish reasonable Reserves adequate to meet any and all contingent or unforeseen liabilities or obligations of the Company; provided that at the expiration of such period of time as the Liquidating Agent may deem advisable, the balance of such Reserves remaining after the payment of such contingencies or liabilities shall be distributed as hereinafter provided; and

(d) thereafter, in accordance with Section 4.1.

8.4. Negative Capital Account. Except if and as may be otherwise provided in this Agreement, no Interest Holder shall be obligated to restore a Negative Capital Account.

8.5. Termination. The Company shall terminate when all property owned by the Company shall have been disposed of and the assets shall have been distributed as provided in Section 8.3. The Liquidating Agent shall then execute (or cause to be executed) and cause to be filed articles of dissolution of the Company with the Secretary of State of the State of Delaware.

## ARTICLE 9
## BOOKS, RECORDS, ACCOUNTING
## AND TAX ELECTIONS

9.1. Bank Accounts. All funds of the Company shall be deposited in an account or accounts maintained in the Company's name at a bank or other financial institution. The Manager shall determine the bank, banks, institution or institutions at which the accounts will be opened and maintained, when such accounts shall be closed, the types of accounts, and the Persons who from time to time will have authority with respect to the accounts and the funds therein.

9.2. Books and Records. The Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Certificate and this Agreement and all amendments to the Certificate and this Agreement; a current list of the names and last known business, residence, or mailing addresses of all Interest Holders; and the Company's federal, state or local tax returns. The accounting and financial books, records and accounts of the Company shall be kept and maintained in accordance with such accounting principles as determined by the Manager. Any Member, or its duly authorized representatives, shall be entitled to a copy of the list of names and addresses of the Members, for any purpose reasonably related to its status as a Member or otherwise permitted by Applicable Law.

9.3. Annual Accounting Period and Taxable Year. The annual accounting period of the Company shall be its Fiscal Year. The Company's taxable year shall be selected by the Manager, subject to the requirements and limitations of the Code.

9.4. Reports. The Manager shall use its reasonable efforts to cause to be sent to each Interest Holder, within 90 days after the end of each Fiscal Year, the tax information concerning the Company which is necessary to prepare the Interest Holder's income tax returns for that Fiscal Year.

Plaintiffs0840

9.5.    Tax Matters Partner.

(a)    TSH, for as long as it is a Member, is hereby designated as the "tax matters partner" as referred to in Section 6231(a)(7)(A) of the Code to manage administrative tax proceedings conducted at the Company level by the Internal Revenue Service with respect to Company matters. Expenses of such administrative proceedings undertaken by the tax matters partner will be paid out of the Company Assets. The Tax Matters Partner shall keep all Interest Holders informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Partner. The Company shall pay and be responsible for all reasonable third-party costs incurred by the Tax Matters Partner in performing those duties and any costs and expenses incurred by the Tax Matters Partner in connection with an audit of a Company income tax return. An Interest Holder shall be responsible for any costs incurred by the Interest Holder with respect to any tax audit or tax-related administrative or judicial proceeding against any Interest Holder, even though it relates to the Company. The Tax Matters Partner may not compromise any dispute with the Internal Revenue Service without the approval of the Manager. The Tax Matters Partner may be removed and replaced at any time upon the approval of the Manager.

(b)    The following shall apply as to tax matters:

(i)    For purposes of this Section 9.5(b), unless otherwise specified, all references to provisions of the Code shall be to such provisions as enacted by the Bipartisan Budget Act of 2015 as such provisions may subsequently be modified.

(ii)    TSH, for as long as it is a Member, shall be the Company's designated "partnership representative" within the meaning of Code Section 6223 (the "Tax Representative") with sole authority to act on behalf of the Company for purposes of Subchapter C of Chapter 63 of the Code and any comparable provisions of state or local income tax laws. The Tax Representative shall keep all Interest Holders informed of all notices from government taxing authorities which may come to the attention of the Tax Representative.

(iii)    If the Company qualifies to elect pursuant to Code Section 6221(b) (or successor provision) to have Subchapter C of Chapter 63 of the Code not apply to any federal income tax audits and other proceedings, the Manager shall cause the Company to make such election.

