**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MELISSA FOOTLICK; ERIN CLARK; TOBY ADAMSON; JAY RUDMAN; AND GRIFFIN CAPRIO, | |
| Plaintiffs, | Case No. 1:22-cv-06152 |
| v. | |
| TOPSTEP LLC; TOPSTEP HOLDINGS LLC, TOPSTEPTRADER LLC, TOPSTEPPEOPLE INC., PATAK HOLDINGS, INC.; and MICHAEL PATAK, *in his individual capacity*, | Judge John Robert Blakey Magistrate Judge Jeffrey Cole |
| Defendants. | |

---

MICHAEL PATAK, *in his individual capacity*; PATAK HOLDINGS, INC.

Cross-Claim Plaintiffs,

v.

JAY RUDMAN

Cross-Claim Defendant.

---

TOPSTEP LLC; TOPSTEP HOLDINGS LLC, TOPSTEPTRADER LLC, TOPSTEPPEOPLE INC.,

Counterclaim-Claim Plaintiffs,

v.

MELISSA FOOTLICK; ERIN CLARK; TOBY ADAMSON; JAY RUDMAN,

Counterclaim-Claim Defendants.

---

1

**DEFENDANTS' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT,
AFFIRMATIVE DEFENSES, CROSS-CLAIM, AND COUNTER-CLAIMS**

Defendants Topstep LLC ("Topstep" or the "Company"), Topstep Holdings LLC ("Topstep Holdings"), TopstepTrader LLC ("TopstepTrader"), Patak Holdings, Inc. ("Patak Holdings"), and Michael Patak ("Patak") (collectively "Defendants"),[1] by and through their attorneys, answer Plaintiffs' Second Amended Complaint ("Complaint") as follows:

**NATURE OF ACTION**

1.    Plaintiffs have suffered injury and damage from Defendants' breach of the 2020 Operating Agreement, Incentive Unit Award Agreements, and violation of fiduciary duties.

**ANSWER:   The allegations in this paragraph contain a legal conclusion; thus, no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 1.**

2.    Plaintiffs bring this action to recover compensation and damages they are rightfully entitled to, but due to Defendants' negligent and wrongful conduct, never received.

**ANSWER:   Defendants deny the allegations that Defendants engaged in negligent and wrongful conduct. The remaining allegations in this Paragraph contain legal conclusions; thus, no response is required. To the extent a response is required as to the remaining allegations, Defendants deny the remaining allegations contained in Paragraph 2.**

3.    In addition, Topstep discriminated against and denied equal pay to the female Plaintiffs, *e.g.*, Topstep:  (a) failed and refused to obtain a third-party valuation when assigning

---

[1] Defendants plead this Answer jointly on behalf of each individual Defendant, whom were or are all either individuals or corporate entities affiliated with Topstep. Unless otherwise specified, with the exception of Patak, where an Answer to a particular Paragraph in the Complaint admits or denies conduct by certain Defendants and not others, the other Defendants lack knowledge or information sufficient to form a belief as to the allegations of that particular Paragraph. By way of example, Patak Holdings was a corporate entity that was affiliated with TopstepTrader and Topstep until February 2021, (Compl. ¶ 12), and has no knowledge or information concerning any allegations of events that occurred after that timeframe.

value to the female Plaintiffs' Incentive Units; (b) assigned purchase prices in an unreasonable and arbitrary manner; (c) assigned values that are lower than similarly situated males—in Ms. Adamson's case $0; (d) provided less favorable payment terms to the female Plaintiffs; (e) subjected a 2019 offer of Incentive Units to the 2020 Operating Agreement's profit hurdle, which increased by 43%; and, (f) denied female Plaintiffs credit for all vested incentive units, in violation of the Equal Pay Act, Title VII of the 1964 Civil Rights Act, the Illinois Equal Pay Act, and Illinois Human Rights Act.

**ANSWER:** **Defendants admit that Topstep LLC redeemed Plaintiffs' Class B units consistent with and pursuant to the Amended and Rested Limited Liability Company Agreement of Topstep LLC dated January 1, 2020 ("2020 Operating Agreement"). Defendants otherwise deny the allegations contained in Paragraph 3.**

<u>JURISDICTION AND VENUE</u>

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Counts I and II arise under the laws of the United States, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.*; and the Equal Pay Act, 29 U.S.C. § 621, *et seq.*

**ANSWER:** **Defendants admit the allegations contained in Paragraph 4.**

5. This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367 on the grounds that the state law claims are so related to the federal claims that they form a part of the same case or controversy.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 5.**

6.     This Court has personal jurisdiction over Defendants because they reside in, transact business in, otherwise have significant contacts with this District, and a substantial part of the events giving rise to these claims occurred in this District.

**ANSWER:     Defendants admit the Court has personal jurisdiction over Defendants. Defendants deny the remaining allegations in Paragraph 6.**

7.     Venue is proper in this District as Defendants reside in, transact business in, otherwise have significant contacts with this District, and a substantial part of the events giving rise to these claims occurred in this District.

**ANSWER:     Defendants admit venue is proper in this District. Defendants deny the remaining allegations in Paragraph 7.**

8.     Footlick, Clark, and Adamson timely filed charges of sex discrimination with the Equal Employment Opportunity Commission ("EEOC"). Copies of Footlick's, Clark's, and Adamson's Notices of Right to Sue from the EEOC are attached hereto as Exhibit A.

**ANSWER:     The allegations in Paragraph 8 refer to certain materials filed with the Equal Employment Opportunity Commission ("EEOC"). Those documents speak for themselves, and Defendants deny any characterization thereof.**

<u>**THE PARTIES**</u>

9.     Upon information and belief, Defendant Topstep is a Delaware limited liability company.  Topstep's principal place of business is 141 W. Jackson Blvd., Suite 4240, Chicago, IL 60604.  Upon information and belief, Defendant Topstep Holdings serves as the manager of Topstep.

**ANSWER:     Defendants admit the allegations contained in Paragraph 9.**

10.    Upon information and belief, Defendant Topstep Holdings LLC is an Illinois limited liability company with its principal office at 224 N. Des Plaines St. #350, Chicago, IL 60661.  Michael Patak is the sole owner and manager of Topstep Holdings. Topstep Holdings is the sole Class A Member of Topstep.

**ANSWER:    Defendants deny that Topstep Holdings LLC is an Illinois LLC and state that it is a Delaware LLC.  Defendants further deny that Michael Patak is the sole owner of Topstep Holdings.  Defendants further deny that Topstep Holdings' principal office is at 224 N. Des Plaines St. #350, Chicago, IL 60661. Defendants otherwise admit the allegations contained in Paragraph 10.**

11.    Upon information and belief, Defendant Michael Patak is the sole owner, manager, and President of Patak Holdings, Inc. and Topstep Holdings. Upon information and belief, Patak resides in Pitkin County, Colorado.

**ANSWER:    Defendants deny that Michael Patak is the sole owner, manager, and President of Patak Holdings, Inc., which is no longer in existence. Defendants otherwise admit the allegations contained in Paragraph 11.**

12.    Upon information and belief, Defendant Patak Holdings Inc. was an Illinois corporation with its principal place of business located at 130 S. Jefferson, Suite 200, Chicago, IL Effective January 1, 2020, Patak Holdings was the sole Manager of TopstepTrader and Topstep. Patak Holdings was voluntarily dissolved in or around Thursday, February 4, 2021.  At all relevant times, Michael Patak was the sole owner, Manager, and President of Patak Holdings, Inc.

**ANSWER:    Defendants admit the allegations contained in Paragraph 12.**

13. Upon information and belief, Defendant TopstepTrader LLC is an Illinois limited liability company with a principal office at 224 N. Des Plaines St. #350, Chicago, IL 60661. Topstep Holdings serves as manager of TopstepTrader.

**ANSWER: Defendants deny that TostepTrader's principal office is at 224 N. Des Planes St. #350, Chicago IL 60661. Defendants otherwise admit the allegations contained in Paragraph 13.**

14. Upon information and belief, Defendant TopstepPeople Inc. is a Delaware Corporation and not registered to do business in Illinois.

**ANSWER: Defendants admit the allegations contained in Paragraph 14.**

15. Plaintiff Melissa Footlick was employed by Patak Trading Partners, TopstepTrader, and Topstep from September 20, 2010 to approximately September 3, 2021. Footlick is female and resides in Johnson County, Kansas.

**ANSWER: Defendants admit that Plaintiff Melissa Footlick was employed by Patak Trading Partners, TopstepTrader, and TopstepPeople from September 20, 2010 until approximately September 3, 2021. Defendants deny that Footlick was employed by Topstep LLC. Defendants further admit that Plaintiff Melissa Footlick is a female. Defendants lack sufficient knowledge or information to form a belief as to the allegation that Plaintiff Melissa Footlick resides in Johnson County, Kansas, and therefore deny and demand strict proof of same.**

16. Plaintiff Erin Clark was employed by TopstepTrader and Topstep from approximately November 2012 through July 2, 2021. Clark is female and resides in Cook County, Illinois.

**ANSWER:** **Defendants admit that Erin Clark was employed by TopstepTrader and TopstepPeople from approximately November 2012 through July 2, 2021. Defendants deny that Footlick was employed by Topstep. Defendants further admit that Plaintiff Erin Clark is female. Defendants lack sufficient knowledge or information to form a belief as to the allegation that Plaintiff Erin Clark resides in Cook County, Illinois, and therefore deny and demand strict proof of same.**

17. Plaintiff Toby Adamson was employed by TopstepTrader and Topstep from September 24, 2019 to May 25, 2022. Adamson is female and resides in Cook County, Illinois.

**ANSWER:** **Defendants admit that Plaintiff Toby Adamson was employed by TopstepTrader and TopstepPeople from September 24, 2019 until May 25, 2022. Defendants deny that Adamson was employed by Topstep. Defendants further admit that Plaintiff Toby Adamson is female. Defendants lack sufficient knowledge or information to form a belief as to the allegation that Plaintiff Toby Adamson resides in Cook County, Illinois, and therefore deny and demand strict proof of same.**

18. Plaintiff Jay Rudman was employed by TopstepTrader and Topstep from approximately 2016 through January 31, 2022. Rudman resides in Cook County, Illinois.

**ANSWER:** **Defendants admit that Plaintiff Jay Rudman was employed by TopstepTrader and Topstep from approximately 2016 through January 31, 2022, including as Chief Executive Officer from March 7, 2017 until January 31, 2022. Defendants lack sufficient knowledge or information to form a belief as to as to the allegation that Plaintiff Jay Rudman resides in Cook County, Illinois, and therefore deny and demand strict proof of same.**

19.    Plaintiff Griffin Caprio was an advisor of TopstepTrader and Topstep from December 2015 through February 2022. Caprio resides in Cook County, Illinois.

**ANSWER:   Defendants admit that Plaintiff Griffin Caprio was an advisor of TopstepTrader and Topstep from December 2015 through February 2022. Defendants lack sufficient knowledge or information to form a belief as to as the allegation that Plaintiff Griffin Caprio resides in Cook County, Illinois, and therefore denies and demands strict proof of same.**

## INTRODUCTION

20.    Plaintiffs are former employees and/or advisors of Topstep.  After devoting their time and talent to Topstep, Plaintiffs earned Class B units as a reward, incentive, and compensation ("Incentive Units"). Topstep provided employees with clarification on how to accurately and fully understand the value of their Incentive Units. In 2019, Topstep explained that assuming revenue of \$15,000,000, a prospective buyer may purchase Topstep for 4x revenue, so each 1% interest in Topstep equates to \$600,000 of value. "Amortized over a 4-year vesting period, that contributes \$150,000 annually to your total compensation."

**ANSWER:    Defendants admit that Plaintiffs are former employees and/or advisors of Topstep entities and that TopstepTrader and Topstep offered Class B units to Plaintiffs. Defendants further admit that the remainder of Paragraph 20 quotes from a document Defendants drafted in or before 2019 which has been produced in this litigation, but further state that the document bears a header stating that "Any example given below is purely hypothetical and illustrative" and that "Topstep makes no guarantees or promises around . . . incentive units." Defendants otherwise deny the allegations in Paragraph 20.**

8

21.     On March 30, 2020, Defendants represented to Plaintiffs via email that Topstep Trader and its related entities were undergoing a restructuring of the companies and ownership, and "[e]ffective January 1, 2020, TopstepTrader's profit interests will be contributed to Topstep LLC." The email states, "As a profit interest holder, you may wonder what this means for you. Essentially, it just means you have ownership over TopstepTrader, and ALL its entities.  Other than tax reporting . . . you will see nothing change and it will be 'business as usual.'"

**ANSWER:     Defendants admit that, on March 30, 2020, Melissa Elaguizy, an Accounting Manager and Director of Finance at TopstepTrader sent an email to all members, including Plaintiffs, regarding the planned restructuring which contained the above text identified in Paragraph 21.  Defendants further state that Ms. Elaguizy's email was drafted at the direction of, and approved by, Plaintiff Jay Rudman who was the Chief Executive Officer of TopstepTrader at the time the email was sent.**

22.     Upon information and belief, from January 1 – December 31, 2020, Topstep's gross revenue exceeded $25,000,000 and EBITDA exceeded $3,700,000 total gross revenue from January 1, 2021 - October 31, 2021, a partial year, exceeded $25,000,000.

**ANSWER:     Defendants deny the allegations contained in Paragraph 22.**

23.     In 2021, Plaintiffs Footlick and Clark, both female, left their roles at Topstep for various reasons—*e.g.*, after nine years of service, Topstep laid off Clark.

**ANSWER:     Defendants admit that Plaintiffs Footlick and Clark left their roles at Topstep in 2021. Defendants deny any characterizations implied by the remaining allegations contained in Paragraph 23.**

24.     In November 2021, Topstep attempted to force a redemption of Clark's and Footlick's Incentive Units.  Topstep did not obtain an independent or third-party valuation or

engage in a formal internal valuation. Instead, Topstep claimed the entire company was worth $5,143,000—a fraction of revenue for a single year. Notably, Patak had recently diverted more than $5,000,000 in distributions to himself.

**ANSWER:** **Defendants admit that, pursuant to Section 7.8 of the 2020 Operating Agreement, Topstep redeemed Clark's and Footlick's Incentive Units following their departure from the Company. Defendants further admit that, on November 21, 2021, the Manager of Topstep determined the fair market value of the Company to be $5,143,000 and set forth the basis for that valuation in the executed Written Consent resolution. Defendants otherwise deny the allegations contained in Paragraph 24.**

25. Moreover, Topstep tried to redeem the women's incentive units via an unsecure four-year promissory note, subordinate to all other Company debt.

**ANSWER:** **Defendants admit that Topstep redeemed Plaintiff Footlick and Clark's incentive units in accordance with Section 7.8(b)(ii) of the 2020 Operating Agreement. Defendants otherwise deny the allegations contained in Paragraph 25.**

26. Upon information and belief, Topstep previously provided more favorable redemption values and payment terms to male employees; for example in 2018, Topstep made a lump sum cash payment and valued the company at 2x revenue when redeeming the interest of a departing male employee.

**ANSWER:** **Defendants deny the allegations in Paragraph 26 as to Topstep. Defendants admit that TopstepTrader redeemed a male employee in 2018 and state that such redemption was made by a different entity entirely, pursuant to a different operating agreement, and at a completely different time in the organization facing, *inter alia*, different financial and business circumstances.**

27.     Clark and Footlick objected to and rejected the purported redemption and requested documents and records, and an independent appraisal.   Topstep refused to provide complete documents and information, or obtain an evaluation.

