# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MELISSA FOOTLICK, ERIN CLARK, TOBY ADAMSON, JAY RUDMAN, AND GRIFFIN CAPRIO, | |
| Plaintiffs, | |
| v. | |
| TOPSTEP LLC, TOPSTEP HOLDINGS LLC, TOPSTEPTRADER LLC, PATAK HOLDINGS, INC., and MICHAEL PATAK, in his individual capacity, | |
| Defendants. | |
| MICHAEL PATAK, in his individual capacity, and PATAK HOLDINGS, INC., | Case No. 22 CV 6152 |
| Crossclaim Plaintiffs, | Hon. Georgia N. Alexakis |
| v. | |
| JAY RUDMAN, | |
| Crossclaim Defendant. | |
| TOPSTEP LLC, TOPSTEP HOLDINGS LLC, and TOPSTEPTRADER LLC, | |
| Counterclaim Plaintiffs, | |
| v. | |
| MELISSA FOOTLICK, ERIN CLARK, TOBY ADAMSON, and JAY RUDMAN | |
| Counterclaim Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Melissa Footlick, Erin Clark, Toby Adamson, Jay Rudman, and Griffin Caprio are former Topstep LLC ("Topstep") employees and advisors who contend that Topstep undervalued their Class B incentive units after they left the company. In this suit, they bring claims for breach of contract and breach of fiduciary duty against Topstep, Topstep Holdings LLC ("Topstep Holdings"), Patak Holdings Inc. ("Patak Holdings"), TopstepTrader LLC ("TopstepTrader"), and Michael Patak (collectively, "defendants"). The female plaintiffs (Footlick, Clark, and Adamson) also bring claims against Topstep under Title VII of the Civil Rights Act of 1964, the Equal Pay Act, the Illinois Equal Pay Act, and the Illinois Human Rights Act. In response, defendants brought a crossclaim and a series of counterclaims alleging that plaintiffs breached their separation agreements with Topstep.

Plaintiffs have moved to dismiss the crossclaim and four of the six counterclaims. [80]. For the following reasons, the Court grants plaintiffs' motion in part and denies it in part.

### LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need only contain factual allegations that, accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

At the pleading stage, courts "accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). But "allegations in the form of legal conclusions are insufficient." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## BACKGROUND

The Court assumes familiarity with the facts of this case as described in a March 2024 ruling on defendants' motion to dismiss the first amended complaint that was issued by the district court previously assigned to this matter. *See* [51]. To summarize: Topstep is a Chicago-based financial technology firm that provides training and resources on day-trading futures and foreign exchange contracts. [60] ¶¶ 38–39. Footlick, Clark, Adamson, Rudman, and Caprio are former Topstep employees and advisors who at various points earned Class B incentive units from the company. *Id.* ¶ 20. After they departed, Topstep attempted to redeem their shares for sums plaintiffs contend were below fair market value. *Id.* ¶¶ 24, 31. The female employees (Footlick, Clark, and Adamson) also claim that their shares were undervalued and had less favorable payment terms relative to what certain male employees had received for their shares. *Id.* ¶¶ 26, 33–34.

Plaintiffs initially filed suit in November 2022 and amended their complaint in January 2023. [1]; [18]. Defendants moved to dismiss the first amended complaint, [31], and the prior district court granted that motion in part and denied it in part. [50]–[51]. With that court's leave [50], plaintiffs filed a second amended complaint in May 2024 bringing the following claims: violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count I), the Equal Pay Act, 29 U.S.C. § 206(d) *et seq.* (Count II), the Illinois Equal Pay Act, 820 ILCS 112 *et seq.* (Count III), and the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.* (Count IV); breach of contract (Counts V & VI); and breach of fiduciary duty (Count VII). [60].[1]

Defendants answered the second amended complaint in June 2024. [67]. They also asserted what they styled as a crossclaim for joint and several liability against Rudman, *id.* at 69 ¶¶ 19–24, and six counterclaims, including: breach of contract against Footlick, Clark, Adamson, and Rudman (Counts I through IV); breach of fiduciary duty against Rudman (Count V); and breach of the implied covenant of good faith and fair dealing against Rudman (Count VI), *id.* at 85 ¶¶ 81–129. Now before the Court is plaintiffs' motion to dismiss defendants' crossclaim and Counterclaims I, II, III, and VI. [80].