(iv)    If any "partnership adjustment" (as defined in Code Section 6241(2)) is determined with respect to the Company, the Tax Representative shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall take such actions as it determines to be appropriate and as approved by the Managers, such approval, which shall not be unreasonably withheld, including whether to file a petition in Tax Court, cause the Company to pay the amount of any such adjustment under Code Section 6225, or make the election under Code Section 6226.

(v)    If any "partnership adjustment" (as defined in Code Section 6241(2)) is finally determined with respect to the Company and the Tax Representative has not caused the Company to make the election under Code Section 6226, then (i) the Members shall take such actions requested by the Tax Representative, including filing amended tax returns and paying any tax due in accordance with Code Section 6225(c)(2); (ii) the Tax Representative shall use commercially reasonable efforts to make any modifications

Plaintiffs0841

DocuSign Envelope ID: C461C4CD-9DA5-476E-9432-69B17726E05E

available under Code Section 6225(c)(3), (4) and (5); and (iii) to the extent that the Company is assessed amounts under Section 6221(a) of the Code, each current or former Member to which the assessment relates shall pay to the Company such Member's share of the assessed amounts (as determined by the Partnership Representative based on the provisions of Exhibit E hereto, including such Member's share of any accrued interest and penalties assessed against the Company relating to such Member's share of the assessment, no later than thirty (30) days following written notice from the Partnership Representative requesting the payment).

(c)     The obligations of each Member or former Member under this <u>Section 9.5</u> shall survive the Transfer or redemption by such Member of its Membership Interest and the termination of this Agreement or the dissolution of the Company.

9.6.     <u>Tax Elections</u>. The Manager shall have the authority to make (and abstain from making) all Company elections permitted under the Code, including elections of methods of depreciation and elections under Code Section 754.

9.7.     <u>Title to Company Property</u>. All real and personal property acquired by the Company shall be acquired and held by the Company in its name.

## ARTICLE 10
## AMENDMENTS AND WAIVERS

10.1.     <u>Amendments and Waivers</u>. Except as otherwise provided in <u>Section 10.2</u>, a provision of this Agreement may only be amended or waived from time to time by a Majority-in-Interest of the Members; provided, however, that a Majority-in-Interest of the Members shall not have the right to amend any provision of this Agreement that would have a material and disproportionate (taking into account the relative rights and obligations of the Class B Members) adverse effect on the rights or obligations of a Class B Member without the prior written consent of such Class B Member. No failure on the part of a Member or the Company to exercise, and no delay in exercising, any right, power or privilege hereunder operates as a waiver thereof; nor does any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, power or privilege.

10.2.     <u>Amendments Without Consent of the Members</u>. In addition to any amendments which may be made by the Interest Holders otherwise authorized herein, amendments may be made to this Agreement from time to time by the Manager, without the consent of any Member, to (a) cure any ambiguity, to correct or supplement any provisions herein which may be inconsistent with any other provision herein, or to add other provisions with respect to matters arising under this Agreement which will not be inconsistent with the provisions of this Agreement; (b) delete or add any provision to this Agreement required to be so deleted or added by any federal or state agency provided such provision is deemed by such agency to be for the benefit or protection of the Members; or (c) better assure, in the reasonable opinion of counsel to the Company, that the Company will continue to be classified as a pass-through entity for purposes of Federal income taxes; <u>provided</u>, <u>however</u>, that no amendment shall be adopted pursuant to this <u>Section 10.2</u> unless the adoption thereof (i) is for the benefit of or not adverse to the interests of all of the Interest Holders; (ii) is consistent with <u>Article 5</u>; and (iii) does not adversely affect the limited liability of the Interest Holders or the status of the Company as a pass-through entity for federal income tax purposes. Additionally, the Manager may, without the consent of the Interest Holders, amend the books and records of the Company from time to time to accurately reflect any additional issuance or Transfer of Interests in accordance with the terms contained herein, the withdrawal of any

Plaintiffs0842

DocuSign Envelope ID: C461C4CD-9DA5-476E-9432-69B17726E05E

Interest Holder in accordance with the terms contained herein, or the admittance of any new or substituted Interest Holder in accordance with the terms contained herein.