**ANSWER:     Defendants admit that Clark and Footlick objected to the redemption and requested documents, records, and an independent appraisal. Defendants admit that, consistent with the requirements of the 2020 Operating Agreement, Topstep did not obtain an independent appraisal. Defendants further admit that, although Footlick and Clark requested certain records pertaining to Topstep, their redemption was shortly thereafter effected pursuant to a notice delivered prior to any request, and therefore Clark and Footlick were not subsequently provided the requested documents as they no longer held any interest in Topstep. Defendants deny the remaining allegations contained in Paragraph 27.**

28.     Around this time, Plaintiffs learned that through the restructuring and various amendments, Defendants engaged in a scheme to strip away Plaintiffs' rights and benefits, and reduce the value of Incentive Units, e.g. the restructuring and amendments purportedly:

a.          Provided vested shares could be redeemed for $1, should the employee voluntarily withdraw from the company or be terminated;

b.          Created unfavorable payment terms via "unsecured promissory note . . . junior in right of payment to all other indebtedness of Company, . . . payable in four annual payments on the first, second, third, and fourth anniversaries of the closing;"

c.          Reduced Manager's fiduciary duties;

d.          Eliminated Plaintiffs' rights to independent appraisals; and,

e.          Decreased the value of the Incentive Units by carrying more organizational debt and liabilities.

**ANSWER:** **Defendants admit that the 2020 Operating Agreement effected changes to the manner in which redemptions would be completed. The 2020 Operating Agreement is attached as an Exhibit to the Second Amended Complaint and speaks for itself. Defendants deny any characterization thereof. Defendants further deny that they "engaged in a scheme to strip away Plaintiff's rights and benefits" and affirmatively state that Plaintiff Jay Rudman was Chief Executive Officer of TopstepTrader at the time of the restructuring and was the individual principally responsible for negotiating, drafting, communicating, and implementing the 2020 Operating Agreement with the assistance of outside counsel. Defendants otherwise deny the allegations in Paragraph 28.**

29.     In 2022, Plaintiffs Rudman (male), Caprio (male), and Adamson (female) separated from Topstep.

**ANSWER:** **Defendants admit that Plaintiff Caprio separated from an advisor role with Topstep and Rudman and Adamson separated from employment with TopstepPeople, Inc. in 2022.**

30.     In May 2022, Topstep obtained a third-party valuation.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 30.**

31.     Thereafter, Defendants attempted to redeem Rudman, Caprio, and Adamson's vested Incentive Shares at purchase prices far below fair market value.

**ANSWER:** **Defendants admit that Topstep redeemed the Incentive Shares issued to Plaintiffs Rudman, Caprio, and Adamson, but otherwise deny the allegations contained in Paragraph 31.**

32.     Defendants claimed the "fair market value" of Adamson's (female) 150,315 vested units was "$0, but in its discretion [was] willing to pay $1.00."

**ANSWER: Defendants admit that Topstep determined, pursuant to the 2020 Operating Agreement, that the fair market value of Adamson's 150,315 vested incentive units was $0, and advised that in its discretion, it would pay $1.00.**

33. In contrast, although Defendants grossly undervalued Rudman and Caprio's interests, Defendants assigned some worth to the men's Incentive Shares, e.g., Defendants claimed the "fair market value" of Caprio's 272,790 vested units was $18,788.

**ANSWER: Defendants admit that Topstep determined that the fair market value of Caprio's 272,790 vested units was $18,788. Defendants otherwise deny the allegations in Paragraph 33.**

34. Moreover, Defendants did not subject Caprio to the unfavorable 4 year promissory note, instead, Defendants tendered a check for the purported purchase price.

**ANSWER: Defendants admit that Caprio was tendered a check for the purchase price of his vested units. Defendants deny the remaining allegations contained in Paragraph 34.**

35. Rudman, Caprio, and Adamson objected to and rejected Topstep's redemptions because the purported purchase prices were grossly undervalued, unreasonable, and not made in good faith.

**ANSWER: Defendants admit that Rudman, Caprio, and Adamson objected to the redemptions. Defendants deny the remaining allegations contained in Paragraph 35.**

## GENERAL FACTUAL BACKGROUND

36. Plaintiffs herein were employed by or retained as advisors to Topstep or its affiliates at various times; none of the Plaintiffs are current employees or advisors.

**ANSWER:** Defendants admit the allegations contained in Paragraph 36 to the extent they pertain to Topstep or its affiliates. Defendants lack sufficient knowledge or information to form a belief as to whether Plaintiffs are current employees or advisors to any other entities.

37. In exchange for their service to Topstep, Plaintiffs earned Incentive Units via Incentive Unit Award Agreements.

**ANSWER:** Defendants admit that TopstepTrader and Topstep awarded Incentive Units to the Plaintiffs. Defendants deny any characterization of such award as "earned" and the Award Agreements speak for themselves as to the terms and conditions of the award of such Incentive Units. Defendants deny the remaining allegations contained in Paragraph 37.

38. Topstep is a financial technology firm based in Chicago, Illinois.

**ANSWER:** Defendants admit that Defendants provide an online service and engage in training in a simulated markets with funding and actual live trading components. At all times during the relevant periods Defendants solely white labeled and relied on third party technology for its operations. Defendants deny and specific characterization thereof, and any remaining allegations in this Paragraph 38.

39. Topstep provides training and resources to customers that desire to become familiar with day-trading futures and foreign exchange contracts.

**ANSWER:** Defendants admit the allegations contained in Paragraph 39 as to futures contracts. Topstep further admits that it attempted to provide such training and resources in foreign exchange markets but shuttered any such activity for regulatory compliance in 2022 shortly after Rudman's departure. Defendants deny the remaining allegations contained in this Paragraph 39.

14

40.     Customers who pass Topstep's initial evaluation, known as the Trading Combine, earn a funded trading account.

**ANSWER:     Defendants admit that under certain circumstances, graduates of the Combine which is administered by TopstepTrader may, among other options and circumstances, earn a funded trading account with an affiliate of Topstep. Defendants deny any characterization of such outcome as an oversimplification of Topstep's business and structure. Defendants deny any remaining allegations contained in Paragraph 41.**

41.     These customers trade futures contracts in the financial markets using Topstep's capital.

**ANSWER:     Defendants admit that under certain circumstances, graduates of the Combine which is administered by TopstepTrader may, among other options and circumstances, trade futures contracts in the financial markets with an affiliate of Topstep. Defendants deny any characterization of such outcome as an oversimplification of Topstep's business and structure. Defendants deny any remaining allegations contained in Paragraph 41.**

42.     In 2020, Topstep's gross revenue exceeded $25,000,000 and EBITDA exceeded $3,700,000.

**ANSWER:     Defendants deny the allegations contained in Paragraph 42.**

43.     Topstep's growth continued. Total gross revenue from January 1, 2021 – October 31, 2021, a partial year, exceeded $25,000,000.

**ANSWER:     Defendants deny the allegations contained in Paragraph 43.**

**I.     Company Founding, Ownership, and Organization**

44.     Patak founded Patak Trading Partners in or around December 2009.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 44.**

45.  In 2010, Patak hired Footlick as Recruitment Manager of Patak Trading Partners.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 45.**

46.  On or around July 12, 2012, Patak and Footlick created TopstepTrader.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 46.**

47.  In 2013, as compensation for Footlick's outstanding performance, and to incentivize her to stay, Patak offered her Class B units in TopstepTrader.

**ANSWER:** **Defendants admit that Footlick was provided Class B units in TopstepTrader in 2013 pursuant to an Award Agreement, the terms and conditions of which speak for themselves. Defendants deny any characterization of such award outside of the Award Agreement and any remaining allegations in Paragraph 47.**

**A.  The 2016 Operating Agreement**

48.  On October 1, 2016, TopstepTrader's members—Footlick and Patak—entered into an Amended and Restated Operating Agreement ("2016 Operating Agreement"). A true and accurate copy of the 2016 Operating Agreement is attached hereto as Exhibit B.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 48.**

49.  Patak appointed Patak Holdings as Manager of TopstepTrader.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 49**

50.  Section 6.07 of the 2016 Operating Agreement provides that "Each Manager shall discharge the Manager's duties to the Company and other Members in good faith and with that degree of care that an ordinarily prudent person in a similar position would use under similar circumstances."

**ANSWER:** **Defendants admit the allegations contained in Paragraph 50.**

16

51.    Section 8.07 of the 2016 Operating Agreement provides:

If any Person who was issued Class B Units ceases to be employed by the Company for any reason at any time, the Company shall have the right, but not the obligation, to purchase all of the Vested Class B Units that were issued to such Person (regardless of whether such Units are still held by the Person or have been Transferred in accordance with this Agreement) on the following terms: (1) for the Fair Market Value of such Class B Units at the time of such termination of employment unless an employee is terminated for cause or quits and goes to work for a direct competitor . . . .

**ANSWER:    Defendants admit that the language quoted in Paragraph 50 of the 2016 Operating Agreement, but state that the full provisions of the 2016 Operating Agreement speak for themselves as to the process for redemptions of Class B Units and deny any attempt by the allegations in Paragraph 50 to limit or mischaracterize them.**

52.    The 2016 Operating Agreement defines "Fair Market Value," as "with respect to any property on a given date as determined in good faith by the Manager, the amount a willing buyer would pay a willing seller for such property, where neither the buyer nor the seller is under any compulsion to buy or sell and both are aware of all the material facts with respect to the property."

**ANSWER:    Defendants admit the allegations contained in Paragraph 52.**

53.    Section 8.04 of the 2016 Operating Agreement provides that a member selling their incentive units may obtain up to three independent appraisals to determine the shares' fair market value.

**ANSWER:    Defendants admit the 2016 Operating Agreement provided for a dispute resolution involving appraisals obtained by, and at the cost of, various differing**

parties. **Defendants deny the characterization and implication that such appraisals were to be obtained solely by a seller and further denies any remaining allegations in Paragraph 53.**

### B. Incentive Units

54.    Plaintiffs were awarded Incentive Units in TopstepTrader and/or Topstep.

**ANSWER:    Defendants admit the allegations contained in Paragraph 54 as to all Plaintiffs other than Adamson. Defendants admit that Adamson was awarded Incentive Units in Topstep and deny that Adamson was issued Incentive Units in TopstepTrader. Adamson was never a party to the 2016 Operating Agreement and furthermore never a direct interest holder in TosptepTrader.**

55.    Topstep described the Incentive Units as follows:

[I]n layman's terms, your incentive units are "profit interests" which means once vested, you have certain rights to Topstep's profits. These incentive units are not options. However, similar to an option's strike price, there is a "hurdle" (currently $16M). As of July 2019, Topstep's expected revenues for the year . . . should approximate $15M. Assuming a multiple of 4x revenues, that hypothetically implies a buyer might pay $60M for Topstep. Thus, in this hypothetical example, each 1% interest in Topstep equates to $600,000 of value (not accounting for the profit hurdle). Amortized over a 4-year vesting period, that contributes $150,000 annually to your perceived total compensation. Furthermore, a change in control accelerates the vesting of incentive units, therefore potentially reducing the denominator when calculating per year compensation. Again, the example outlined above is hypothetical, but it is Topstep's current belief that its revenues, and therefore its value, will only continue to grow over time.

**ANSWER:    Defendants admit that Paragraph 55 accurately quotes the excerpt from the uncited correspondence contained in Paragraph 55. Defendants further state that the header to the document quoted in Paragraph 55 contains a header stating in bold and italics that "[a]ny example given below is purely hypothetical and illustrative. Topstep makes no guarantees or promises around CPP or incentive units."**

56.     Over time, Topstep's revenue and value grew vastly. For example, Topstep increased the profit hurdle for Class B incentive shares as follows:

a.     2017: $100,000;

b.     2018: $250,000;

c.     2019: $16,000,000;

d.     2020: $28,000,000.

**ANSWER:     Defendants admit that Topstep increased the profit interest hurdle for Class B incentive units consistent with the values alleged in Paragraph 56. Defendants deny that the profit interests hurdles reflected or corresponded with the growth or value of Topstep's revenue changes and further state that the hurdles were determined by Michael Patak, with input from Jay Rudman, to be of an amount necessary to cause each unit to constitute a "profits interest" within the meaning of Revenue Procedures 93-27 and 2001-43. Defendants deny the remaining allegations and characterizations implied by the remaining allegations contained in Paragraph 56.**

**C.     The 2020 Restructuring and Amended Operating Agreement**

57.     On March 30, 2020, Topstep emailed all members to advise that effective January 1, 2020, TopstepTrader and related entities, would be restructured under Topstep and various subsidiaries.

**ANSWER:     Defendants admit that on March 30, 2020, Melissa Elaguizy an Accounting Manager and Director of Finance at TopstepTrader LLC, sent the email referred to in Paragraph 57. Defendants further state that Ms. Elaguizy's email was drafted at the direction of, and approved by, Plaintiff Jay Rudman who was the Chief Executive Officer at the time the email was sent.**

19

58.    The correspondence from Melissa Elaguizy, Topstep's former Accounting Manager and Director of Finance provides that:

> [b]y restructuring, we are moving to a more organized business structure which provides all members benefits from all entities . . . [p]reviously, our Funded Trader entities (TopstepFX and TopstepFunded (FKA Patak Trading Partners) were solely owned by Michael Patak. However, this restructure moves these entities under the umbrella of Topstep LLC. This gives interest holders the benefits of having an interest in the company in its entirety, not piecemeal.

**ANSWER:    Defendants admit the allegations contained in Paragraph 58. Defendants further state that Ms. Elaguizy's email was drafted at the direction of, and approved by, Plaintiff Jay Rudman who was the Chief Executive Officer at the time the email was sent.**

59.    In the same email, Topstep advised its members "As a profit interest holder, you may wonder what this means for you. Essentially, it just means you have ownership over TopstepTrader, and ALL its entities. Other than tax reporting . . . you will see nothing change and it will be 'business as usual.'"

**ANSWER:    Defendants admit that Paragraph 59 accurately quotes the correspondence from Melissa Elaguizy. Defendants further state that Ms. Elaguizy's email was drafted at the direction of, and approved by, Plaintiff Jay Rudman who was the Chief Executive Officer at the time the email was sent.**

60.    Topstep's March 30, 2020 email fraudulently misrepresented changes to the Class B Members and Incentive Unit holders.

**ANSWER:    Defendants deny the allegations contained in Paragraph 60.**

61.    It was not business as usual, for example, the restructuring saddled Incentive Units with more debt and liabilities on the balance sheet decreasing the overall value of the Incentive Units.

**ANSWER:   Defendants deny the allegations contained in Paragraph 61.**

62.    In addition, the following changes were adopted in Topstep's January 1, 2020 Amended and Restated Limited Liability Company Agreement ("2020 Operating Agreement"):

a.    The fair market value of the Class B units is determined solely by the reasonable discretion of Manager;

b.    Class B Members' right to independent appraisals and valuations was eliminated;

c.    Nearly all fiduciary duties were removed; and,

d.    If the company terminates the employment of a Class B unit holder, or if a Class B unit holder withdraws from the company without "good cause," Topstep has an option to purchase the Class B unit holder's vested units at an aggregate price equal to $1.

**ANSWER:   Defendants admit the allegations contained in Paragraph 62.**

63.    A true and accurate copy of the 2020 Operating Agreement is attached hereto as Exhibit C.

**ANSWER:   Defendants deny that Exhibit C to the Complaint is a true and accurate copy of the 2020 Operating Agreement to the extent that it does not include the First Amendment to the 2020 Operating Agreement dated January 1, 2020.**

64.    Upon information and belief, Patak, and/or various entities owned and controlled by Patak, adopted several amendments to Topstep's Operating Agreement, management, and governance without disclosure to the Class B Members, including but not limited to, removing Patak Holdings as Topstep's Manager and appointing Topstep Holdings.