## DISCUSSION

### A. Joint and Several Liability Crossclaim Against Rudman

Patak and Patak Holdings bring what they improperly label a "crossclaim" against Rudman for joint and several liability. [67] at 69 ¶¶ 19–24. Crossclaims are

---

[1] Although plaintiffs repleaded Counts VIII through XI in their second amended complaint, [60], the court later struck those counts pursuant to its previous dismissal order [65].

filed "by one party against a *coparty*," *see* Fed. R. Civ. P. 13(g) (emphasis added), and Rudman is not defendants' "coparty." As Rudman puts it, "he is on the wrong side of the 'v.'" [81] at 1.

Nonetheless, the Court will not dismiss the crossclaim with prejudice as Rudman requests. Rudman has not pointed to any case in which a court has dismissed a defendant's crossclaim or counterclaim because they attached the wrong label to the claim. In *Ahmed*, which Rudman cites, the reason for dismissal was not that the party was "on the wrong side of the v." but that the purported "coparty" had been "dropped from the amended complaint" altogether. *See Ahmed v. Autotrader.com, Inc.*, No. 17 C 1398, 2019 WL 13489098, *1–2 (N.D. Ill. July 22, 2019). Instead of dismissing the claim outright, the far more common approach is to construe a mislabeled "crossclaim" as a counterclaim. *See* 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1431 (3d ed.) ("[T]he mislabeling of a properly asserted crossclaim or counterclaim will not prejudice the pleader and typically the court will treat the claim as if it were brought under the appropriate subdivision of Rule 13."); *see also Dale K. Barker Co., P.C. v. Valley Plaza*, 541 F. App'x 810, 813 (10th Cir. 2013) ("We may treat the Sumralls' pleading as though it were correctly designated.") (cleaned up); *Interlabservice, OOO v. Illumina, Inc.*, No. 15CV2171-KSC, 2017 WL 4217133, at *5 (S.D. Cal. Sept. 20, 2017) ("[T]he Court construes defendant's existing crossclaims and proposed amendments against plaintiff as counterclaims."); *cf.* Fed. R. Civ. P. 8(c)(2) ("If a party mistakenly

designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated.").

Even if the Court were to dismiss the claim against him for joint and several liability, Rudman offers no basis for his contention that the dismissal should be with prejudice. "Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015). Thus, even if the Court were to require strict adherence to proper labeling, it would nonetheless allow Patak and Patak Holdings to fix the defect. Rather than needlessly delay the litigation over a labeling error, the more efficient solution is to construe the "crossclaim" as a counterclaim going forward.

Rudman has offered no alternative reason why Patak and Patak Holdings' claim for joint and several liability should be dismissed. The Court therefore allows the claim to proceed as a counterclaim.

**B. Breach of Contract Against Footlick and Clark (Counterclaims I & II)**

In Counterclaims I and II, defendants contend that Footlick and Clark breached the separation agreements they signed with TopstepPeople, Inc. ("TopstepPeople") by bringing claims against defendants under Title VII, the Equal Pay Act, the Illinois Equal Pay Act, and the Illinois Human Rights Act. [67] at 86,

¶ 86; *id.* at 87, ¶ 94.[2] In moving to dismiss the counterclaims, Footlick and Clark argue that their separation agreements do not bar these claims because they arose after Footlick and Clark were terminated.

To resolve the parties' dispute, the Court must consider the language of the separation agreements. When construing a contract, a court "must initially determine, as a question of law, whether the language of a purported contract is ambiguous as to the parties' intent." *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 526 (7th Cir. 2022) (quoting *Quake Constr., Inc. v. Am. Airlines, Inc.*, 141 Ill.2d 281, 288 (1990)). "If the language of an alleged contract is ambiguous regarding the parties' intent, the interpretation of the language is a question of fact which a [ ] court cannot properly determine on a motion to dismiss." *Id.* (quoting *Quake*, 141 Ill.2d at 288). Here, no party has argued that the language of the separation agreements is ambiguous and therefore not amenable to interpretation by the Court when resolving a Rule 12(b)(6) motion. Instead, by advancing competing understandings of the relevant release provisions based on their plain language, the parties have effectively invited the Court to interpret the separation agreements. *See, e.g.*, [81] at 8 (Footlick and Clark argue that their separation agreements did not release any claim that arose after their departures based on the plain language of the agreements); [88] at 9 (defendants take the contrary position, also based on the plain

---

[2] Although the claims against TopstepPeople have been dismissed from this suit, defendants contend that Topstep and TopstepTrader were third-party beneficiaries of Footlick and Clark's contracts with TopstepPeople. [67] at 85, ¶ 83; *id.* at 86, ¶ 91. Footlick and Clark have not argued that TopstepPeople's dismissal from this suit precludes the remaining defendants from bringing Counterclaims I and II.

language of the agreements). Therefore, in resolving this motion, the Court will interpret the separation agreements' release provisions, both because no party has suggested that it cannot take this step and because, as explained next, the relevant language of the agreements is unambiguous—in plaintiffs' favor.