## ARTICLE 11
## GENERAL PROVISIONS

11.1.   Uniform Commercial Code. Interests and Membership Rights shall for all purposes be deemed to be a "security" under Articles 8 and 9 of the Uniform Commercial Code as adopted in any applicable jurisdiction.

11.2.   Further Assurances. Each Interest Holder shall execute all such certificates and other documents and shall do all such filing, recording, publishing and other acts as the Manager deems appropriate (a) to comply with the requirements of Applicable Law for the formation and operation of the Company; and (b) to comply with any Applicable Law relating to the acquisition, operation, or holding of the property of the Company.

11.3.   Notifications. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, a "Notice") required or permitted under this Agreement must be in writing (which shall be deemed to include facsimile and e-mail communications) and either (a) delivered personally, (b) sent by certified or registered mail, postage prepaid, return receipt requested, (c) sent by recognized overnight delivery service (including, without limitation, Federal Express) or (d) sent via facsimile, e-mail or other electronic communication (with confirmation of receipt). A Notice must be addressed to an Interest Holder at the Interest Holder's address set forth in the books and records of the Company (or the facsimile or e-mail address of the Interest Holder, if applicable). A Notice to the Company must be addressed to the Manager of the Company at the Company's principal place or business (or the facsimile or e-mail addresses of the Manager on record with the Company, if applicable). A Notice to a Manager must be addressed to such Manager at the Company's principal place of business (or the facsimile or e-mail address of the Manager on record with the Company, if applicable). A Notice that is sent by mail will be deemed given: (i) 3 Business Days to an address within the United States of America or (ii) seven Business Days to an address outside of the United States of America after it is mailed. A Notice sent by recognized overnight delivery service will be deemed given when received or refused. A Notice sent by facsimile or e-mail will be deemed given on the date received if received prior to 5 p.m. (in the time zone to which sent) or on the next day if received on the preceding day after 5 p.m. (in the time zone to which sent). Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

11.4.   Specific Performance. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other rights and remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach, all (if and to the extent permitted by Applicable Law) without being required to show actual damage or irreparable harm, and (if and to the extent permitted by Applicable Law) without having to furnish any bond or other security.

11.5.   Complete Agreement. This Agreement (including its Schedule and Exhibits), together with any written agreement among all of the Interest Holders or between the Company and an Interest Holder which is entered into in accordance with and complies with the terms of this Agreement,

Plaintiffs0843

DocuSign Envelope ID: C461C4CD-9DA5-476E-9432-69B17726E05E

constitute the complete and exclusive statement of the agreement among the parties hereto with respect to the subject matter hereof. This Agreement supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty.

      11.6.   <u>Applicable Law; Venue</u>. All questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware. Each Interest Holder hereby agrees that (a) any and all litigation arising out of this Agreement shall be conducted only in state or Federal courts located in the State of Illinois, and (b) such courts shall have the exclusive jurisdiction to hear and decide such matters. Each Interest Holder hereby submits to the personal jurisdiction of such courts and waives any objection such Interest Holder may now or hereafter have to venue or that such courts are inconvenient forums.

      11.7.   <u>Section Titles</u>. The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

      11.8.   <u>Binding Provisions</u>. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns

      11.9.   <u>No Third Party Beneficiaries</u>. Nothing contained in this Agreement is intended to confer upon any Person, other than the parties hereto and any successors and assigns described herein, any rights or remedies under or by reason of this Agreement.

      11.10.   <u>Terms.</u> Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

      11.11.   <u>Severability of Provisions</u>. Should any provision of this Agreement be held to be illegal, invalid or unenforceable, or legal, valid and enforceable only if modified, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon each party hereto with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties hereto further agree that any court or arbitrator is expressly authorized to modify any such illegal, invalid or unenforceable provision of this Agreement in lieu of severing such illegal, invalid or unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law. The parties hereto expressly agree that this Agreement as so modified shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

      11.12.   <u>Counterparts, Facsimile; Reproductions</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute one and the same instrument. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart. This Agreement and any amendments hereto, to the extent signed and delivered by means of a facsimile machine, PDF or other electronic communication (including without limitation e-mail), shall be treated in all manner and respects and for all purposes as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version hereof delivered in person. At the request of any party hereto, each other

Plaintiffs0844

DocuSign Envelope ID: C461C4CD-9DA5-476E-9432-69B17726E05E

party hereto shall re-execute original forms hereof and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine, e-mail or other electronic communication to deliver a signature or the fact that any signature was transmitted or communicated through the use of a facsimile machine, e-mail or other electronic communication as a defense to the formation or enforceability of a contract and each such party forever waives any such defense. Upon execution in accordance herewith, this Agreement may be reproduced by any photographic, photostatic, microfilm, optical disk, micro-card, miniature photographic or other similar process, each of which reproduction of this Agreement shall be deemed an original.