**ANSWER:** **Defendants admit that Topstep made a corrective amendment to its Operating Agreement for clean up purposes and further that it appointed Topstep Holdings as the Manager of Topstep. Topstep denies that these actions were taken without disclosure to Class B members. All of such changes were available in the books and records of Topstep. Topstep further states that it at all times held in signature blocks and otherwise that Topstep Holdings was the Manager of Topstep – of which Rudman, Footlick, and upon information and belief all other Plaintiffs, were completely aware since such appointment was made. Defendant deny any remaining allegations contained in Paragraph 64.**

65. Each Plaintiff separated from or withdrew from Topstep following entry of the 2020 Operating Agreement and received Notices of Forfeiture of Unvested Units and Repurchase of Vested Units from Topstep.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 65.**

66. In each of the Notices of Forfeiture of Unvested Units and Repurchase of Vested Units, Defendants acted in bad faith to deprive Plaintiffs of the fair market value of their Incentive Units.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 66.**

67. The valuation of Plaintiffs' vested Class B units in the Notices of Forfeiture of Unvested Units and Repurchase of Vested Units ran contrary to the distribution method used in each of Plaintiffs' Incentive Unit Award Agreements.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 67.**

68. Moreover, for the female Plaintiffs, Defendants either assigned their Incentive Units no value, offered less favorable payment terms via unsecured and subordinate four-year promissory note, and/or failed and refused to obtain a third-party valuation for the redemption.

**ANSWER:** Defendants deny the allegations contained in Paragraph 68.

**D.    Patak's Negligent and Selfish Acts**

69.    Patak effectively controls, owns, and operates Topstep, and its affiliated entities, such that separate personalities no longer exist.

**ANSWER:** Defendants deny the allegations contained in Paragraph 69.

70.    Patak commingled resources between Patak Holdings and Topstep, resulting in inaccurate accounting for both companies.

**ANSWER:** Defendants deny the allegations contained in Paragraph 70.

71.    Patak willfully acted in bad faith and knowingly misrepresented the fair market value of the companies and the Plaintiffs' incentive shares.

**ANSWER:** Defendants deny the allegations contained in Paragraph 71.

72.    Patak diverted Topstep resources and membership distributions to fund a separate company he founded and managed, Bluechxp, LLC.

**ANSWER:** Defendants deny the allegations contained in Paragraph 72. Topstep further states that Jay Rudman, as CEO of Topstep, directed and coordinated a revolving line of credit that was satisfied when all equity interests Bluechxp, LLC were contributed to, and became a subsidiary of, Topstep.

73.    Upon information and belief, Patak informally took more than $5 Million in personal distributions without reciprocal distributions or notice to all Members.

**ANSWER:** Defendants deny the allegations contained in Paragraph 73. All Members received either commensurate distributions subject to participation thresholds or otherwise signed written waivers for any distributions, all of which were formally documented and reflected on the books and records of Topstep.

23

74.    Upon information and belief, Patak transferred Topstep funds into accounts for himself and/or his entities to reflect more liquidity in seeking approval for loans.

**ANSWER:    Defendants deny the allegations contained in Paragraph 74 to the extent they allege that Patak engaged in any illegal, fraudulent, or misrepresentative contact in the transfer of funds between Topstep entities.  Any transfers made were disclosed in Defendants' books and records and reviewed and approved by the Company's officers, including its CEO, Jay Rudman.**

75.    Upon information and belief, Patak, and/or one of his affiliated entities, used inappropriate Topstep distributions to purchase a home in Aspen, Colorado.

**ANSWER:    Defendants deny the allegations contained in Paragraph 75.**

76.    Upon information and belief, Patak misappropriated Topstep funds for his own use.

**ANSWER:    Defendants deny the allegations contained in Paragraph 76.**

77.    Upon information and belief, Patak added non-employee family members to Topstep's payroll, allowing them to receive improper payments and benefits.

**ANSWER:    Defendants deny the allegations contained in Paragraph 77.**

**II.    Plaintiffs' Incentive Shares, and Defendants' Attempts to Force Redemptions**

**A.    Melissa Footlick**

78.    Footlick is a founding member of Topstep's leadership team. For more than a decade, Melissa Footlick devoted her time and talents to build Topstep from the ground up.  She was responsible for defining and executing company strategy and vision.

**ANSWER:    Defendants admit Plaintiff Footlick joined TopstepTrader in 2010 and worked with the organization in various roles through her departure in 2021. Defendants deny any further characterization and the remaining allegations in Paragraph 78.**

79. Footlick started working with Patak in 2010 as Recruitment Manager of Patak Trading Partners, until she and Patak formed Topstep Trader in 2012.

**ANSWER: Defendants admit that Footlick began working with Patak in 2010 but otherwise deny the allegations contained in Paragraph 79.**

80. Footlick served as Topstep's Director of Operations from 2012 to 2017.

**ANSWER: Defendants admit that Footlick was the Director of Operations for TopstepTrader LLC from 2012 to 2017. Defendants otherwise deny the allegations contained in Paragraph 80.**

81. In 2013, as compensation for her outstanding performance, and to incentivize her to stay, Patak offered her 2,193,170 Class B units in TopstepTrader.

**ANSWER: Defendants admit that Footlick was provided Class B units in TopstepTrader in 2013 pursuant to an Award Agreement, the terms and conditions of which speak for themselves. Defendants deny any characterization of such award outside of the Award Agreement and any remaining allegations in Paragraph 81.**

82. On November 1, 2014, Footlick entered into an Incentive Unit Award Agreement with TopstepTrader, whereby she was granted 2,193,170 Class B units.

**ANSWER: Defendants admit the allegations contained in Paragraph 82.**

83. As of November 1, 2014, Footlick's 2,193,170 units were fully vested.

**ANSWER: Defendants admit the allegations contained in Paragraph 83.**

84. In 2017, Footlick was promoted to Chief Operating Officer ("COO") of TopstepTrader.

**ANSWER: Defendants admit the allegations contained in Paragraph 84.**

85.     On November 26, 2019, Footlick entered into another Incentive Unit Award Agreement, which granted her a 0.25% profits interest for hitting certain EBITDA and revenue goals in 2019 and 2020, for a total of 1% profits interests, i.e., 595,149 Incentive Units.

**ANSWER:     Defendants admit that on November 26, 2019, TopstepTrader and Footlick entered into an Incentive Unit Award Agreement, which granted her a 0.25% profits interest for hitting certain EBITDA and revenue goals in 2019 and 2020, which would equal 595,149 Incentive Units, which represented approximately 1% of the then issued and outstanding units. Defendants otherwise deny the allegations contained in Paragraph 85.**

86.     Footlick achieved the milestones and the Incentive Units vested.

**ANSWER:     Defendants admit that all of the Incentive Units granted to Footlick under the November 26, 2019 Incentive Award Agreement vested. Defendants otherwise deny the allegations in Paragraph 86.**

87.     In connection with the 2020 restructuring, Footlick became Topstep's COO.

**ANSWER:     Defendants admit the allegations contained in Paragraph 87.**

88.     In or around September 2021, Topstep pushed Footlick out of her role while she was pregnant.

**ANSWER:     Defendants admit that Plaintiff Footlick terminated her employment with TopstepPeople in September 2021. Defendants deny the remaining allegations contained in Paragraph 88.**

89.     On September 3, 2021, Footlick executed a Separation Agreement and General Release, but expressly reserved all rights and claims she may have against:

Topstep LLC as a member of Company arising under: that certain Amended and Restated Limited Liability Company Agreement dated as of January 1, 2020; TopstepTrader LLC Amended and Restated Equity Incentive Plan dated October 1, 2016; TopstepTrader LLC Incentive Unit Award Agreement, dated November 26,

2019; Acknowledgement, dated January 1, 2020; and TopstepTrader, LLC Incentive Unit Award Agreement, dated November 1, 2014.

**ANSWER:** **The Defendants admit that Paragraph 89 accurately quotes the excerpt from the uncited Separation Agreement and General Release entered into between Footlick and TopstepPeople, Inc., which document speaks for itself, and deny any characterization thereof. Additionally, this Paragraph alleges a legal conclusion, to which no response is required. To the extent a response is required, Defendants deny the remaining allegations contained in Paragraph 89.**

90.    On November 12, 2021, Topstep sent Footlick a Notice of Forfeiture of Unvested Class B Units and Repurchase of Vested Class B Units.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 90.**

91.    In the Notice and Repurchase documents, Topstep's Manager determined the fair market value of the company at less than one-third of revenue for a partial year, January 1, 2021 through October 31, 2021.

**ANSWER:** **Defendants deny that the Notice of Forfeiture of Unvested Class B Units and Repurchase of Vested Class B Units delivered to Footlick contained a valuation of Topstep. Defendants state that the Notice provided the fair market value of Footlick's vested Incentive Units, which was determined in accordance with the 2020 Operating Agreement. Defendants deny the remaining allegations contained in Paragraph 91.**

92.    Rather than a revenue multiple valuation, like what was provided to a male employee in 2018 and Topstep's illustration to clarify the value of Incentive Units, Topstep purportedly applied an EBITDA multiple.

**ANSWER:** **Defendants admit that Topstep determined the fair market value of Footlick's Incentive Units through the application of a multiple of EBITDA. Defendants**

27

**further admit that a male employee was redeemed in 2018 using a revenue multiple calculation, but state that the employee redeemed in 2018 was redeemed by a different entity, pursuant to a different operating agreement, years prior (with other parties, both male and female, being redeemed closer in time under different methodologies based on the nature and strength of the business at such time). Defendants otherwise deny the allegations in Paragraph 92.**

93.     In addition, Topstep directed that it would deliver a promissory note for the purchase price at closing.

**ANSWER:     Defendants admit the allegations contained in Paragraph 93.**

94.     The proposed promissory note was not secure and was subordinate to all other debt.

**ANSWER:     Defendants admit the allegations contained in Paragraph 94.**

95.     The purported payments would be made on the anniversary of the closing and following three years.

**ANSWER:     Defendants admit the allegations contained in Paragraph 95.**

96.     Footlick, through counsel, objected to the redemption and requested to review Topstep's books and records to understand the valuation, but Topstep refused to provide relevant information.

**ANSWER:     Defendants admit that Footlick requested to review Topstep's books and records through counsel. Defendants further admit that, although Footlick requested certain records pertaining to Topstep, her redemption was shortly thereafter effected pursuant to a notice delivered prior to any request, and therefore Footlick was not subsequently provided the requested documents as she no longer held any interest in Topstep. Defendants deny the remaining allegations contained in Paragraph 96.**

97.     Footlick requested a valuation by an agreed upon independent third-party; Topstep refused.

**ANSWER:     Defendants admit that Footlick requested an independent valuation. Defendants further admit that, pursuant to the 2020 Operating Agreement, Topstep did not obtain an independent third-party valuation. Defendants deny the remaining allegations contained in Paragraph 97.**

98.     Footlick did not execute the Notice of Forfeiture of Unvested Class B Units and Repurchase of Vested Class B Units.

**ANSWER:     Defendants admit the allegations contained in Paragraph 98.**

**B.     Erin Clark**

99.     From approximately November 2012 through 2015, Clark served as an Executive Assistant at TopstepTrader.

**ANSWER:     Defendants admit the allegations contained in Paragraph 99.**

100.     From approximately 2015 to September 2018, Clark served as Customer Support Manager of TopstepTrader.

**ANSWER:     Defendants admit the allegations contained in Paragraph 100.**

101.     From September 2018 through July 2, 2021, Clark served as the People and Culture Manager for TopstepTrader and Topstep.

**ANSWER:     Defendants admit that Clark served as the People and Culture Manager for TopstepTrader and TopstepPeople.  Defendants otherwise deny the allegations contained in Paragraph 101.**

102.     As Executive Assistant, Clark's responsibilities included, customer support, IT, HR, and office management, e.g., she oversaw and directed two office moves.

**ANSWER:   Defendants admit that Clark's responsibilities included handling customer support, information technology and human resources matters, as well as office management. Defendants deny the remaining allegations contained in Paragraph 102.**

103.    As Customer Support Manager, Clark recruited, interviewed, hired, and trained talent. She created and implemented policies and strategic operational tools and protocols.  For example, she implemented credit card processing, the payment gateway, a new phone system, and customer support ticketing software.

**ANSWER:   Defendants admit the allegations contained in Paragraph 103.**

104.    As People and Culture Manager, Clark retained her responsibilities for recruiting, interviewing, hiring, onboarding, and training. She also took charge of the diversity and inclusion initiative as well as philanthropy and volunteering opportunities.

**ANSWER:   Defendants admit the allegations contained in Paragraph 104.**

105.    On May 15, 2017, Clark entered into an Incentive Agreement with Topstep whereby she was awarded 281,222 Class B shares.

**ANSWER:   Defendants admit that Clark entered into an Incentive Agreement with TopstepTrader whereby she was awarded 281,222 Class B shares on May 15, 2017. Defendants otherwise deny the allegations contained in Paragraph 105.**

106.    On or around July 2, 2021, Topstep laid off Clark after nine years of service.

**ANSWER:   Defendants admit that Clark's employment with TopstepPeople was terminated on July 2, 2021. Defendants otherwise deny the allegations in Paragraph 106.**

107.    On November 12, 2021, Topstep sent Clark a Notice of Forfeiture of Unvested Class B Units, Repurchase of Vested Class B Units, and a Subordinated Promissory Note.  Topstep purportedly elected to purchase her 281,222 vested units.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 107.**

108.    Topstep's Manager claimed the fair market value of the remaining vested shares at $26,115, and elected to purchase them at that price.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 108.**

109.    In addition, Topstep directed that it would deliver a promissory note for the purchase price at closing.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 109.**

110.    The proposed promissory note was not secure and was subordinate to all other debts.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 110.**

111.    The purported payments would be made on the anniversary of the closing and the following three years.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 111.**

112.    Clark, through counsel, objected to the redemption and requested to review Topstep's books and records to understand the valuation, but Topstep refused to provide relevant information.

**ANSWER:** **Defendants admit that Clark requested to review Topstep's books and records through counsel. Defendants further admit that, although Clark requested certain records pertaining to Topstep, her redemption was shortly thereafter effected pursuant to a notice delivered prior to any request, and therefore Clark was not subsequently provided the requested documents as she no longer held any interest in Topstep. Defendants deny the remaining allegations contained in Paragraph 112.**

113. Clark requested a valuation by an agreed upon independent third-party and Topstep refused.

**ANSWER: Defendants admit that Clark requested an independent valuation. Defendants further admit that, consistent with the 2020 Operating Agreement, Topstep did not obtain an independent third-party valuation. Defendants deny the remaining allegations contained in Paragraph 113.**

114. Clark did not execute the Forfeiture of Unvested Class B Units and Repurchase of Class B Units.

**ANSWER: Defendants admit the allegations contained in Paragraph 114.**

**D. Toby Adamson**

115. Adamson was employed as Topstep's Vice President of Product from September 24, 2019 to May 25, 2022.

**ANSWER: Defendants admit that Adamson was employed by Topstep Holdings, and TopstepPeople as Vice President of Product from September 24, 2019 until May 25, 2022. Defendants otherwise deny the allegations contained in Paragraph 115.**

116. As the Vice President of Product, Adamson spearheaded efforts to create and manage product strategy, provided a roadmap of Topstep's portfolio of products, created strategies to develop growth into other markets, and managed the team that defined the requirements for produce enhancements.

**ANSWER: Defendants admit that Adamson's duties as Vice President of Product included product and growth strategy, providing a roadmap of Topstep's portfolio of products, and overseeing requirements for product enhancements. Defendants otherwise deny the allegations contained in Paragraph 116.**

32

117.    Adamson's offer letter provides that "A total of one percent (1%) equity will be paid over a four (4) year period, at 0.25% (one-fourth of a percent) per year, beginning one year from your start date, and on the same date for the following three years."

**ANSWER:    Defendants admit that Paragraph 117 accurately quotes the referenced excerpt of Adamson's offer letter.**

118.    Adamson received the Incentive Unit example and description which advised that Incentive Units could be seen as annual contribution to total compensation, such that Adamson was earning her first 0.25% Interest from her start date in 2019.

**ANSWER:    Defendants admit the allegations contained in Paragraph 118.**

119.    The Incentive Unit example and description also advised that "a change in control accelerates the vesting schedule of incentive units."

**ANSWER:    Defendants admit that the referenced document contains the language quoted in Paragraph 119, but state that the document speaks for itself and deny any characterization thereof.**

120.    Adamson's onboarding materials imposed a profit hurdle of $16 million, indeed, men offered incentive awards, with delayed vesting schedules, in 2019 were given the 2019 agreement, including the lower profit hurdle.