Footlick's and Clark's separation agreements contain nearly identical language. Section 7(a) of their agreements provides that the employee "releases and forever discharges" Topstep, Patak, and their affiliates "from any and all claims or causes of action that Employee had, has or may have, known or unknown, relating to Employee's employment with and/or termination from Company." [67-5] at § 7(a); [83] at § 7(a). Section 7(a) goes on to specifically release "any claims arising under" a number of federal and state statutes, including Title VII and the Illinois Human Rights Act, with the following caveat: "except as set forth in Section 7(c)" of the agreement.[3] [67-5] at § 7(a); [83] at § 7(a).

Section 7(b) of the agreements states that the employee "further covenants and agrees to not at any time sue [the] Company or [Michael Patak and the Company's respective [a]ffiliates and their respective past, present and future officers, directors, managers, members, stockholders, attorneys, agents, representatives, employees, successors and assigns] … regarding any matter within the scope of the release set forth in Section 7(a)." [67-5] at § 7(b); [83] at § 7(b).

---

[3] Technically, Clark's separation agreement states "except as set forth in Section 7(d)." [83] at 3. For purposes of the Court's analysis, however, Section 7(c) of Footlick's separation agreement and § 7(d) of Clark's separation agreement are materially indistinguishable. For ease, the Court will simply refer to § 7(c) instead of otherwise referring to § 7(c) of Footlick's separation agreement and § 7(d) of Clark's separation agreement.

Section 7(c) of the agreements provides that, "*[n]otwithstanding the foregoing,* Company and Employee agree that the release set forth in <u>Section 7(a)</u> shall not apply to any claims *arising after* the Departure Date." [67-5] at § 7(c); [83] at § 7(d) (emphasis added).

Footlick and Clark move to dismiss Counterclaims I and II on the grounds that their claims arose *after* their departure dates and therefore are exempt—under § 7(c) of the separation agreements—from releases that would otherwise govern pursuant to §§ 7(a) and (b). More specifically, they say their claims did not become ripe until they learned the valuation and payment terms for their incentive units in November 2021, which was after their departure dates. [81] at 7–8; [89] at 5–6. Defendants respond that, although the units were valued after Footlick and Clark departed the company, each of their allegations "is based upon the Topstep Parties' adherence to the redemption provisions set forth in the 2020 Operating Agreement, which was enacted well in advance of Footlick and Clark's Departure Dates." [88] at 9. The question therefore boils down to this: did Footlick and Clark's claims still "arise after" their departure dates if the procedure for valuing their incentive units was determined prior to their departure?

Based on the plain language of the separation agreements and uncontested facts, the answer is yes. The 2020 Operating Agreement provided that the fair market value of the Class B units would be "determined solely by the reasonable discretion of [Topstep's] Manager." [60] ¶ 62(a); *see also* [67] at 78, ¶¶ 40–41. And the exercise of that discretion—i.e., the final valuation of Footlick's and Clark's units—did not

9

occur until after Footlick and Clark departed the company and subsequently received communications from Topstep regarding the value of their Class B units in November 2021. *See* [60] ¶¶ 23–24, 90–91, 107–08; *see also* [67] at 10, ¶ 24 (defendants "admit that on November 21, 2021, the Manager of Topstep determined the fair market value of the Company to be $5,143,000"). That the discretion to value shares was granted to Topstep's manager in 2020 makes no difference. Similarly, that departing male employees received a more favorable valuation in 2018 is of no moment. Footlick and Clark's claims of discrimination arise from the valuation of *their* incentive units, which plainly occurred after they left the company. *Cf. Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001) (in the Title VII context, the statute of limitations only begins to run "when the defendant has taken the action that injures the plaintiff and when the plaintiff knows she has been injured").