      11.13. <u>Legal Expenses</u>. If any legal action or other proceedings (including arbitration) (a "<u>Proceeding</u>") is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any provisions of this Agreement, the successful or prevailing party (if any) shall be entitled to recover reasonable attorney's fees, court costs, and all expenses even if not taxable as court costs (including, without limitation, all such fees, costs, and expenses incident to appeals), incurred in that action or proceeding, in addition to any other relief to which such party or parties may be entitled. Without limiting the foregoing, to the extent any holder of Class B Units is involved in any Proceeding against the Company, the Company shall have a lien on the Class B Units owned by such holder as security for the payment of any such fees, costs and expenses which may be owed by such holder of Class B Units to the Company. Such lien shall not be released until a final, non-appealable order has been issued in such Proceeding.

      **11.14. <u>Legal Counsel</u>. RM Partners Law LLC ("<u>RMP</u>") has acted as legal counsel to the Company and TSH (collectively, "<u>Topstep Entities</u>"). No legal counsel has been engaged by the Company to protect or otherwise represent the interests of the other Interest Holders. Each Interest Holder: (a) approves RMP's representation of the Company and Topstep Entities in the preparation of this Agreement; (b) acknowledges that no legal counsel has been engaged by the Company to protect or otherwise represent the interests of the other Interest Holders, that RMP has not been engaged by the other Interest Holder to protect or represent the interests of the Company or any such Interest Holder vis-a-vis the Company in connection with the preparation of this Agreement, and that actual or potential conflicts of interest may exist among the other Interest Holders in connection with the preparation of this Agreement (with the consequence that an Interest Holder's interests may not be vigorously represented unless such other Interest Holder engages its, his or her own legal counsel); (c) acknowledges and agrees that RMP may take direction from Topstep Entities in connection with the drafting, preparation and negotiation of this Agreement and the formation of the Company; (e) acknowledges that the attorneys, accountants and other experts who perform services for any of the Members or their Affiliates, if approved by the Manager as provided herein, may also perform services for the Company; and (g) acknowledges further that such Interest Holder has been afforded the opportunity to engage and seek the advice of its, his or her own legal counsel before entering into this Agreement. TO THE EXTENT THAT THE FOREGOING CONSTITUTES A CONFLICT OF INTEREST, EACH MEMBER HEREBY EXPRESSLY WAIVES ANY SUCH CONFLICT OF INTEREST.**

Plaintiffs0845

IN WITNESS WHEREOF, the undersigned have executed the Amended and Restated Limited Liability Company Agreement as of the date first written above.

**MANAGER:**

Patak Holdings, Inc.

By: *Michael Patak*
Name: Michael Patak
Title: President

**MEMBERS:**

**Class A Member**

Topstep Holdings LLC

By: Patak Holdings, Inc.
  Its: Manager

By: *Michael Patak*
Name: Michael Patak
Title: President

Plaintiffs0846

IN WITNESS WHEREOF, the undersigned have executed the Amended and Restated Limited Liability Company Agreement as of the date first written above.

**MEMBERS**

**Class B Members**

Melissa Footlick

Jay Rudman

Griffin Caprio

Erin Clark

Kayne Grau

Raman Chadha

Doug Monieson

Robin Simkins

Mark Meadows

Preya Patel

Susan Silver

Melissa Molinski

{00140793 4}

Plaintiffs0847

DocuSign Envelope ID: C461C1CD-9DA5-476E-9432-69B17726E05E

## **Schedule A**

### **INTEREST HOLDERS' UNITS
AND PERCENTAGE INTERESTS**

Plaintiffs0848