**ANSWER:    Defendants admit that Adamson's onboarding materials imposed a profit hurdle of $16 million. Defendants lack sufficient knowledge or information to provide an answer as to the truth of the allegations regarding unidentified "men offered incentive awards", and therefore deny and demand strict proof of same.**

121.    On November 2, 2020, Adamson entered into an Incentive Agreement with Topstep for her 300,630 Class B units.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 121.**

122. Adamson's profit hurdle was then set at $28 million, a 43% increase from the 2019 profit hurdle.

**ANSWER:** **Defendants admit that the profit hurdle included in the Incentive Agreement between Topstep and Adamson was $28 million. Defendants deny any characterizations implied by the remaining allegations contained in Paragraph 122.**

123. In November 2021, Adamson also led Topstep's technical team, assisting in product engineering.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 123.**

124. On around May 25, 2022, Adamson separated from Topstep.

**ANSWER:** **Defendants admit that on May 25, 2022, Adamson separated from TopstepPeople. Defendants otherwise deny the allegations in Paragraph 124.**

125. On July 7, 2022, Topstep sent Adamson a Notice of Forfeiture of Unvested Class B Units and Repurchase of Vested Units. Therein, Topstep purportedly elected to purchase her 150,315 vested units and alleged that the remainder of her 150,315 units were unvested and forfeited.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 125.**

126. Topstep's Manager determined the fair market value of the vested units to be $0.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 126.**

127. Topstep indicated it was willing to buy the vested units at a price of $1.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 127.**

128. Adamson objected to the redemption and requested to review Topstep's books and records to understand the valuation, but Topstep refused to provide relevant information.

**ANSWER: Defendants admit that Adamson objected to the redemption and requested to review Topstep's books and records. Defendants further admit that, although Adamson requested certain records pertaining to Topstep, her redemption was shortly thereafter effected pursuant to a notice delivered prior to any request, and therefore Adamson was not subsequently provided the requested documents as she no longer held any interest in Topstep. Defendants deny the remaining allegations contained in Paragraph 128.**

129.    Adamson did not execute the Notice of Forfeiture of Unvested Class B Units and Repurchase of Vested Class B Units.

**ANSWER: Defendants admit the allegations contained in Paragraph 129.**

**E.    Jay Rudman**

130.    Rudman joined TopstepTrader in 2016 as a *pro bono* mentor.

**ANSWER: Defendants admit the allegations contained in Paragraph 130.**

131.    Rudman then served as TopstepTrader and Topstep's Chief Growth Officer and ultimately Chief Executive Officer ("CEO") from approximately 2017 through January 31, 2022.

**ANSWER: Defendants admit the allegations contained in Paragraph 131. Defendants further state that as CEO of TopstepTrader and Topstep, Rudman was the individual principally responsible for negotiating, drafting, communicating, and implementing the 2020 Operating Agreement.**

132.    As CEO, Rudman grew Topstep's revenue 5-6 times in five years and maintained double-digit EBITDA, without taking in any investment dollars.

**ANSWER: Defendants admit that Topstep's revenue grew during the time that Rudman was a CEO. Defendants also admit that it maintained positive EBITDA without investments, despite Rudman's continued failed efforts to obtain investments (of which he**

sought over multiple years, utilizing an investment banker, and resulting in no interest by any party to invest in the organization). Defendants deny the remaining allegations contained in Paragraph 132.

133.    On March 1, 2017, Rudman entered into an Incentive Unit Award Agreement with TopstepTrader, whereby he was awarded 1,105,312 Class B units.

    **ANSWER:    Defendants admit the allegations contained in Paragraph 133.**

134.    On March 16, 2018, Rudman entered into a Second Incentive Unit Award Agreement with TopstepTrader, whereby he was awarded 1,151,007 Class B units.

    **ANSWER:    Defendants admit the allegations contained in Paragraph 134.**

135.    On August 22, 2019, Rudman entered into a Third Incentive Unit Award Agreement with TopstepTrader, whereby he was awarded 1,190,297 Class B units.

    **ANSWER:    Defendants admit the allegations contained in Paragraph 135.**

136.    On January 8, 2021, Rudman entered into a Fourth Incentive Unit Award Agreement with Topstep, whereby he was awarded 1,237,122 Class B units.

    **ANSWER:    Defendants admit the allegations contained in Paragraph 136.**

137.    In 2021, Rudman was a finalist for 1871's "Outstanding Tech CEO Award."

    **ANSWER:    Defendants admit the allegations contained in Paragraph 137.**

138.    Rudman's employment with Topstep ended on January 31, 2022.

    **ANSWER:    Defendants admit the allegations contained in Paragraph 138.**

139.    On July 14, 2022, Topstep sent Rudman a Notice of Repurchase of Vested Class B Units.

    **ANSWER:    Defendants admit the allegations contained in Paragraph 139.**

140.    The Notice of Repurchase of Class B Units provided that 1,237,122 Class B units awarded under the Fourth Incentive Unit Award Agreement were unvested and forfeited without payment.

**ANSWER:    Defendants admit the allegations contained in Paragraph 140.**

141.    Topstep provided that its Manager valued the 2,256,319 vested units awarded under the First and Second Incentive Unit Award Agreements at $146,895.00.

**ANSWER:    Defendants admit the allegations contained in Paragraph 141.**

142.    Topstep provided that its Manager valued the 1,190,297 vested units under the Third Incentive Unit Award Agreement at $0, but would purchase the same for $1.

**ANSWER:    Defendants admit the allegations contained in Paragraph 142.**

143.    Rudman objected to the redemption and requested to review Topstep's books and records to understand the valuations, but Topstep refused to provide relevant information.

**ANSWER:    Defendants admit that Rudman objected to the redemption and requested to review Topstep's books and records. Defendants further admit that, although Rudman requested certain records pertaining to Topstep, his redemption was shortly thereafter effected pursuant to a notice delivered prior to any request, and therefore Rudman was not subsequently provided the requested documents as he no longer held any interest in Topstep. Defendants deny the remaining allegations contained in Paragraph 143.**

144.    Rudman did not execute the Notice of Repurchase of Class B Units.

**ANSWER:    Defendants admit the allegations contained in Paragraph 144.**

**F.    Griffin Caprio**

145.    Caprio served as an Advisory Board Member to TopstepTrader and Topstep from approximately December 2015 through February 2022.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 145.**

146. Caprio used his experience in technology, product, and marketing to advise and scale Topstep.

**ANSWER:** **Defendants lack information sufficient to form a belief as to the truth of the allegations contained in Paragraph 146, and therefore deny and demand strict proof of same.**

147. On May 28, 2017, Caprio entered into an Incentive Unit Award Agreement with TopstepTrader, whereby he was awarded 133,231 Class B units.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 147.**

148. On October 1, 2017, Caprio entered into a second Incentive Unit Award Agreement with TopstepTrader, whereby he was awarded 139,559 Class B units.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 148.**

149. On July 14, 2022 Topstep sent Caprio a Notice of Repurchase of Vested Class B Units.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 149.**

150. The Notice of Repurchase of Class B units provided that Topstep's Manager valued Caprio's 272,790 vested units at $18,788.00 and chose to purchase the units at that price via lumpsum cash payment.

**ANSWER:** **Defendants admit the allegations contained in Paragraph 150.**

151. Caprio objected to the redemption and requested to review Topstep's books and records to understand the valuations, but Topstep refused to provide relevant information.

**ANSWER:** **Defendants admit that Caprio objected to the redemption and requested to review Topstep's books and records. Defendants further admit that, although**

38

**Caprio requested certain records pertaining to Topstep, his redemption was shortly thereafter effected pursuant to a notice delivered prior to any request, and therefore Caprio was not subsequently provided the requested documents as he no longer held any interest in Topstep. Defendants deny the remaining allegations contained in Paragraph 151.**

152. Caprio did not execute the Notice of Repurchase of Vested Class B Units.

**ANSWER: Defendants admit the allegations contained in Paragraph 152.**

## COUNT I – TITLE VII

### (Footlick, Clark, & Adamson v. Topstep)

153. Footlick, Clark, and Adamson ("Title VII Plaintiffs") hereby incorporate and reallege Paragraphs 1 through 152 as though fully set forth herein.

**ANSWER: Defendants repeat and reallege their Answers in Paragraphs 1 through 152 as though fully incorporated herein.**

154. Topstep is an employer as defined under Title VII.

**ANSWER: The allegations of Paragraph 154 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 154.**

155. The Title VII Plaintiffs were employees of Topstep.

**ANSWER: Defendants deny the allegations in Paragraph 155.**

156. Topstep intentionally discriminated against the Title VII Plaintiffs by treating them less favorably than male employees with respect to their Incentive Units in violation of Title VII, 42 U.S.C. § 2000e-2(a).

**ANSWER:** The allegations of Paragraph 156 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 156.

157. Topstep acted with malice and/or reckless indifference to Title VII Plaintiffs' federally protected rights to be free from such discrimination.

**ANSWER:** The allegations of Paragraph 157 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 157.

158. As a direct and proximate result of Topstep's unlawful conduct, Title VII Plaintiffs have been injured and are entitled to judgment and compensation pursuant to Title VII.

**ANSWER:** The allegations of Paragraph 158 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 158.

WHEREFORE, Title VII Plaintiffs respectfully request entry of judgment in their favor and against Topstep and compensatory damages, punitive damages, attorney's fees and costs, and pre-and post-judgment interest in an amount to be proven at trial, plus injunctive and other relief.

**ANSWER:** The allegations of the WHEREFORE clause contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in the WHEREFORE clause.

## COUNT II – EQUAL PAY ACT

**(Footlick, Clark, & Adamson v. Topstep)**

159. Plaintiffs Footlick, Clark, and Adamson ("EPA Plaintiffs") hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

**ANSWER:** **Defendants repeat and reallege their Answers in Paragraph 1 through 152 as though fully set forth herein.**

160. Topstep is an employer as defined under the Equal Pay Act.

**ANSWER:** **The allegations of Paragraph 160 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 160.**

161. The EPA Plaintiffs were employees of Topstep.

**ANSWER:** **Defendants deny the allegations in Paragraph 161.**

162. The conditions of rights, benefits, and conditions of ownership of Class B Incentive Units were substantially the same, if not identical to EPA Plaintiffs' similarly situated male colleagues.

**ANSWER:** **The allegations of Paragraph 162 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 162.**

163. Topstep compensated EPA Plaintiffs at a substantially lower amounts and less favorable conditions than their similarly situated male counterparts. 29 U.S.C. § 206(d).

**ANSWER:** **The allegations of Paragraph 163 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 163.**

164. EPA Plaintiffs received lower valuations, less information, less favorable payment methods, and less favorable treatment despite the same procedure purportedly applying to all Class B Incentive Unit holders.

**ANSWER:** The allegations of Paragraph 164 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 164.

165. Topstep acted with malice and/or reckless indifference to EPA Plaintiffs' federally protected right to be free from such discrimination.

**ANSWER:** The allegations of Paragraph 165 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 165.

166. EPA Plaintiffs' demanded fair payment and Topstep refused.

**ANSWER:** Defendants deny the allegations contained in Paragraph 166.

167. As a result of Topstep's discriminatory conduct, EPA Plaintiffs have been damaged and are entitled to compensation.

**ANSWER:** The allegations of Paragraph 167 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 167.

WHEREFORE, EPA Plaintiffs respectfully request entry of judgment in their favor and against Defendants and lost compensation and liquidated damages, attorney's fees and costs, and pre-and post-judgment interest in an amount to be proven at trial.

**ANSWER:** The allegations of the WHEREFORE clause contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in the WHEREFORE clause.

## COUNT III – ILLINOIS EQUAL PAY ACT

**(Footlick, Clark, & Adamson v. Topstep)**

168.    Plaintiffs Footlick, Clark, and Adamson ("IEPA Plaintiffs") hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

**ANSWER:    Defendants incorporate and reallege their Answers in Paragraphs 1 through 152 as though fully incorporated herein.**

169.    Topstep is an employer as defined under the Illinois Equal Pay Act.

**ANSWER:    The allegations of Paragraph 169 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 169.**

170.    IEPA Plaintiffs were employees of Topstep.

**ANSWER:    Defendants deny the allegations in Paragraph 170.**

171.    The conditions of ownership and valuations of Class B units were substantially the same, if not identical to IEPA Plaintiffs' similarly situated male colleagues.

**ANSWER:    The allegations of Paragraph 171 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 171.**

172.    The IEPA Plaintiffs entered into Equity Incentive Agreements and the 2020 Operating Agreement with Topstep.

**ANSWER:    Defendants admit the allegations contained in Paragraph 172.**

173.    Under the Equity Incentive Agreements and 2020 Operating Agreement, Topstep redeemed IEPA Plaintiffs' Class B shares at a values substantially lower, pursuant to less favorable conditions, unfavorable payment methods, with less information than their similarly situated male counterparts.

43

**ANSWER:** The allegations of Paragraph 173 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 173.

174. Topstep acted with malice and/or reckless indifference to IEPA Plaintiffs' protected right to be free from such discrimination, in violation of 820 ILCS § 112, *et seq.*

**ANSWER:** The allegations of Paragraph 174 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 174.

175. IEPA Plaintiffs demanded fair payment and Topstep refused.

**ANSWER:** Defendants deny the allegations contained in Paragraph 175.

176. As a result of Topstep's discriminatory conduct, IEPA Plaintiffs have been damaged and are entitled to compensation pursuant to 820 ILCS § 112/30.

**ANSWER:** The allegations of Paragraph 176 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 176.

WHEREFORE, IEPA Plaintiffs respectfully request entry of judgment in their favor and against Defendants and actual damages, compensatory damages, punitive damages, civil penalties, attorney's fees and costs, and pre-and post-judgment interest in an amount to be proven at trial, plus injunctive relief.

**ANSWER:** The allegations of the WHEREFORE clause contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in the WHEREFORE clause.

## COUNT IV – ILLINOIS HUMAN RIGHTS ACT

44

**(Footlick, Clark, & Adamson v. Topstep)**

177.    Footlick, Clark, and Adamson ("IHRA Plaintiffs") hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

**ANSWER:    Defendants repeat and reallege their Answers in Paragraphs 1 through 152 as through fully incorporated herein.**

178.    Topstep is an employer under the IHRA.

**ANSWER:    The allegations of Paragraph 178 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 178.**

179.    The IHRA Plaintiffs were employees under the IHRA.

**ANSWER:    Defendants deny the allegations contained in Paragraph 179.**

180.    As women, IHRA Plaintiffs are members of a protected class under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101, *et seq.*

**ANSWER:    The allegations of Paragraph 180 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 180.**

181.    Defendants intentionally discriminated against the IHRA Plaintiffs, e.g., by treating them less favorably than male employees by redeeming their Class B shares at values less than those paid to male employees, imposing payment methods that were less favorable than those offered to men, failing and refusing to obtain a third-party valuation of the Company, and imposing improper conditions and calculations in the Incentive Units.

**ANSWER:** The allegations of Paragraph 181 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 181.

182. As a direct and proximate result of Defendants' unlawful conduct, IHRA Plaintiffs have been injured and are entitled to judgment and compensation pursuant to the IHRA.

**ANSWER:** The allegations of Paragraph 182 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 182.

WHEREFORE, IHRA Plaintiffs respectfully request entry of judgment in their favor and against Defendants and actual damages, punitive damages, preliminary and permanent injunction, attorney's fees and costs, pre and post-judgment interest, and civil penalties, in an amount to be proven at trial.

**ANSWER:** The allegations of the WHEREFORE clause contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in the WHEREFORE clause.

<u>**COUNT V – BREACH OF CONTRACT**</u>

**(Footlick, Clark, Adamson, Rudman, and Caprio v. Topstep, Topstep Holdings, & Patak Holdings)**

*2020 Operating Agreement*

183. Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

**ANSWER:** Defendants incorporate and reallege their Answers in Paragraphs 1 through 152 as though fully incorporated herein.