Defendants have provided no authority to support their position that plaintiffs' claims cannot be based on post-departure events because those events "directly flowed from" earlier conduct. [88] at 9. Nor is their text-based interpretation of the separation agreement convincing. Defendants argue that "arising out of" means "originating from," "growing out of," or "flowing from." *Id.* Yet, as Footlick and Clark correctly observe, the phrase "arising out of" is not even the pertinent phrase to consider. [89] at 5 & n.3. The critical language in § 7(c) is "arising after."

At bottom, the Court finds that the separation agreements unambiguously allow Footlick and Clark's claims. *See Quake*, 141 Ill.2d at 288 ("If no ambiguity exists in the writing, the parties' intent must be derived by the [ ] court, as a matter of law,

solely from the writing itself.").[4] The Court therefore grants Footlick and Clark's motion to dismiss Counterclaims I and II with prejudice. *See Esco v. City of Chicago*, 107 F.4th 673, 683 (7th Cir. 2024) ("District courts have broad discretion to deny leave to amend the pleadings where the amendment would be futile.").

### C. Breach of Contract Against Adamson (Counterclaim III)

In Counterclaim III, Topstep Holdings brings a claim for breach of contract against Adamson. Specifically, it contends that Adamson breached the terms of her restrictive covenant by attempting to persuade Topstep employees to leave the company after she departed. [67] ¶ 101.

Adamson's separation agreement contained the following provision, effective for 12 months after she left Topstep:

> Employee shall not directly or indirectly, either for Employee's own account or as a member, manager, shareholder, partner, officer director, employee, consultant, representative or agent for any other Person:
>
> …
>
> b) induce or influence, or seek to induce or influence, any Person who is engaged as an employee, consultant or independent contractor providing services for the Company to (i) terminate his, her or its employment, engagement, or representation or association with the Company, as applicable, or (ii) reduce, restrict or otherwise alter his, her or its business relationship with the Company, as applicable.

[67-6] § 5(b). Adamson moves to dismiss Counterclaim III on the grounds that the restrictive covenant is overly broad and therefore unenforceable. [81] at 9.

---

[4] Because the Court finds that the agreements unambiguously allow Footlick and Clark's claims based on the valuation of their Class B incentive units, it need not address their additional arguments that (1) their claims "do not relat[e] to [their] employment with and/or termination from Company" under § 7(a), [89] at 4–5, and (2) Footlick's agreement contained an additional carveout releasing her claims.

Illinois courts deem a restrictive covenant enforceable only if it: "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor; and (3) is not injurious to the public." *Experiential Sys., Inc. v. Reddish*, No. 22-CV-4789, 2023 WL 6311694, at *10 (N.D. Ill. Sept. 28, 2023) (quoting *Reliable Fire Equip. Co. v. Arredondo*, 358 Ill.Dec. 322, 325 (2011)). Whether a restriction is no greater than required to protect an employer's legitimate business interest "necessarily turns on the facts and circumstances of each case.'" *Hay Grp., Inc. v. Bassick*, No. 02 C 8194, 2005 WL 2420415, at *3 (N.D. Ill. Sept. 29, 2005) (quoting *Lawrence and Allen, Inc. v. Cambridge Hum. Res. Grp., Inc.*, 292 Ill.App.3d 131, 138 (Ill. App. Ct. 1997)).

"In certain circumstances, maintaining stability within an employer's workforce can be a legitimate business interest and thus the basis for a restrictive covenant" containing a non-solicitation clause. *Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1013 (N.D. Ill. 2014), *aff'd*, 793 F.3d 748 (7th Cir. 2015) (citing *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 781–86 (N.D. Ill. 2011)); *Integrated Genomics, Inc. v. Kyrpides*, No. 06 C 6706, 2010 WL 375672, at *10 (N.D. Ill. Jan. 26, 2010); *Arpac Corp. v. Murray*, 589 N.E.2d 640, 650 (Ill. App. Ct. 1992). But the "business interest underlying this covenant must also be real—not merely aspirational." *Instant Tech.*, 40 F. Supp. at 1014. In other words, it "requires a work force that is stable in the first instance or at least one whose stability will likely result from the restrictive covenant." *Pampered Chef*, 804 F. Supp. 2d at 787.