184.     Plaintiffs each entered into the 2020 Operating Agreement with Topstep, Topstep Holdings, and Patak Holdings.

**ANSWER:     Defendants admit the allegations contained in Paragraph 184.**

185.     Plaintiffs performed their obligations under the 2020 Operating Agreement.

**ANSWER:     The allegations of Paragraph 185 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 185.**

186.     Pursuant to the 2020 Operating Agreement, Topstep, Topstep Holdings, and Patak Holdings breached the Agreement in several ways, including but not limited to:

a.     Forcing a redemption of Plaintiffs' Class B shares for values not equal to their fair market value;

b.     Providing more than Five-Million Dollars in distributions to Patak, while undervaluing Topstep and the Plaintiffs' Class B shares;

c.     Failing to secure proper authority for distributions to Patak;

d.     Following Plaintiffs' proper demand, failing to allow Plaintiffs to inspect Topstep's books and records

e.     Failure to provide Plaintiffs a cap table in their various records requests;

f.     Providing an unreasonable one week closing for Class B units;

g.     Failing to issue appropriate tax documentation and distributions.

**ANSWER:     The allegations of Paragraph 186 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 186.**

187.    As a direct and proximate result of Topstep's, Topstep Holdings', and Patak Holdings' breaches, Plaintiffs have sustained monetary damages in an amount to be proven at trial.

**ANSWER:    The allegations of Paragraph 187 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 187.**

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor and against Defendants and an award of damages and interest in an amount to be proven at trial.

**ANSWER:    The allegations of the WHEREFORE clause contain a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations contained in the WHEREFORE clause.**

<u>**COUNT VI – BREACH OF CONTRACT**</u>

**(Footlick, Clark, Adamson, Rudman, and Caprio v. Topstep & TopstepTrader)**

***Incentive Unit Award Agreements***

188.    Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

**ANSWER:    Defendants incorporate and reallege their Answers in Paragraphs 1 through 152 as though fully incorporated herein.**

189.    Plaintiffs each entered into Incentive Unit Award Agreements with Topstep and TopstepTrader.

**ANSWER:    Defendants admit the allegations contained in Paragraph 189.**

190.    Plaintiffs performed their obligations under the Incentive Award Agreements.

**ANSWER:** **The allegations of Paragraph 189 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 189.**

191. Topstep and TopstepTrader breached the Incentive Unit Award Agreements in several ways, including but not limited to, redeeming Plaintiffs' Incentive Shares for value not equal to their fair market value, and denying that certain units vested upon the change of control in 2020.

**ANSWER:** **The allegations of Paragraph 191 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 191.**

192. As a direct and proximate result of Topstep's and TopstepTrader's breaches, Plaintiffs have sustained monetary damages in an amount to be proven at trial.

**ANSWER:** **The allegations of Paragraph 192 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 192.**

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Topstep and TopstepTrader and award damages in an amount to be proven at trial, attorney's fees, and costs.

**ANSWER:** **The allegations of the WHEREFORE clause contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in the WHEREFORE clause.**

49

## COUNT VII – BREACH OF FIDUCIARY DUTY

**(Footlick, Clark, Adamson, Rudman, and Caprio v. Patak Holdings and Patak)**

193.    Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

**ANSWER:    Defendants reassert and reallege their Answers in Paragraphs 1 through 152 as if fully incorporated herein.**

194.    Under the 2016 Operating Agreement, Patak, as an officer of Topstep and its sole Class A member, owed Plaintiffs a duty of loyalty, good faith, and candor.

**ANSWER:    The allegations of Paragraph 194 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 194.**

195.    Under the Illinois Limited Liability Company Act, 805 ILCS § 180/15, *et seq.*, Patak, as an officer of Topstep and its sole Class A member, owed Plaintiffs a duty of loyalty, good faith, and candor.

**ANSWER:    The allegations of Paragraph 195 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 195.**

196.    Under the 2016 Operating Agreement, Patak Holdings, as the Manager of Topstep, owed Plaintiffs a duties of loyalty, good faith, and candor.

**ANSWER:    The allegations of Paragraph 196 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 196.**

197.     Patak and Patak Holdings breached their fiduciary duties in multiple ways, including but not limited to:

a.     Negligently misrepresenting the changes implemented in the 2020 Operating Agreement;

b.     Stripping fiduciary duties from the 2020 Operating Agreement;

c.     Eliminating the right to independent appraisal of Class B units;

d.     Implementing a provision in the 2020 Operating Agreement that terminated employees and employees withdrawing from Topstep without "good reason" may have their vested Class B shares redeemed by Topstep at a price of $1;

e.     Taking more than Two-Million Dollars in undisclosed distributions;

f.     Inaccurately claiming the profits interest hurdle applies to redemptions;

g.     Without members' knowledge or consent, diverting membership distributions to fund Patak's company, Bluechxp, LLC;

h.     Placing all ownership of Incentive Shares in the holding entity, shifting additional debt and liabilities to the holders, which lowered the value of their shares;

i.     Amending the Operating Agreement and changing Management Control without notice, consent, or disclosure to all Members;

j.     Upon information and belief, adding Patak's non-employee family members to Topstep's payroll so they may receive improper payments and insurance benefits.

**ANSWER:     The allegations of Paragraph 197 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 197.**

198.     As a direct and proximate result of Patak's and Patak Holdings' breach of fiduciary duties, Plaintiffs have sustained damages in an amount to be proven at trial.

**ANSWER:     The allegations of Paragraph 198 contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 198.**

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Patak and Patak Holdings in an amount to be proven at trial, including punitive damages.

**ANSWER:     The allegations of the WHEREFORE clause contain a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations contained in the WHEREFORE clause.**

## COUNT VIII – ALTER EGO - PIERCING THE CORPORATE VEIL

### (Footlick, Clark, Adamson, Rudman, and Caprio v. Defendants)

199.     Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

**ANSWER:     The Parties have agreed in their Stipulation Concerning Plaintiffs' Second Amended Complaint, filed June 5, 2024, (ECF No. 64) ("Stipulation"), that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count VIII and finding that Defendants need not respond (ECF No. 65).**

200.     Topstep and its affiliate entities under Patak's control were merely an alter ego, instrumentality, conduit, or adjunct of Patak.

**ANSWER:** **The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count VIII and finding that Defendants need not respond (ECF No. 65).**

201. Patak ignored the corporate form in several ways, including but not limited to:

a. Commingling the assets and affairs of Topstep, Patak Holdings, and Topstep Holdings;

b. Misappropriating Topstep funds for his own personal use/gain;

c. Without members' knowledge or consent, diverting membership distributions to fund Bluechxp, LLC;

d. As the sole Class A shareholder of Topstep, knowingly making misrepresentations regarding the effect of the 2020 Operating Agreement on the valuation of the Class B shares;

e. Upon information and belief, adding his non-employee family members to Topstep payroll so they may receive improper payments and insurance benefits.

**ANSWER:** **The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count VIII and finding that Defendants need not respond (ECF No. 65).**

## COUNT IX – NEGLIGENT MISREPRESENTATION

**(Footlick, Clark, Adamson, Rudman, and Caprio v. Topstep, Topstep Holdings,**

**TopstepTrader, Patak Holdings, Patak)**

202.    Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

**ANSWER:    The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count IX and finding that Defendants need not respond (ECF No. 65).**

203.    At all relevant times, Topstep, Topstep Holdings, TopstepTrader, Patak Holdings, and Patak owed fiduciary duties to Plaintiffs, including the duty of good faith and fair dealing.

**ANSWER:    The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count IX and finding that Defendants need not respond (ECF No. 65).**

204.    Topstep's March 30, 2020, email regarding company restructuring, providing that no changes would be implemented adverse to Class B members' interest, i.e., "business as usual," constituted false statements of material fact.

**ANSWER:    The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court**

entered a Minute Order striking Count IX and finding that Defendants need not respond (ECF No. 65).

205.    Defendants acted carelessly, negligently, and with disregard for the truth in making their false statements in the March 30, 2020 email to Plaintiffs.

**ANSWER:   The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count IX and finding that Defendants need not respond (ECF No. 65).**

206.    By making their false statements in their March 30, 2020 email to Plaintiffs, Defendants intended to fraudulently induce Plaintiffs to sign the 2020 Operating Agreement.

**ANSWER:   The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count IX and finding that Defendants need not respond (ECF No. 65).**

207.    In reliance on Defendants' false and fraudulent statements, Plaintiffs did execute the 2020 Operating Agreement, to their detriment.

**ANSWER:   The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count IX and finding that Defendants need not respond (ECF No. 65).**

208.    As a result of Plaintiffs' reliance on Defendants' false and fraudulent statements, Plaintiffs suffered monetary damages in an amount to be proven at trial.

**ANSWER:    The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count IX and finding that Defendants need not respond (ECF No. 65).**

**COUNT X – COMMON LAW FRAUD**

**(Footlick, Clark, Adamson, Rudman, and Caprio v. Defendants)**

209.    Plaintiffs hereby incorporate by reference Paragraphs 1 through 152 as though fully set forth herein.

**ANSWER:    The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count X and finding that Defendants need not respond (ECF No. 65).**

210.    Defendants' March 30, 2020, email regarding company restructuring, providing that no changes would be implemented adverse to Class B members' interest was a false statement of material fact.

**ANSWER:    The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court**

56

**entered a Minute Order striking Count X and finding that Defendants need not respond (ECF No. 65).**

211.   Defendants knew that the false and fraudulent statements did not accurately reflect the changes implemented in the 2020 Operating Agreement effecting the Class B members' rights under the agreement.

**ANSWER:   The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count X and finding that Defendants need not respond (ECF No. 65).**

212.   By making their false statements in their March 30, 2020 email to Plaintiffs, Defendants intended to fraudulently induce Plaintiffs to sign the 2020 Operating Agreement.

**ANSWER:   The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count X and finding that Defendants need not respond (ECF No. 65).**

213.   In reliance on Defendants' false and fraudulent statements, Plaintiffs did execute the 2020 Operating Agreement, to their detriment.

**ANSWER:   The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court**

entered a Minute Order striking Count X and finding that Defendants need not respond (ECF No. 65).

214.    As a result of Plaintiffs' reliance on Defendants' false and fraudulent statements, Plaintiffs suffered monetary damages in an amount to be proven at trial.

**ANSWER:    The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count X and finding that Defendants need not respond (ECF No. 65).**

## COUNT XI – ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505, *et seq.*)

### (Footlick, Clark, Adamson Rudman, and Caprio v. Defendants)

215.    Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 152 as though fully set forth herein.

**ANSWER:    The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count XI and finding that Defendants need not respond (ECF No. 65).**

216.    Defendants engaged in deceptive actions in various ways, including but not limited to, inducing Plaintiffs to sign the 2020 Operating Agreement by virtue of their false and misleading March 30, 2020 email, and fraudulently valuing the Class B shares to redeem the units for the lowest price possible.

**ANSWER:** **The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count XI and finding that Defendants need not respond (ECF No. 65).**

217.    Defendants' deceptive actions were made in the course of trade or commerce, with the intention of making profit.

**ANSWER:** **The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count XI and finding that Defendants need not respond (ECF No. 65).**

218.    Defendants intended to induce Plaintiffs to rely upon their deceptive actions and Plaintiffs did so rely upon the same in signing the 2020 Operating Agreement.

**ANSWER:** **The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count XI and finding that Defendants need not respond (ECF No. 65).**

219.    Defendants' deceptive actions proximately caused injury and monetary damages to Plaintiffs in in an amount to be proven at trial.

**ANSWER:** **The Parties have agreed in their Stipulation that this count was dismissed by the Court, Plaintiffs have reasserted but have not repleaded this claim, and**

Defendants are not required to respond to this dismissed claim. On June 10, 2024, the Court entered a Minute Order striking Count XI and finding that Defendants need not respond (ECF No. 65).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court Order the following relief from Defendants jointly and/or severally:

a. Entry of judgment in their favor for compensatory, incidental, consequential, and punitive damages, lost profits, interest, attorneys' fees, and costs.

b. Pursuant to the Declaratory Judgment Act, an Order declaring the forced redemptions invalid and ineffective as they were not signed by the Manager, Patak Holdings, Inc. 28 U.S.C. § 2201(a).

c. Entry of an Order compelling Patak Holdings to allow Plaintiffs to inspect Topstep's financial books and records dating from its inception through present.

d. Pre and post-judgment interest.

e. For such other relief as the Court deems equitable and just.

**ANSWER: The allegations of the Prayer for Relief contain a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in the Prayer for Relief.**

## SEPARATE AND AFFIRMATIVE DEFENSES

Having fully answered the allegations in the Complaint, Defendants assert the following separate affirmative defenses. In so doing, Defendants do not allege or admit that they have the

burden of proof and/or persuasion with respect to any of these matters. Defendants reserve the right to assert additional defenses that discovery indicates are proper.

### FIRST DEFENSE

#### (Plaintiffs' Own Actions)

As a separate defense to the Complaint, and to the purported causes of action set forth therein, Defendants allege that the Complaint is barred in whole or in part by Plaintiffs' own actions.

### SECOND DEFENSE

#### (Unclean Hands)

As a separate defense to the Complaint, and to the purported causes of action set forth therein, Defendants allege that Plaintiffs are barred in whole or in part from prosecuting each cause of action set forth in the Complaint by the doctrine of unclean hands including by, without limitation, intentionally ratifying relevant policies and practices of the Defendants.

### THIRD DEFENSE

#### (Laches, Waiver, and Estoppel)

As a separate defense to the Complaint, and to the purported causes of action set forth therein, Defendants allege that each cause of action asserted in the Complaint is barred by the equitable doctrines of laches, waiver, and estoppel.

### FOURTH DEFENSE

#### (Statute of Limitations)

As a separate defense to the Complaint, and to the purported causes of action set forth therein, Defendants allege that Plaintiffs' claims are barred, in whole or in part, by the applicable statute(s) of limitations.

## FIFTH DEFENSE

### (Failure to State a Claim)

As a separate defense to the Complaint, and to the purported causes of action set forth therein, Defendants allege that Plaintiffs have failed, in whole or in part, to state a claim upon which relief can be granted.

## SIXTH DEFENSE

### (Barred Claims)

As a separate defense to the Complaint, and to the purported causes of action set forth therein, Defendants allege that Plaintiffs' claims are barred in whole or in part because they have been released or waived.

## SEVENTH DEFENSE

### (Good Faith)

As a separate defense to the Complaint, and to the purported causes of action set forth therein, Defendants allege that good-faith compliance with the law by Defendants precludes Plaintiffs from recovering punitive damages.

## EIGHTH DEFENSE

### (Proper Conduct)

As a separate defense to the Complaint, and to the purported causes of action set forth therein, Defendants allege that **they** cannot be liable for punitive damages because **they have** not engaged in any conduct of a reckless, malicious, or egregious nature.

## NINTH DEFENSE

### (Due Process)

As a separate defense to the Complaint, and to the purported causes of action set forth therein, Defendants allege that an award of punitive damages under the circumstances of this case would constitute an excessive fine and otherwise would be in violation of Defendants' due process and other rights under the United States Constitution.

## TENTH DEFENSE

### (Failure to Exhaust Administrative Remedies Remedies)

As a separate defense to the Complaint, and to the purported causes of action set forth therein, Defendants allege that Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs failed to exhaust their administrative remedies and/or satisfy other procedural requirements.

## ELEVENTH DEFENSE

### (Failure to Mitigate Damages)

As a separate defense to the Complaint, and to the purported causes of action set forth therein, Defendants allege that to the extent Plaintiffs have suffered any injuries, which is denied, Plaintiffs failed to minimize or mitigate their damages.

## TWELFTH DEFENSE

### (Employment Decisions)

1.      As a separate defense to the Complaint, and to the purported causes of action set forth therein, Defendants allege that Plaintiffs Footlick, Clark and Adamson's claims are not actionable because the challenged employment decisions are justified by legitimate, non-discriminatory, and non-pretextual business reasons and were based upon reasonable factors other than Plaintiffs Footlick, Clark, and Adamson's gender or sex.