To determine whether restrictive covenants like Adamson's are reasonable, courts analyze the "facts and circumstances of [the] individual case." *Instant Tech.*, 40 F. Supp. 3d at 1013. In *Pampered Chef*, for example, the Court found plaintiff was not likely to succeed on the merits for purposes of a preliminary injunction motion because the evidence showed that its workforce was "chronically unstable, and that this instability [was] common" throughout plaintiff's industry. *Pampered Chef*, 804 F. Supp. 2d at 789. Likewise, in *Instant Technology*, the court concluded after a bench trial that an employer's non-recruitment covenant was not necessary to maintain a stable workforce because the employer's business relied "on a high volume of direct sales, which is a business model traditionally characterized by 'massive' turnover." 40 F. Supp. 3d at 1014 (quoting *Pampered Chef*, 804 F. Supp. 2d at 787–88). In *Malone*, to the contrary, the Court found a restrictive covenant was likely enforceable on a motion for an emergency temporary restraining order because the entity seeking its enforcement was "a small company where many of its employees perform key functions." *Malone v. Cort Furniture Corp.*, No. 02 C 1729, 2002 WL 1874819, at *1 (N.D. Ill. Aug. 13, 2002).

Returning to this case, Topstep Holdings maintains that the restrictive covenant is reasonable and necessary to protect its interest in a stable workforce. [88] at 11 (citing *Integrated Genomics*, 2010 WL 375672, at *10). But beyond generally insisting that it has an interest in a stable workforce, Topstep Holdings does not explain whether it already maintains a stable workforce or why a stable workforce is particularly important to its particular operations. Such details are critical where the

Court must determine whether the restrictions imposed were "no greater than necessary to protect the interests at stake." *Instant Technology*, 40 F. Supp. 3d at 1013. Thus, due to the fact-specific nature of the analysis (and the lack of any facts available to the Court at this juncture), the Court withholds ruling on the enforceability of the restrictive covenant at this stage. *See Experiential Sys., Inc.*, 2023 WL 6311694, at *10 ("Due to the fact-specific nature of the analysis and the limited information often available, federal district courts have declined to rule on whether a non-competition clause is reasonable at the Rule 12(b)(6) stage.").

For her part, Adamson does not point to any case finding a similar restrictive covenant unenforceable on a Rule 12(b)(6) motion. Instead, each of the three cases Adamson cites was resolved at the summary judgment stage. *See Hay*, 2005 WL 2420415, at *4; *Pactiv Corp. v. Menasha Corp.*, 261 F. Supp. 2d 1009, 1014 (N.D. Ill. 2003); *YCA, LLC v. Berry*, No. 03 C 3116, 2004 WL 1093385, at *19 (N.D. Ill. May 7, 2004). This means that those courts only opined on the enforceability of the restrictive covenants *after* the parties had the opportunity to present evidence that the restriction was or was not reasonable based on the employer's particular circumstances. In *Pactiv*, for example, Menasha Corporation ("Menasha") gained access to Pactiv's confidential information when it considered purchasing a Pactiv subsidiary. 261 F. Supp. 2d at 1011. During the engagement, the two companies signed an agreement prohibiting Menasha from hiring any management-level employee from Pactiv for three years with no geographical limitation. *Id.* Based on the facts in the record, the Court determined that the restrictive covenant was not

14

"narrowly-tailored and necessary" to protect Pactiv's specific interest in protecting the confidential information that Menasha had accessed through its research into the company. *Id.* at 1015; *see also Zep, Inc. v. First Aid Corp.*, No. 09 CV 1973, 2010 WL 1195094, at *12 (N.D. Ill. Mar. 19, 2010) ("[F]urther analysis into the reasonableness of Zep's restrictive covenants would require fact-based determinations inappropriate at the motion to dismiss stage.").

Moreover, none of the three cases Adamson cites considered and rejected the specific argument Topstep Holdings advances here: that the restrictive covenant was necessary to protect the stability of its workforce. *See Pampered Chef*, 804 F. Supp. 2d at 784 (noting that the same three cases "do not constitute a blanket rejection of the principle that maintenance of a stable work force can never be a legitimate and protectible business interest"). Both *Pactiv* and *YCA* focused on whether the restrictive covenants were tailored to protect the employer's interest in protecting confidential information—an argument Topstep Holdings does not advance. *See Pactiv*, 261 F. Supp. 2d at 1015; *YCA*, 2004 WL 1093385, at *18. And in *Hay*, the Court did not even discuss whether the employer had "an interest subject to protection." *Hay*, 2005 WL 2420415, at *5. Instead, it concluded that the restrictive covenants were "patently unreasonable," relying in large part on a provision prohibiting the employee from "engag[ing] in *any* business which is competitive with, *in whole or in part*, the business of the Employer." *Id.* at *3 (emphasis added). Adamson's restrictive covenant contains no similarly sweeping provision that the Court is prepared to deem "patently unreasonable" at this stage in the litigation,

especially where at least one court in this District has found a similar restriction enforceable. *See also Integrated Genomics*, 2010 WL 375672, at *10 (similar non-solicitation provision was reasonable to protect employer's interest in maintaining a stable workforce).