2.      Any differences in pay between Plaintiffs Footlick, Clark and Adamson and other employees was based on facts other than sex and was based on objective implementation of redemption based on valuations of securities given vesting and participation thresholds, job content, seniority system, and/or a merit system.

3.      Plaintiffs Footlick, Clark, and Adamson's claims are barred, in whole or in part, because Defendants had in place clear and well-disseminated policies against discrimination on the basis of sex or gender and other protected classifications, which provide for prompt and effective, responsive action. Defendants exercised reasonable care to prevent and promptly correct any allegedly discriminatory conduct, and Plaintiffs Footlick, Clark and Adamson unreasonably failed to take advantage of any preventative or corrective opportunities provided by Defendants or to otherwise avoid harm.

4.      Defendants deny that any of their employees or agents, acting within the course and scope of their employment or agency, violated any statute, regulation, constitutional provision, common law or public policy or caused any damage or injury to Plaintiffs Footlick, Clark and Adamson. Any unlawful conduct allegedly engaged in by Defendants' employees, supervisory or otherwise, was outside the scope of their employment and was contrary to Defendants' efforts to comply with any and all applicable laws.

5.      To the extent that, during the course of the litigation, Defendants acquire any evidence of wrongdoing by Plaintiffs, which would have materially affected the terms and conditions of Plaintiffs' employment and would have resulted in Plaintiffs not being hired or being either demoted, disciplined, or terminated, such after-acquired evidence shall bar or limit Plaintiffs' claims for liability and/or damages.

## THIRTEENTH DEFENSE

**(Reservation of Rights)**

Defendants reserve the right to assert additional defenses in the event that discovery indicates that it would be appropriate to do so.

WHEREFORE, Defendants pray for relief as follows:

1.     That the Complaint be dismissed, with prejudice and in its entirety;

2.     That Plaintiffs take nothing by reason of this Complaint and that judgment be entered against Plaintiffs and in favor of Defendants;

3.     That Defendants be awarded their attorneys' fees and costs incurred in defending this action; and

4.     That Defendants be granted such other and further relief as the Court may deem just and proper.

## CROSS-CLAIM

1.     Now come Defendants/Cross-Claimants Michael Patak ("Patak") and Patak Holdings, Inc. ("Patak Holdings", and collectively with Patak, "Cross-Claimants"), who each incorporate by reference the answers and affirmative defenses raised in Defendants' Answer to Plaintiffs' Second Amended Complaint, and state as follows their Cross-Claim against Plaintiff/Cross-Claim Defendant Jay Rudman ("Rudman") pursuant to Federal Rule of Civil Procedure 13(g).

## JURISDICTION AND VENUE

2.     The Cross-Claimants bring this cross-claim pursuant to Fed R. Civ. P. 13.  The Court has supplemental jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1367 inasmuch as: (a) the Court has original jurisdiction over Plaintiffs'/Counter-Defendants' claims pursuant to 28 U.S.C. § 1332; (b) exercising supplemental jurisdiction is consistent with

the jurisdictional requirements of 28 U.S.C. § 1332; and (c) this Court is empowered to provide the remedy sought in this matter pursuant to 28 U.S.C. § 2201(a), as this is a case of actual controversy within this Court's jurisdiction that seeks the declaration of rights and other legal relations of an interested party seeking such declaration.

3.      Venue of the Cross-Claim is proper under 28 U.S.C. § 1391(a).

## PROCEDURAL BACKGROUND

4.      On November 7, 2022, Rudman and his co-Plaintiffs filed suit against Defendants/Cross-Claimants alleging a claim of breach of fiduciary duty arising out of the Amended and Restated Operating Agreement of TopstepTrader LLC, dated October 1, 2016 ("2016 Operating Agreement").

5.      On January 19, 2023, Rudman and his co-Plaintiffs filed their First Amended Complaint in which they again alleged a claim against Patak and Patak Holdings for breach of fiduciary duty arising out of the 2016 Operating Agreement. Plaintiffs alleged that Patak and Patak Holdings breached the 2016 Operating Agreement by, *inter alia*, "negligently misrepresenting the changes implemented in the 2020 Operating Agreement," "stripping fiduciary duties from the 2020 Operating Agreement," "[e]liminating the right to independent appraisals of Class B units," "[i]mplementing a provision in the 2020 Operating Agreement that terminated employees and employees withdrawing from Topstep without 'good reason' may have their vested Class B shares redeemed by Topstep at a price of $1," "[p]lacing all ownership of Incentive shares in the holding entity, shifting additional debt and liabilities to the holders, which lowered the value of their shares;" and "[a]mending the Operating Agreement and changing Management Control without notice, consent, or disclosure to all Members" ("Fiduciary Duty Claim").

6.  On March 20, 2023, Patak moved to dismiss the Fiduciary Duty Claim based upon, *inter alia*, the fact that he was not the Manager of TopstepTrader, LLC ("TopstepTrader") and thus did not owe fiduciary duties to the LLC or its members as a matter of law.

7.  On March 26, 2024, the Court denied Patak's motion to dismiss, finding that as CEO, Patak was granted managerial authority over TopstepTrader such that he owed the same fiduciary duties to the members of TopstepTrader as the Manager.

8.  On May 14, 2024, Plaintiffs filed a Second Amended Complaint in which they re-alleged the Fiduciary Duty Claim against Patak and Patak Holdings.

## FACTUAL ALLEGATIONS

9.  On March 7, 2017, Patak resigned as Chief Executive Officer and Rudman was appointed (and accepted) such role of Chief Executive Officer ("CEO") of TopstepTrader. **Exhibit A (March 7, 2017 Consent).** Thereafter, pursuant to Section 6.09(a) of the 2016 Operating Agreement, Rudman had "general supervision over the day-to-day business, operations, and affairs of the Company." **Exhibit B (2016 Operating Agreement).**

10. Rudman signed his most recent employment agreement (the "Rudman Employment Agreement") with TopstepTrader on or about June 1, 2019. A copy of the Rudman Employment Agreement is attached as **Exhibit C**.

11. The Rudman Employment Agreement provides that Rudman shall serve as the CEO of TopstepTrader and "shall have the normal duties, responsibilities and authority implied by such position." (Ex. C, Rudman Employment Agreement, ¶ B.1. (a).)

12. Between March 7, 2017 and the time of Rudman's resignation in January 2022, Patak fully entrusted the day-to-day business, operations, and affairs of TopstepTrader to Rudman. Among other things, Rudman was responsible for oversight of TopstepTrader's employees,

TopstepTrader's day-to-day business operations, and TopstepTrader's compliance with its legal obligations, including but not limited to its obligations to its employees and Class B members.

13.     In or around early 2019, after review of the flow of funds, accounting, regulatory matters, and general organization of TopstepTrader and its related entities, Management, including Rudman and other parties, determined that TopstepTrader and its related entities should be reorganized and consolidated into Topstep LLC.  As Chief Executive Officer, Rudman then began to work on the organizational structure and legal documents associated with the organization on a go-forward basis, the primary document being the 2020 Operating Agreement for Topstep LLC, which at closing would govern all equity interests holders as the contemplated restructure, in part, would include the issuance of equity interests in Topstep LLC in consideration of an in-kind contribution of equity interests of TopstepTrader to Topstep LLC .

14.     In effecting the aforementioned reorganization, Rudman exclusively worked hand-in-hand with TopstepTrader's outside counsel to draft the 2020 Operating Agreement for Topstep LLC, specifically the provision for valuation of Class B units.

15.     Further, Rudman, as part of overseeing the reorganization, edited and walked through the 2020 Operating Agreement many times, discussed each provision in detail with outside counsel, proposed and architected many edits and terms, and sought regular progress updates from TopstepTrader's outside counsel and tax advisors during the process.

16.     Rudman's efforts resulted in the creation of the Amended and Restated Limited Liability Company Agreement of Topstep, LLC, dated as of January 1, 2020 (the "2020 Operating Agreement").

17.     The 2020 Operating Agreement, post-reorganization, replaced the 2016 Operating Agreement for TopstepTrader as the core governing document of the Topstep organization as a whole.

18.     Plaintiffs' alleged Fiduciary Duty Claim arises out of the reorganization resulting in changes of certain terms between the 2016 Operating Agreement and the 2020 Operating Agreement, and the purported messaging of changes effectuated therein.  Rudman was the chief architect of all of these changes and this entire reorganization.

## FIRST CLAIM FOR RELIEF

## (CROSS-CLAIM FOR JOINT AND SEVERAL LIABILITY)

19.     Cross-Claimants re-allege Paragraph 1-18 as if fully set forth herein.

20.     Rudman was the CEO of TopstepTrader LLC at the time that Plaintiffs allege Patak and Patak Holdings took actions in breach of their fiduciary duties.

21.     As CEO of TopstepTrader LLC, Rudman had managerial authority over the day-to-day affairs of TopstepTrader LLC, including, but not limited to, the actions claimed by Plaintiffs to have been performed in breach of Patak and Patak Holdings' fiduciary duties.

22.     Pursuant to the Court's March 26, 2024 Opinion, the CEO of the organization was delegated and possessed such fiduciary duties.

23.     Contrary to Plaintiffs' assertion, it was Rudman in fact, not Patak, who stood as CEO in connection with the structuring of Topstep at the time of its reorganization.

24.     To the extent that Patak and/or Patak Holdings are found liable for breaching their fiduciary duties as a result of those actions effectuated during the time of Rudman's tenure, Rudman is jointly and severally liable with Patak and Patak Holdings, or liable over Patak and Patak Holdings, or liable exclusively, for those alleged breaches.

**WHEREFORE**, Crossclaim-Plaintiffs respectfully request:

69

To the extent that Patak and/or Patak Holdings are found liable for breaching their fiduciary duties as a result of those actions effectuated during the time of Rudman's tenure, Rudman be found jointly and severally liable with Patak and Patak Holdings, or liable over Patak and Patak Holdings, or liable exclusively, for those alleged breaches.

## COUNTERCLAIMS

Now come Defendants/Counter-Plaintiffs Topstep LLC ("Topstep" or the "Company"), Topstep Holdings LLC ("Topstep Holdings"), TopstepTrader LLC ("TopstepTrader"), and TopstepPeople Inc. ("TopstepPeople") (collectively, the "Counter-Plaintiffs"), who each incorporate by reference the answers and affirmative defenses raised in Defendants' Answer to Plaintiffs' Second Amended Complaint, and state as follows for their Counterclaims against Plaintiffs/Counter-Defendants Melissa Footlick ("Footlick"), Erin Clark ("Clark"), Toby Adamson ("Adamson"), and Jay Rudman ("Rudman") (collectively, the "Counter-Defendants"):

## NATURE OF ACTION

1.      Counter-Defendants were once trusted executives and members of Topstep or its affiliated entities. They departed the Company in the fall of 2021 and spring of 2022, at a time when the organization had been experiencing business and financial difficulties caused, in part, by the Counter-Defendants' actions. Counter-Plaintiffs now face a baseless suit by these Counter-Defendants to redress purported harms that they themselves have caused and, as discussed below, for claims certain of them have released.

2.      As an example, Rudman brought claims against Defendants based upon alleged misdeeds arising out of and relating to the valuation of Counter-Defendants Class B units. That valuation was performed in strict accordance with the terms and conditions of the 2020 Operating Agreement. What Rudman conveniently omits from his complaint, however, is that he was TopstepTrader's and Topstep's Chief Executive Officer and was principally responsible for

70

negotiating, drafting, communicating, and implementing the 2020 Operating Agreement, including the precise provisions and valuation methodology that he and his co-Plaintiffs now attack. Accordingly, if and to the extent Defendants are found liable for any conduct relating to the enactment or invocation of the 2020 Operating Agreement—including, but not limited to, Topstep's valuation of Counter-Defendants' Class B units—it is only because of Rudman.

3.      Should Defendants be vindicated in this action, which is its expectation, Rudman is still liable to the Counter-Plaintiffs for his breach of the duty of care and, upon information and belief, the duty of loyalty. Specifically, it was primarily Rudman that negotiated, drafted, communicated, and implemented the 2020 Operating Agreement. And now, he and others who he has encouraged have leveled serious accusations against the Defendants for simply following the letter of the agreement that Rudman himself drafted. Given Rudman's leadership and active participation in this lawsuit regarding certain provisions of the 2020 Operating Agreement, he cannot contend, on the one hand, that he acted in good faith and in the best interests of (or not opposed to) TopstepTader and Topstep when he negotiated, drafted, communicated, and implemented the 2020 Operating Agreement when, on the other hand, he contends that such actions are a breach of fiduciary duty.

4.      Moreover, Clark and Footlick each entered into written settlement agreements with TopstepPeople, Inc. upon their resignations in which they each released and agreed not to bring some of the claims they seek to now litigate against Defendants. As a consequence, Clark and Footlick are in breach of each of those settlement agreements for which Defendants are entitled to redress.

5.      Finally, Adamson is in breach of her written agreement with TopstepPeople, Inc. Adamson specifically agreed not to solicit Topstep employees for other employment opportunities

following her departure. She violated that agreement when, following her resignation, she solicited employees away from TopstepPeople. Given the significant time and expense associated with a competitive recruiting process and onboarding and training new employees, TopstepPeople seeks to remedy the damage Adamson has caused.

## **THE PARTIES**

6.      Topstep LLC is a Delaware limited liability company. Topstep's principal place of business is 141 W. Jackson Blvd., Suite 4240, Chicago, IL 60604.  Topstep Holdings serves as the manager of Topstep.

7.      Topstep Holdings LLC is a Delaware limited liability company with its principal office at 141 W. Jackson Blvd., Suite 4240, Chicago, IL 60604. Topstep Holdings is the Manager and sole Class A Member of Topstep.

8.      TopstepTrader LLC is an Illinois limited liability company with a principal office at 141 W. Jackson Blvd., Suite 4240, Chicago, IL 60604. Topstep Holdings serves as Manager of TopstepTrader.

9.      TopstepPeople Inc. is a Delaware Corporation and not registered to do business in Illinois.

10.      Melissa Footlick was employed by Patak Trading Partners, TopstepTrader, Topstep Holdings, and TopstepPeople from September 20, 2010 to approximately September 3, 2021. Upon information and belief, Footlick resides in Johnson County, Kansas.

11.      Erin Clark was employed by TopstepTrader, Topstep Holdings, and TopstepPeople from approximately November 2012 through July 2, 2021. Upon information and belief, Clark resides in Cook County, Illinois.

12.     Toby Adamson was employed by Topstep Holdings and TopstepPeople from September 24, 2019 to May 25, 2022. Upon information and belief, Adamson resides in Cook County, Illinois.

13.     Jay Rudman was employed by TopstepTrader, Topstep Holdings, and Topstep from approximately 2016 through January 31, 2022.  Upon information and belief, Rudman resides in Cook County, Illinois.

## JURISDICTION AND VENUE

14.     The Counter-Plaintiffs bring these counterclaims pursuant to Fed R. Civ. P. 13.  The Court has supplemental jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1367 inasmuch as: (a) the Court has original jurisdiction over Plaintiffs'/Counter-Defendants' claims pursuant to 28 U.S.C. § 1332; (b) exercising supplemental jurisdiction is consistent with the jurisdictional requirements of 28 U.S.C. § 1332; and (c) this Court is empowered to provide the remedy sought in this matter pursuant to 28 U.S.C. § 2201(a), as this is a case of actual controversy within this Court's jurisdiction that seeks the declaration of rights and other legal relations of an interested party seeking such declaration.

15.     Venue of the Counterclaims is proper under 28 U.S.C. § 1391(a).

## FACTUAL BACKGROUND

### I.     Topstep's Business

16.     In 2012, Patak, a former commodities trader at the Chicago Board of Trade ("CBOT"), wanted to create a place where traders could develop their skills and trade live capital without putting their life savings on the line.  He accordingly founded Patak Trading Partners d/b/a TopstepTrader, a company with an online platform that evaluates day traders' performance in real-time simulated accounts.