As a final note, Adamson argues in her reply that the non-solicitation clause fails the second and third prongs of the three-prong test because it "unreasonably encroaches on [her] ability to earn a living and support her family." [89] at 10 (cleaned up). Such an argument is inherently factual. As with the question of Topstep Holding's legitimate business interest, the Court saves consideration of the second and third prongs for a later date. Because the Court defers deciding the enforceability of the restrictive covenant at this stage, it does not reach Topstep Holding's alternative argument that the Court should rely on the agreement's "Blue Pencil" provision to reconstruct the restrictive covenant so that it is enforceable. [88] at 13.

Adamson's motion to dismiss Counterclaim III is denied.

### D. Implied Covenant of Good Faith and Fair Dealing (Counterclaim VI)

Topstep and TopstepTrader bring a counterclaim against Rudman for breach of the implied covenant of good faith and fair dealing. The parties agree that Illinois law governs the claim.

Rudman moves to dismiss the counterclaim on the grounds that Illinois law does not recognize breach of the implied covenant of good faith and fair dealing as an independent cause of action. [81] at 12. Although "Illinois does not recognize such an independent cause of action *in tort*," the "obligation to deal in good faith is implied by

16

Illinois law into every contract and breach of that duty is simply a breach of the underlying contract." *Juza v. Wells Fargo Bank, N.A.*, 794 F. App'x 529, 536 (7th Cir. 2020) (quoting *In re Wireless Telephone 911 Calls Litig.*, No. MDL-1521, 2005 WL 1564978, at *13 (N.D. Ill. June 3, 2005)). "This claim exists where a contract specifically vests one party with broad discretion in performing a term of the contract and that party fails to exercise discretion 'reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *Id.* (quoting *Slay v. Allstate Corp.*, 426 Ill.Dec. 19, 29 (Ill. App. Ct. 2018)). However, "[w]here a separately stated breach of contract claim renders the breach of covenant claim superfluous, dismissal of the breach of covenant claim is appropriate." *Id.*

Here, Topstep and TopstepTrader have already asserted breach of contract claims against Rudman in Counterclaims IV and V. *See* [67] ¶¶ 104–20. And the allegations supporting Counterclaims IV and V are essentially identical to those supporting Counterclaim VI. *Compare id.* ¶¶ 109, 118, *with id.* ¶¶ 127; *see also* [88] at 1 (stating that Counterclaims IV and V are "premised on the same exact conduct" as Counterclaim VI). The Court therefore concludes that Counterclaim VI is superfluous. *See In re Wireless*, 2005 WL 1564978, at *13 (because plaintiffs had "already asserted a separate breach of contract claim … [t]heir claim for breach of the implied covenant of good faith and fair dealing [ ] [was] superfluous") (cleaned up); *Miller v. Ford Motor Co.*, 152 F. Supp. 2d 1046, 1049 (N.D. Ill. 2001) (dismissing breach of covenant of good faith and fair dealing claim because it "would be subsumed

by [plaintiff's] claim for wrongful termination without cause, which is essentially a claim for breach of the employment contract").

Counterclaim VI for breach of the implied covenant of good faith and fair dealing is dismissed with prejudice. *See Esco*, 107 F.4th at 683.

## CONCLUSION

For the reasons discussed, plaintiffs' motion to dismiss defendants' crossclaim and counterclaims [80] is granted in part and denied in part. The Court dismisses Counterclaims I, II, and VI with prejudice. The Court denies the motion to dismiss as to Counterclaim III. As to the crossclaim, the Court denies the motion to dismiss and will construe the claim as a counterclaim going forward.

Plaintiffs are directed to answer the remaining counterclaims (III, IV, and V) by 3/28/25.

_____
Georgia N. Alexakis
United States District Judge

Date: 3/7/25