73

17.     Patak Trading Partners became TopstepTrader, and TopstepFX (for futures and foreign exchange or "forex" trading, respectively), and ultimately with other business lines established, became the enterprise which now exists under the name Topstep in 2020.

18.     For a membership fee, Topstep's online platform measures the traders' profitability and evaluates the traders' risk management.  If a trader successfully completes these steps, he or she receives the opportunity to have a portion of their trading profits funded by the Company.

19.     To date, Topstep has funded thousands of traders across the globe and paid out millions in withdrawals.  Topstep was featured on the Inc. 5000 list of America's fastest-growing private companies, selected as one of Crain's 100 Best Places to Work in Chicago, and nationally recognized on the Deloitte Technology Fast 500 list.

20.     The Counter-Defendants are all former employees or advisors of TopstepTrader, Topstep or its affiliates.

## II.     Jay Rudman Repeatedly Damaged Topstep's Interests in Failing to Perform his Duties as CEO

21.     Jay Rudman began working with Topstep as a mentor to Patak in or around January 2016.

22.     Rudman was then hired as TopstepTrader's Chief Growth Officer in or around June 2016.  In his position as Chief Growth Officer, Rudman was responsible for, *inter alia*, overseeing TopstepTrader's reorganization and entrance into the Amended and Restated Limited Liability Company Operating Agreement dated October 1, 2016 (the "2016 Operating Agreement").

23.     On March 7, 2017, Rudman was promoted to Chief Executive Officer ("CEO") of TopstepTrader, LLC.  **Exhibit A (March 7, 2017 Consent).**  Thereafter, pursuant to Section 6.09(a) of the 2016 Operating Agreement, Rudman had "general supervision over the day-to-day business, operations, and affairs of the Company." **Exhibit B (2016 Operating Agreement).**

74

24.     Between March 7, 2017 and the time of his resignation in January 2022, Patak fully entrusted the day-to-day business, operations, and affairs of TopstepTrader to Rudman. Among other things, Rudman was responsible for oversight of TopstepTrader's employees, TopstepTrader's day-to-day business operations, and TopstepTrader's compliance with its legal obligations, including but not limited to its obligations to its employees and Class B members.

25.     Rudman signed his most recent employment agreement (the "Rudman Employment Agreement") with TopstepTrader on or about June 1, 2019. A copy of the Rudman Employment Agreement is attached as **Exhibit C**.

26.     The Rudman Employment Agreement provides that Rudman shall serve as the CEO of the Company and "shall have the normal duties, responsibilities and authority implied by such position." (Ex. C, Rudman Employment Agreement, ¶ B.1. (a).)

27.     The Rudman Employment Agreement further provides that, in exchange for his employment and his compliance with the 2016 Operating Agreement, Rudman shall receive an annual base salary of $175,000 and equity in TopstepTrader. Rudman's equity award is described in a separate Incentive Agreement, executed contemporaneously with the Rudman Employment Agreement.

28.     The Rudman Employment Agreement contains, among other things, an "Indemnification" clause, which provides, in relevant part, that:

> [t]he Company shall defend, indemnify and hold [Rudman] harmless from and against any and all claims, judgments, fines, penalties, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) asserted against or incurred by [Rudman] as a result of acts or omissions of [Rudman] taken or made in the course of performing his duties for the Company . . .

(*Id*. at ¶ 22)

29.     However, this promise by TopstepTrader to indemnify Rudman in such circumstances is conditioned upon the fact that the acts committed by Rudman that are material to the cause of action against him were:

> (i) committed in good faith, (ii) were committed in a manner that [Rudman] reasonably believed to be in or not opposed to the best interests of the Company, and (iii) with respect to any criminal action or proceeding, [Rudman] had no reasonable cause to believe his conduct was unlawful.

(*Id*.)

30.     In various ways, Rudman failed to act in good faith and in the best interests of TopstepTrader in his position as CEO.

31.     For instance, in 2019, at Rudman's direction and under his leadership as CEO, TopstepTrader failed to heed TopstepTrader's tax consultant's recommendations to begin filing taxes in Texas and other states in accordance with applicable tax laws and regulations.

32.     Rudman's poor oversight led to TopstepTrader becoming vulnerable to state tax penalties and interest.

33.     Moreover, at Rudman's direction and under his leadership as CEO, TopstepTrader rolled out a Foreign Exchange ("forex") trading platform in 2018.  Upon information and belief, despite Rudman being aware of the regulatory risks with respect to structuring this platform in the manner he chose, Rudman moved forward with the rollout of the forex platform causing TopstepTrader to invest millions of dollars to do so.

34.     Rudman did not share his knowledge of the regulatory risks with Patak and Patak only learned after Rudman's resignation of the significant regulatory risks Topstep faced based upon the manner in which Rudman had structured the forex platform.  As a result of those risks, Topstep discontinued the forex platform, leading to additional losses of millions of dollars in opportunity costs.

35.     While employed as the CEO of TopstepTrader, Rudman also embraced the task of reorganizing the company under the umbrella of Topstep, LLC, including the drafting and terms of all governing documents.  The 2016 Operating Agreement provided, among other things, the process for valuing the Company's equity, including the Class B units[2] granted to each of the Plaintiffs/Counter-Defendants.

36.     In drafting the 2020 Operating Agreement, Rudman exclusively worked hand-in-hand with TopstepTrader's outside counsel to rewrite its text, including specifically the provision for valuation of Class B units.

37.     Further, Rudman, as part of overseeing the reorganization, edited and walked through the 2020 Operating Agreement many times, discussed each provision in detail with outside counsel, proposed and architected many edits and terms, and sought regular progress updates from TopstepTrader's outside counsel and tax advisors during the process.

38.     Rudman's efforts resulted in the creation of the Amended and Restated Limited Liability Company Agreement of Topstep, LLC, dated as of January 1, 2020 (the "2020 Operating Agreement").

39.     The 2020 Operating Agreement, post-reorganization, replaced the 2016 Operating Agreement for TopstepTrader as the core governing document of the Topstep organization as a whole.

---

[2] The Class B units were intended to constitute "profit interests" in the Company (i.e., an equity right based on the future value of a company).  Profit interests give equity holders an opportunity to participate in the positive growth of a company and are meant to incentivize the equity holder to help make that growth happen.

40. Specifically, the 2020 Operating Agreement defines Patak Holdings—a company wholly owned and operated by Patak—as the "Manager" of Topstep[3], and provides, in Section 7.8, that:

> (b) Unless otherwise specified in a Class B Member's Incentive Agreement, if (i) the Company terminates the employment or other type of relationship of a Class B Member without Good Cause, or (ii) a Class B Member terminates its employment or other type of relationship without Good Reason, the Company shall have the option to purchase, and such Class B Member shall have the **obligation to sell, all the Interests owned by such Class B Member at an aggregate price equal to the fair market value of such Class B Units *as determined by the Manager in its reasonable discretion*** (which determination shall be final and binding on the parties).
>
> (c) The foregoing options shall be exercisable by written notice to the selling Class B Member provided within six months of the date of such Class B Member's termination of employment with the Company.

(2020 Operating Agreement, ¶ 7.8(b) and (c) (emphasis added).)

41. In other words, Rudman was the chief architect of an agreement that gave the Manager the sole authority to determine, in the Manager's reasonable discretion, the fair market value of Topstep's equity.

42. The Manager's fair market valuation would, in turn, serve as a basis upon which Topstep would value any Class B Members' units in the event of the Company's redemption of those same units.

43. After implementing and executing the 2020 Operating Agreement, Rudman encouraged at least one TopstepPeople employee, Plaintiff Footlick, to threaten suit if Mr. Patak

---

[3] Patak Holdings was later replaced by Topstep Holdings as the sole Manager of Topstep as of January 1, 2022, pursuant to the Written Consent of the Sole Member of TopstepTrader, LLC. Both Patak Holdings and Topstep Holdings were wholly owned and operated by Patak.

exercised his authority to determine a fair market valuation in a manner Footlick deemed unfavorable. **Exhibit D (September 21, 2020 email from Rudman to Footlick).[4]**

44.     When Plaintiffs terminated their employment with Topstep or Topstep's affiliates at various times following the institution of the 2020 Operating Agreement, their Class B units were valued pursuant to the process set forth in Section 7.8 of that document (*i.e.*, the process that Rudman created as CEO of the Company).

45.     Now, dissatisfied with the Manager's fair market valuation of their Class B units as outlined in Section 7.8 of the 2020 Operating Agreement created by Rudman, each of the Plaintiffs (including Rudman, himself) have filed suit against Topstep and Patak.

46.     Rudman, however, authored the very process that is at the heart of Plaintiffs' lawsuit.  As such, if such process were determined to be in bad faith and not in the best interests of the Company, Rudman should bear sole responsibility for any losses alleged or suffered by Plaintiffs.

47.     The Indemnification in the Rudman Employment Agreement would not insulate him from his liability under the foregoing, as it requires that Rudman's actions be taken in good faith and in a manner that he reasonably believed to be in or not opposed to the best interests of the Company.

48.     Rudman's current lawsuit based upon the enactment of those provisions of the 2020 Operating Agreement is overwhelming evidence that he did not believe them to be in the best interests of the Company, the interests he was trusted to protect as the designated CEO.

---

[4] Defendants/Counter-Plaintiffs have redacted a portion of Exhibit D based upon attorney-client privilege.

**III**.    **Melissa Footlick Sues Topstep Despite Release and Covenant Not to Do So**

49.    Patak Trading Partners hired Footlick as the Director of Operations shortly after Patak founded the company in 2012.

50.    In 2017, Footlick was promoted to TopstepTrader's Chief Operating Officer and became a member of the Company's Executive Team.

51.    Following the January 1, 2020 reorganization, Footlick became an employee of TopstepPeople, Inc., in which position she continued to operate as Chief Operating Officer.

52.    In 2021, however, Footlick and Patak began to disagree on various business decisions with respect to Topstep.  Consequently, Footlick and Topstep agreed to part ways on September 3, 2021, pursuant to a separation agreement entitled "Separation Agreement and General Release" (the "Footlick Release"). A copy of the Footlick Release is attached as **Exhibit E**.

53.    The Footlick Release was supported by adequate consideration, including (i) payment by the Company in the amount of $285,000.00 to Footlick of her base salary for a period of 18 months following her separation; (ii) reimbursement of Footlick's health insurance premiums of up to $1,659.00 per month for a period of 18 months following her termination; (iii) payment by the Company in the amount of $38,786.00, in connection with distributions due to Footlick; and (iv) legal fees to her attorneys.

54.    In exchange for this valid consideration, Footlick agreed in the Footlick Release, among other things, to:

> *release[ ] and forever discharge[ ] the Company… and their Affiliates [among others] from any and all claims or causes of action that [she] had, has or may have, known or unknown, relating to Employee's employment with and/or termination from the Company*, including but not limited to . . . Title VII of the Civil Rights Act of 1964 . . . and all claims under any other federal, state . . . or local statute, [as well as] claims for discrimination . . .[and] . . . breach of contract

. . . or business injury of any kind . . . and any other claims to any form of legal or equitable relief, damages, compensation or benefits . . .

(Ex. E, Footlick Release, § 7(a) (emphasis added).)

55.     The Footlick Release excludes claims that Footlick might bring against Topstep as a member of the Company arising under various agreements, including the Amended and Restated Limited Liability Company Agreement dated as of January 1, 2020, TopstepTrader LLC Amended and Restated Equity Incentive Plan dated October 1, 2016, the TopstepTrader LLC Incentive Unit Award Agreement dated November 26, 2019, the Acknowledgement dated January 1, 2020, and the TopstepTrader LLC Incentive Unit Award Agreement dated November 1, 2014. (*Id.*)

56.     However, the Footlick Release further provides that, while Footlick may initiate a proceeding before a governmental agency, she is "barred from seeking or receiving personal relief for released claims in the context of such proceedings [before a governmental agency, including a state or federal fair employment practices agency]." (*Id.*)

57.     In the Footlick Release, Footlick also covenanted and agreed "to not at any time sue [the] Company or [Michael Patak and the Company's respective [a]ffiliates and their respective past, present and future officers, directors, managers, members, stockholders, attorneys, agents, representatives, employees, successors and assigns]." (*Id*. at § 7(b).)

58.     Section 21 of the Footlick Release provides that in the event of a breach of the Footlick Release by Footlick, TopstepPeople may recover any amounts already paid to Footlick, and that Footlick will become liable for any attorneys' fees and costs incurred by TopstepPeople in any related action defending its rights. (*Id.* at § 21.)

59.     Footlick signed the Footlick Release on September 24, 2021. Footlick did not revoke her acceptance of the Footlick Release within seven days following her execution.

60.     Notwithstanding her express release, Footlick filed the instant lawsuit against Defendants on November 7, 2022 alleging claims arising out of her employment by TopstepPeople, Inc., and under Title VII, the federal Equal Pay Act, the Illinois Equal Pay Act, and the Illinois Human Rights Act.

61.     As a result of her breach of the Footlick Release, Counter-Plaintiffs have been forced to incur legal fees and costs in defending against this litigation.

## IV.     Erin Clark Sues Topstep Despite Release and Covenant Not to Do So

62.     TopstepTrader hired Clark as the Executive Assistant shortly after Patak founded the Company in 2012.  In that role, Clark provided administrative and customer support and managed the office.

63.     In 2015, Clark was promoted to Customer Support Manager and provided human resources support to TopstepTrader.

64.     In 2018, Clark was promoted to TopstepTrader's People and Culture Manager.

65.     Clark at all times reported directly to Patak.

66.     Clark and Topstep agreed to part ways on July 2, 2021 pursuant to a release ("Clark Release") that was substantially similar to the Footlick Release.

67.     The Clark Release was also supported by adequate consideration, including monetary consideration.

68.     In exchange for this valid consideration, Clark agreed in the Clark Release, among other things, to release and forever discharge TopstepPeople and its affiliates from any and all claims or causes of action that she had, has or may have, known or unknown, relating to her employment with and/or termination from TopstepPeople, including but not limited to Title VII of the Civil Rights Act of 1964 as a well as all claims under any other federal, state or local statute, claims for discrimination.

69.     The Clark Release excludes claims that Clark might bring against Topstep as a member of the Company arising under various agreements, including the Amended and Restated Limited Liability Company Agreement dated as of January 1, 2020, TopstepTrader LLC Amended and Restated Equity Incentive Plan dated October 1, 2016, the TopstepTrader LLC Incentive Unit Award Agreement dated November 26, 2019, the Acknowledgement dated January 1, 2020, and the TopstepTrader LLC Incentive Unit Award Agreement dated November 1, 2014.

70.     In the Clark Release, Clark also covenanted and agreed to not at any time sue TopstepPeople, its affiliates, Michael Patak, or and their respective past, present and future officers, directors, managers, members, stockholders, attorneys, agents, representatives, employees, successors and assigns.

71.     Clark signed the Clark Release on June 28, 2021 after a 21 day consideration period.  Clark did not revoke her acceptance of the Clark Release within seven days following her execution.

72.     Notwithstanding her express release, Clark filed the instant lawsuit against Defendants on November 7, 2022 alleging claims arising out of her employment by TopstepPeople, Inc., and under Title VII, the federal Equal Pay Act, the Illinois Equal Pay Act, and the Illinois Human Rights Act.

73.     As a result of her breach of the Clark Release, Counter-Plaintiffs have been forced to incur legal fees and costs in defending against this litigation.

**V.      Toby Adamson Violates Her Restrictive Covenant Agreement by Soliciting Topstep Employees to Leave the Company**

74.     Toby Adamson began her employment with Topstep Holdings as the Vice President of Product on or about September 9, 2019.

83

75.     At the time of her hire, Adamson was also asked to enter into a Confidentiality, Proprietary Rights, Non-Solicitation and Non-Competition Agreement (the "Adamson Restrictive Covenant Agreement") in exchange for a discretionary bonus payment. A copy of the Adamson Restrictive Covenant is attached as **Exhibit F**.

76.     The Adamson Restrictive Covenant Agreement contains, among other terms, a "Non-Solicitation" clause providing, in relevant part, that:

> Employee acknowledges and agrees that during the term of Employee's employment with the Company and ***for a period of 12 months thereafter***, Employee shall not directly or indirectly, either for Employee's own account or as a member, manager, shareholder, partner, officer, director, employee, consultant, representative or agent for any other Person**:**
>
> . . .
>
> b) solicit, induce or persuade, or attempt to solicit, induce or persuade, any Person who is engaged as an employee, consultant or independent contractor providing services for the Company to (i) terminate his, her or its employment, engagement, representation or association with the Company, as applicable, or (ii) reduce, restrict or otherwise alter his, her or its business relationship with the Company, as applicable.

(Ex. F, Adamson Restrictive Covenant Agreement, ¶ 5 (emphasis added).)

77.     Adamson executed the Adamson Restrictive Covenant Agreement on September 9, 2019 and received her discretionary bonus as consideration for the same on or about October 31, 2019.

78.     Adamson left Topstep on May 25, 2022.  As such, she was obligated to comply with non-solicitation restrictions in the Adamson Restrictive Covenant Agreement through May 25, 2023.

79.     Notwithstanding this obligation, Adamson contacted at least two separate Topstep employees via email and text message in or around November 2022.  Adamson solicited both these employees in these emails and text messages, encouraging them to leave Topstep and join her new

employer. *See e.g.* November 8, 2022 email from Adamson to Head of People at Topstep regarding interest in another position, attached as **Exhibit G**.

80.     While Adamson's efforts were unsuccessful, they were still a violation of the terms of her Restrictive Covenant Agreement.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

### (Counter-Plaintiffs Against Melissa Footlick)

81.     The Counter-Plaintiffs incorporate by reference each of the allegations contained in Paragraphs 1 through 80 above.

82.     The Footlick Release is a valid and enforceable contract between Footlick and TopstepPeople.

83.     Topstep and TopstepTrader were third-party beneficiaries of the Footlick Release as the Release included TopstepPeople's affiliates as well as TopstepPeople.

84.     Footlick and TopstepPeople entered into the Footlick Release supported by adequate consideration, wherein Footlick specifically agreed, among other things:

> a.     "to release[ ] and forever discharge[ ] the Company . . . and their Affiliates [among others] from any and all claims or causes of action that [she] had, has or may have, known or unknown, relating to Employee's employment with and/or termination from the Company," and

> b.     "to not at any time sue [the] Company or [Michael Patak and the Company's respective [a]ffiliates and their respective past, present and future officers, directors, managers, members, stockholders, attorneys, agents, representatives, employees, successors and assigns.]"

(Ex. E, Footlick Release, § 7.)

85

85.     TopstepPeople has performed all of its obligations under the Footlick Release.

86.     Footlick has breached the terms of the Footlick Release by suing the Defendants/Counter-Plaintiffs in the instant action for claims arising out of Title VII of the Civil Rights Act of 1964, the federal Equal Pay Act, the Illinois Equal Pay Act, and the Illinois Human Rights Act.

87.     Footlick's breach of the Footlick Release has caused injury to the Defendants/Counter-Plaintiffs in the form of legal fees and costs to defend the instant lawsuit.

88.     The Defendants/Counter-Plaintiffs are entitled to receive from Footlick damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with the precise amount to be determined at trial, plus costs, expenses, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

### Breach of Contract

### (Counter-Plaintiffs Against Erin Clark)

89.     The Counter-Plaintiffs incorporate by reference each of the allegations contained in paragraphs 1 through 80 above.

90.     The Clark Release is a valid and enforceable contract between Clark and TopstepPeople.

91.     Topstep and TopstepTrader were third-party beneficiaries of the Clark Release **as** the Release included TopstepPeople's affiliates as well as TopstepPeople.

92.     Clark and TopstepPeople entered into the Clark Release supported by adequate consideration, wherein Clark specifically agreed, among other things to release TopstepPeople and its affiliates from any claims related to her employment with or termination from TopstepPeople, and to not sue TopstepPeople or Patak for any of the released claims.

93.     TopstepPeople has performed all of its obligations under the Clark Release.

94.     Clark has breached the terms of the Clark Release by suing the Defendants/Counter-Plaintiffs in the instant action for claims arising out of Title VII of the Civil Rights Act of 1964, the federal Equal Pay Act, the Illinois Equal Pay Act, and the Illinois Human Rights Act.

95.     Clark's breach of the Clark Release has caused injury to Defendants/Counter-Plaintiffs in the form of legal fees and costs to defend the instant lawsuit.

96.     The Defendants/Counter-Plaintiffs are entitled to receive from Clark damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with the precise amount to be determined at trial, plus costs, expenses, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF

### Breach of Contract

### (Topstep Holdings Against Toby Adamson)

97.     The Counter-Plaintiffs incorporate by reference each of the allegations contained in the Paragraphs 1 through 80 above.

98.     The Adamson Restrictive Covenant Agreement is a valid and enforceable contract between Adamson and Topstep Holdings.

99.     Adamson and Topstep Holdings entered into the Adamson Restrictive Covenant Agreement supported by adequate consideration, wherein Adamson specifically agreed, among other things, that she would not, during her employment and for a period of 12 months thereafter:

> solicit, induce or persuade, or attempt to solicit, induce or persuade, any Person who is engaged as an employee, consultant or independent contractor providing services for the Company to (i) terminate his, her or its employment, engagement, representation or association with the Company, as applicable, or (ii) reduce,

87

restrict or otherwise alter his, her or its business relationship with the Company, as applicable.

(Ex. F, Adamson Restrictive Covenant Agreement, ¶ 5)

100.   Topstep has performed all of its obligations under the Adamson Restrictive Covenant Agreement.

101.   Adamson has breached the terms of the Restrictive Covenant Agreement by attempting to persuade Topstep employees to leave the Company in the months following her departure.

102.   Adamson's breach of the Adamson Restrictive Covenant Agreement has caused injury to Defendants/Counter-Plaintiffs, including but not limited to efforts which needed to be made to retain the employees solicited by Adamson.

103.   The Defendants/Counter-Plaintiffs are entitled to receive from Adamson damages with the precise amount to be determined at trial, plus costs, expenses, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees.

### FOURTH CLAIM FOR RELIEF

### Breach of the Contract

### (Topstep and TopstepTrader Against Jay Rudman)

104.   The Counter-Plaintiffs incorporate by reference each of the allegations contained in paragraphs 1 through 80 above.

105.   The Rudman Employment Agreement is a valid and enforceable contract between Rudman and TopstepTrader imposing onto Rudman the "normal duties, responsibility and authority implied by" the position of CEO of TopstepTrader. (Ex. C, Rudman Employment Agreement, § 1(a).)

106. Rudman's normal duties as CEO included exercising managerial authority over the conduct of TopstepTrader's business, and general supervision over the daily business, operations, and affairs of TopstepTrader.

107. Under Section 9 of the Rudman Employment Agreement, Rudman also agreed to:

> [r]espond and provide information with regard to matters in which Executive has knowledge as a result of Executive's employment with the Company, and will, upon request, provide reasonable assistance to the Company, its affiliates and their respective representatives in Defense of any claims that may be made against the Company.

(*Id*. at § 9.)

108. TopstepTrader performed all of its obligations under the Rudman Employment Agreement.

109. Rudman breached the terms of the Rudman Employment Agreement by, upon information and belief:

(a) knowingly failing to direct TopstepTrader to take actions necessary to comply with applicable state tax laws and regulations;

(b) knowingly failing to provide information to TopstepTrader related to compliance with state tax laws and regulations;

(c) knowingly risking regulatory non-compliance in his formation and structuring of Topstep's forex trading platform;

(d) encouraging Topstep employees to sue Topstep and TopstepTrader;

(e) authoring the 2020 Operating Agreement that would ultimately serve as the purported basis for Plaintiffs' (including his own) claims against Topstep and TopstepTrader;

(f) failing to disclose knowledge that employees were considering filing suit against Topstep; and

(g) failing to provide reasonable assistance to TopstepTrader, Topstep, and its affiliates with regards to claims brought against them.

110.    Rudman's breaches of the Rudman Employment Agreement caused injury to Defendants/Counter-Plaintiffs in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

111.    The Defendants/Counter-Plaintiffs are entitled to receive from Rudman damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with the precise amount to be determined at trial, plus costs, expenses, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees.

### FIFTH CLAIM FOR RELIEF

### Breach of the Fiduciary Duty of Care

### (Topstep and Topstep Holdings Against Jay Rudman)

112.    The Counter-Plaintiffs incorporate by reference each of the allegations contained in paragraphs 1 through 80 above.

113.    The Rudman Employment Agreement is a valid and enforceable contract between Rudman and TopstepTrader and Topstep, imposing onto Rudman the duties, responsibility and authority implied by the position of CEO of TopstepTrader and Topstep, including managerial authority over the conduct of its business, and general supervision over its daily business, operations, and affairs.

114.    In accordance with the Court's March 26, 2024 Memorandum Opinion and Order (Dkt. No. 51), Rudman's role as the CEO of TopstepTrader, and duties under the Rudman Employment Agreement, indicate that Rudman owed Topstep and Topstep Holdings the fiduciary duty of care.

115.    To the extent that Counter-Plaintiffs are found liable to Plaintiffs in this action, Rudman breached his duty of care by acting in a manner unfaithful to the purpose of the Rudman Employment Agreement by, *inter alia*, authoring the 2020 Operating Agreement that gave

Topstep's Manager the sole authority to determine, in the Manager's reasonable discretion, the fair market value of Topstep's equity, and then suing and encouraging others to sue Topstep and Patak for invocation of that authority.

116.    Indeed, the Manager's fair market valuation pursuant to the 2020 Operating Agreement served as the basis upon which Topstep valued Plaintiffs' Class B units for the purposes of redemption and is the basis upon which Plaintiffs' have filed the instant claims against the Company.

117.    Accordingly, to the extent that 2020 Operating Agreement is found to be a legal basis for any claim brought by Plaintiffs/Counter-Defendants, Rudman has acted arbitrarily, capriciously, without reasonable business judgement, and in a manner inconsistent with the parties' expectations, which has led to Plaintiffs' claims (including his own) against Defendants.

118.    Rudman breached fiduciary duty of care owed to Topstep and Topstep Holdings by, upon information and belief:

(a)    knowingly failing to direct TopstepTrader to take actions necessary to comply with applicable state tax laws and regulations;

(b)    knowingly failing to provide information to TopstepTrader related to compliance with state tax laws and regulations;

(c)    knowingly risking regulatory non-compliance in his formation and structuring of Topstep's forex trading platform;

(d)    encouraging Topstep employees to sue Topstep and TopstepTrader;

(e)    authoring the 2020 Operating Agreement that would ultimately serve as the purported basis for Plaintiffs' (including his own) claims against Topstep and TopstepTrader;

(f)    failing to disclose knowledge that employees were considering filing suit against Topstep; and

(g)    failing to provide reasonable assistance to TopstepTrader, Topstep, and its affiliates with regards to claims brought against them.

119.    Rudman's breaches of the fiduciary duty of care caused injury to Defendants/Counter-Plaintiffs in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

120.    The Defendants/Counter-Plaintiffs are entitled to receive from Rudman damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with the precise amount to be determined at trial, plus costs, expenses, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees.

**SIXTH CLAIM FOR RELIEF**
**<u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>**
**(Topstep Trader and Topstep Against Jay Rudman)**

121.    The Counter-Plaintiffs incorporate by reference each of the allegations contained in paragraphs 1 through 80 above.

122.    The Rudman Employment Agreement is a valid and enforceable contract between Rudman and TopstepTrader and Topstep, and as such, contains within it an implied covenant of good faith and fair dealing.

123.    Counter-Plaintiffs had justified expectations that, under the Employment Agreement and as its CEO, Rudman would provide all contractual benefits and exercise any discretion reasonably, with proper motive, and in line with the parties' expectations.

124.    Instead, regarding the Rudman Employment Agreement and his role as CEO, Rudman has acted arbitrarily, capriciously, and in a manner inconsistent with the parties' expectations, which has led to Plaintiffs' claims (including his own) against Defendants.

125.    Rudman breached his duty of good faith and fair dealing by acting in a manner unfaithful to the purpose of the Rudman Employment Agreement by authoring the 2020 Operating Agreement that gave Topstep's Manager the sole authority to determine, in the Manager's

92

reasonable discretion, the fair market value of Topstep's equity, and then suing and encouraging others to sue based upon Patak's exercise of that discretion.

126.    The Manager's fair market valuation pursuant to the 2020 Operating Agreement served as the basis upon which Topstep valued Plaintiffs' Class B units for the purposes of redemption and has led to Plaintiffs' valuation claims against the Company.

127.    Rudman breached his implied covenant of good faith and fair dealing by, upon information and belief:

(a)    knowingly failing to direct TopstepTrader to take actions necessary to comply with applicable state tax laws and regulations;

(b)    knowingly failing to provide information to TopstepTrader related to compliance with state tax laws and regulations;

(c)    knowingly risking regulatory non-compliance in his formation and structuring of Topstep's forex trading platform;

(d)    encouraging Topstep employees to sue Topstep and TopstepTrader;

(e)    authoring the 2020 Operating Agreement that would ultimately serve as the purported basis for Plaintiffs' (including his own) claims against Topstep and TopstepTrader;

(f)    failing to disclose knowledge that employees were considering filing suit against Topstep; and

(g)    failing to provide reasonable assistance to TopstepTrader, Topstep, and its affiliates with regards to claims brought against them.

128.    Rudman's breach of the implied covenant of good faith and fair dealing has caused injury to Defendants/Counter-Plaintiffs in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

129.    The Defendants/Counter-Plaintiffs are entitled to receive from Rudman damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with the precise amount to be determined

at trial, plus costs, expenses, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees.

**WHEREFORE**, Counter-Plaintiffs demand:

(a)    Judgment in their favor and against Melissa Footlick on the First Claim for Relief in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the precise amount to be determined at trial, plus costs, expenses, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees;

(b)    Judgment in their favor and against Erin Clark on the Second Claim for Relief in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the precise amount to be determined at trial, plus costs, expenses, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees;

(c)    Judgment in their favor and against Toby Adamson on the Third Claim for Relief, with the precise amount to be determined at trial, plus costs, expenses, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees;

(d)    Judgment in their favor and against Jay Rudman on the Fourth Claim for Relief in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the precise amount to be determined at trial, plus costs, expenses, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees;

(e)    Judgment in their favor and against Jay Rudman on the Fifth Claim for Relief in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the precise amount to be determined at trial, plus costs, expenses, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees

(f)     Judgment in their favor and against Jay Rudman on the Sixth Claim for Relief in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the precise amount to be determined at trial, plus costs, expenses, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees; and

(e)     Such other relief in law or in equity to which Counter-Plaintiffs may be entitled.

Respectfully submitted,

/s/  *Margo Wolf O'Donnell*
Margo Wolf O'Donnell (6225758)
Timothy Frey (6303335)
Denis Yavorskiy (6324880)
Danielle Maldonado (6333009)
**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
71 S. Wacker Drive, Suite 1600
Chicago, Illinois 60606 2211
Telephone: 312.212.4982
Facsimile: 312.767.9192

*Attorneys for Defendants/Counter-Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, does hereby certify that they caused a true and correct copy of the *Defendants' Answer To Plaintiffs' Second Amended Complaint*; *Separate And Affirmative Defenses*; *Crossclaim*; and *Counterclaims Against Melissa Footlick, Erin Clark, Toby Adamson, And Jay Rudman* to be served upon all parties by electronic mail and this Court's ECF system, this 11th day of June 2024.

*/s/ Margo Wolf O'Donnell*